## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CYPRESS ENVIRONMENTAL PARTNERS, L.P., *et al.*[1] | ) | Case No. 22-90039 (MI) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

## DEBTORS' <u>EMERGENCY</u> MOTION
## FOR ENTRY OF AN ORDER (I) AUTHORIZING
## THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER
## COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE
## EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF

> **Emergency relief has been requested. Relief is requested not later than 1:30 p.m. on May 9, 2022.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on May 9, 2022 at 1:30 p.m. in Courtroom 404, 4th floor, Bob Casey United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Cypress Environmental Partners, L.P. (1523); Cypress Municipal Water Services, LLC (5974); Cypress Environmental Partners, LLC (7385); Cypress Brown Integrity, LLC (3455); Cypress Energy Partners - 1804 SWD, LLC (9110); Cypress Energy Partners - Bakken, LLC (9092); Cypress Energy Partners - Grassy Butte SWD, LLC (9047); Cypress Energy Partners - Green River SWD, LLC (1534); Cypress Energy Partners - Manning SWD, LLC (4247); Cypress Energy Partners - Mork SWD, LLC (0761); Cypress Energy Partners - Mountrail SWD, LLC (4977); Cypress Energy Partners - Tioga SWD, LLC (3230); Cypress Energy Partners - Williams SWD, LLC (3840); Cypress Environmental - PUC, LLC (8637); Cypress Environmental Management - TIR, LLC (5803); Cypress Environmental Management, LLC (4753); Cypress Environmental Services, LLC (7770); Tulsa Inspection Resources - PUC, LLC (2514); and Tulsa Inspection Resources, LLC (4632). The Debtors' service address for the purposes of these chapter 11 cases is 5727 South Lewis Avenue, Suite 300, Tulsa, Oklahoma 74105.

> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at 832-917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Isgur's conference room number is 954554.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Isgur's home page.  The meeting code is "JudgeIsgur".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page.  Select the case and complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

## RELIEF REQUESTED

1.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (i) authorizing the Debtors to (a) pay prepetition wages, salaries, compensation, reimbursable expenses, and certain incentives to Employees (as defined below) (the "Compensation") and (b) continue providing Employees with benefits (the "Benefits") pursuant to the Employee Benefits Programs (as defined below) in the ordinary course of business, including payment of certain prepetition obligations related thereto and (ii) granting related relief.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 362, 363, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 4002-1 and 9013-1 of the Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## **BACKGROUND**

5.      On May 5, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

6.      The Debtors provide inspection, water treatment, and other environmental services that help their customers protect people, property, infrastructure, and the environment with a focus on safety and sustainability. The Debtors' primary business, inspection services, provides essential environmental services, including inspection and integrity services on a variety of infrastructure assets such as midstream pipelines, oil and gas well gathering systems, natural gas plants, storage facilities, pumping stations, compression stations, and natural gas distribution systems. The Debtors' primary business includes visual inspection, non-destructive testing and examination, and in-line inspection support services for pipeline and energy infrastructure owners and operators and natural gas public utilities that serve our communities. Under the environmental services segment, the Debtors own and operate water treatment facilities in North Dakota where they specialize in the treatment, recovery, separation, and disposal of waste byproducts generated by their customers during the lifecycle of an oil or natural gas well. The Debtors provide quality services in a safe,

professional, ethical, and cost-effective manner adding value to their clients throughout the life of their assets.

7.     Additional factual background and information regarding the Debtors, including their business operations, their corporate and capital structure, the events leading to the commencement of these Chapter 11 Cases, and the emergency need for the relief requested in this Motion, is set forth in detail in the *Declaration of Peter C. Boylan III, Chairman & Chief Executive Officer of the Debtors, in Support of the Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"),[2] filed contemporaneously herewith and incorporated herein by reference.

## THE DEBTORS' WORKFORCE

8.     As of the Petition Date, the Debtors employ approximately 421 employees (collectively, the "Employees"), including approximately 418 full-time Employees and 3 part-time Employees.  The Employees are employed by either Debtor Cypress Environmental Management, LLC or Debtor Cypress Environmental Management – TIR, LLC.

9.     For purposes of payroll and benefits, the Employees are generally grouped into two categories:  inspectors and non-inspectors.  The inspectors (the "Inspectors") provide inspection and integrity services on a variety of infrastructure assets such as midstream pipelines, oil and gas well gathering systems, natural gas plants, storage facilities, pumping stations, compression stations, and natural gas distribution systems.   Approximately 86 Inspectors (the "Union Inspectors") are members of the AFL-CIO, International Brotherhood of Electrical Workers (the "Union").   The terms of the Union Inspectors' employment is governed by a collective

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the First Day Declaration.

bargaining agreement between the Debtors and the Union (the "CBA").  The number of Inspectors the Debtors' employ can vary at any given time based on customer needs.

10.     The remaining non-inspector Employees (the "Non-Inspectors") are comprised of the Employees that provide corporate services and those that provide the environmental services in connection with the Debtors' water treatment facilities in North Dakota.  The corporate Employees provide various services, including management, business development, human resources, compliance, information technology, billing, collections, safety, legal, payroll, tax, treasury, and accounting.  The Employees' providing the environmental services manage the Debtors' water treatment facilities that specialize in the treatment, recovery, separation, and disposal of waste by-products generated by customers during the lifecycle of an oil and natural gas well to protect the environment and our drinking water.

11.     The Employees perform a wide variety of services that are critical to the Debtors' businesses and restructuring efforts.  Their skills, knowledge, and understanding of the Debtors' infrastructure and operations are essential to the continued operation and viability of the Debtors' businesses and preserving operational stability and efficiency.  Many of the Employees are highly trained personnel who are not easily replaced.  Without their continued, uninterrupted services, the Debtors will not be able to maintain their operations during these Chapter 11 Cases.

12.     The Debtors believe that the vast majority of the Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, Employees will be exposed to significant financial hardship if the Debtors are not permitted to continue payment of their compensation, provide benefits, and maintain existing programs.  The Debtors seek to minimize any personal hardship the Employees would suffer if the employee obligations described herein were not satisfied by the Debtors when due or expected.  The Debtors

intend to continue their prepetition employee practices, programs, and policies in the ordinary course of business on a postpetition basis and, subject to the Court's approval of the relief sought herein, to pay prepetition amounts related thereto.

## EMPLOYEE COMPENSATION AND BENEFITS

13.    The Debtors believe that, as of the Petition Date, the aggregate amount of accrued prepetition Compensation and Benefits is approximately $2.7 million.  The prepetition amounts owing in relation to the Compensation and Benefits that the Debtors are seeking authority to pay pursuant to this Motion are summarized in the following table:

| Employee Compensation and Benefits | Estimated Prepetition Amount Outstanding |
|---|---|
| **Employee Compensation** | |
| Unpaid Compensation | $2,289,200 |
| Employer Payroll Taxes | $147,100 |
| Reimbursement Obligations | $172,800 |
| PPE Allowance | $0 |
| Administration Fees | $0 |
| **Employee Benefits Programs** | |
| Medical Benefit Programs | $17,400 |
| Insurance Benefit Programs | $0 |
| 401(k) Plan | $18,100 |
| Leave Policy | N/A |
| **Workers' Compensation Obligations** | N/A |
| **Employee Incentive Programs** | $43,600 |
| **Board Fees** | $0 |
| **TOTAL:** | **$2,688,200** |

I.    **Employee Compensation.**

A.    **Unpaid Compensation and Withholding Obligations.**

14.    In the ordinary course, the Debtors incur obligations to their Employees for, among other things, wages, salaries, overtime, sales commissions, and other obligations described herein (collectively, the "Employee Compensation").  Historically, the Debtors pay obligations relating

to Employee Compensation on different timetables depending upon the Employees' role. Corporate Employees are paid current, semi-monthly on the 15th (or the last business day prior to the 15th) and last business day of the month. All remaining Employees are paid weekly, in arrears every Friday. The Debtors' last scheduled payroll before the Petition Date was disbursed to Employees on Friday, May 6, 2022.

15.      In addition to traditional hourly wages, the Inspectors may be entitled to additional forms of Employee Compensation depending on the terms of their employment, including per diem, a technology and equipment allowance, in lieu of benefits pay, and missed meal pay. Eligible Inspectors are entitled to a per diem or subsistence pay ("Per Diem"). Generally, a Per Diem is an allowance for lodging, meals, and incidental expenses incurred by the Inspectors on account of working away from their home. Unlike the Reimbursable Expenses (as defined below), the Inspectors earn a set Per Diem each day that is added to their paycheck, and the Inspectors are not required to submit receipts in support of the amount. The Debtors generally pay Per Diem amounts based on the high-low rates set by the IRS, subject to customer-specific variations. Similar to the Per Diem, eligible Inspectors are provided a daily allowance to cover the cost of their cell phone, work-specific equipment, or other work-related incidentals (the "Technology and Equipment Allowance"). The Technology and Equipment Allowance is generally $15 per working day. Like the Per Diem, the eligible Inspectors are paid the Technology and Equipment Allowance without the need to submit receipts to the Debtors.

16.      Additionally, under the terms of the CBA, all Union Inspectors are entitled to "in lieu of benefits" pay ("ILB Pay"). The ILB Pay is an additional hourly amount added to the Union Inspectors' hourly rate (up to 40 hours a week). Although the Union Inspectors are entitled to ILB Pay, they remain eligible to participate in the Debtors' benefit programs. Finally, under California

state law, employees who are not provided a meal break on any given work day are entitled to an additional hour of pay for that day.  In compliance with the California state law, when the Inspectors working in California are not provided a meal break, the Debtors make the additional payment to the applicable Inspectors.

17.     The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued, but unpaid prepetition Employee Compensation totals approximately $2,289,200 (the "Unpaid Compensation").  The Debtors seek authority to continue paying Employee Compensation in the ordinary course and to pay the Unpaid Compensation in full, up to the $15,150 priority cap under section 507(a)(4) of the Bankruptcy Code.  The Debtors do not believe that they owe any Employee an amount in excess of the priority wage cap.  As described above, loss of the Unpaid Compensation that the Employees are owed could cause such Employees to experience financial hardship.  In light of the substantial benefit the Employees will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such a hardship.

### 1.     Withholding Obligations.

18.     During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, Union dues, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed below, such as an Employee's share of health care benefits and insurance premiums, 401(k) contributions, legally ordered deductions, and miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various third-party recipients.  In addition to the Deductions, the Debtors are required by law to withhold from Employees' salaries, wages, and other compensation amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Withholding Taxes") and remit them to

the appropriate taxing authorities (collectively, the "Taxing Authorities," and together with the Deductions, the "Withholding Obligations"). As of the Petition Date, the Debtors do not believe there are any amounts owed on account of the Withholding Obligations other than those that are included in the Unpaid Compensation set forth above. The Debtors seek authority to continue collecting and remitting the Withholding Obligations incurred in the ordinary course and to remit any prepetition amounts withheld, or otherwise required to be paid.

**B.**     **Employer Payroll Taxes.**

19.     The Debtors are also required by law to make payments from their own funds on account of Social Security and Medicare taxes and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (the "Employer Payroll Taxes"). As of the Petition Date, the Debtors estimate that the amount outstanding on account of the Employer Payroll Taxes is approximately $147,100. The Debtors seek authority to continue paying Employer Payroll Taxes incurred in the ordinary course and to remit any prepetition amounts related thereto.

**C.**     **Reimbursement Obligations.**

20.     In the ordinary course of business, the Debtors reimburse their Employees for certain eligible expenditures ("Reimbursable Expenses") incurred by the Employees while performing their duties on the Debtors' behalf. Reimbursable Expenses typically include expenses associated with travel, transportation, lodging, meals, personal vehicle use, personal protective equipment ("PPE"), equipment, office equipment and supplies, and other reasonable business-related expenses. The Debtors' business requires a significant amount of travel by numerous Employees, including nearly all Inspectors. As such, the uninterrupted processing of

Reimbursable Expenses is imperative to the smooth operation of the Debtors.  Any interruption would be value destructive and may result in Employee attrition.

21.     The Debtors reimburse Employees for Reimbursable Expenses in a variety of ways: through the use of corporate credit and purchasing cards, through direct reimbursement of out-of-pocket expenses, or through an allowance, each discussed in more detail below.  As of the Petition Date, the Debtors estimate an aggregate of approximately $172,800 in accrued but unpaid prepetition Reimbursement Expenses.   The Debtors seek authority to pay such prepetition Reimbursement Expenses and continue the Reimbursement Programs in the ordinary course, including payment of all Reimbursement Expenses incurred in the ordinary course of business.

### 2.     Corporate Credit Cards.

22.     The Debtors have corporate credit and purchasing cards (collectively, the "Corporate Cards") issued by Comerica Bank ("Comerica").  The Debtors have approximately 30 Corporate Cards, of which approximately 25 are held by Employees (the "Employee Cards") and 5 are ghost cards (the "Ghost Cards").  The Debtors have historically paid approximately $35,000 in the aggregate per month on account of the Corporate Cards.  The credit limit for each of the Employee Cards varies but is between $2,000 and $10,000 each, and Employee Cards are generally used to cover Reimbursable Expenses incurred in the ordinary course of business.  The Ghost Cards are credit cards issued by Comerica to the Debtors without a physical card.  The Ghost Cards are controlled by the Debtors' accounting department, and the credit limits for the Ghost Cards range between $50,000 and $150,000.  The Ghost Cards were historically used for general corporate expenses and Employee-related expenses, including significant Employee travel expenses. Prior to the Petition Date, the Debtors ceased using the Ghost Cards for general corporate expenses, using them only for Employee-related expenses.  As of the Petition Date, the Debtors

estimate that the total accrued but unpaid amount owed on account of the Corporate Cards is approximately $45,000.

### 3.    Out-of-Pocket Expenses.

23.    The Debtors reimburse certain out-of-pocket business expenses incurred by the Employees (collectively, the "Out-of-Pocket Expenses").  While Employees are encouraged to use the Corporate Cards for business-related expenses, Employees who use their personal credit cards or cash for Reimbursable Expenses incurred in the ordinary course of business are entitled to reimbursement after certain approvals are received in accordance with internal policies and procedures.  As of the Petition Date, the Debtors estimate that the total accrued but unpaid Out-of-Pocket Expenses are approximately $5,200.

24.    Although the Debtors ask that Employees submit reimbursement requests promptly, sometimes submission delays occur and Employees may submit reimbursement requests for prepetition Out-of-Pocket Expenses.  Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that the Debtors would fully reimburse such expenses.  Accordingly, to avoid harming Employees who incurred the Reimbursable Expenses and who may become personally liable for such expenses, the Debtors request authority to pay the Out-of-Pocket Expenses and to continue paying the Out-of-Pocket Expenses in the ordinary course of business.

### 4.    Employee Vehicle Programs.

25.    The Debtors have vehicle programs through which they reimburse employees for the use of their personal vehicles (the "Vehicle Reimbursement Program") or provide a vehicle allowance (the "Vehicle Allowance Program," and together with the Vehicle Reimbursement Program, the "Employee Vehicle Programs").  As of the Petition Date, the Debtors estimate that

the total accrued but unpaid obligations on account of the Employee Vehicle Programs are approximately $122,600.

26.     The Vehicle Reimbursement Program has two components.  First, the Debtors reimburse certain Employees, largely comprised of Inspectors, based on miles driven to and from work sites.  Employees submit their mileage on their timesheets and are reimbursed on the following pay cycle.  Mileage reimbursements generally follow the rate set by the IRS, subject to customer-specific variations.  Second, the Debtors reimburse a limited number of Inspectors for the use of their personal all-terrain vehicles needed to access remote worksites.  Instead of arranging rentals through third-party vendors, the Debtors' reimburse this limited number of Inspectors for the use of their personal vehicles based on a flat day rate.  The Inspectors indicate their personal vehicle use on their time sheet and are reimbursed on the following pay cycle.

27.     Under the Vehicle Allowance Program, the Debtors provide a vehicle allowance for three corporate Employees.  These Employees are given an allowance between approximately $500 and $1,000 monthly, which is disbursed with their regular payroll and subject to applicable taxes.

### D.     PPE Allowance.

28.     The nature of the Debtors' business requires the Employees to use specialized PPE. In the ordinary course of business, the Debtors provide eligible Inspectors with an annual allowance to purchase PPE (the "PPE Allowance") through Fastenal Company ("Fastenal").  The PPE Allowance varies by Inspector but currently does not exceed $3,100 for any eligible Inspector. The eligible Inspectors purchase PPE through Fastenal, and Fastenal bills the Debtors for the purchases on a monthly basis.  As of the Petition Date, the Debtors do not believe there are any amounts outstanding on account of the PPE Allowance.

### E.    Administration Fees.

29.    The Debtors use certain third-party processors to assist in the smooth administration of the payroll and Employee work-related travel.  The Debtors' payroll is processed and administered by ADP Workforce ("ADP").  The Debtors pay approximately $4,000 per month for such services.  As of the Petition Date, the Debtors do not believe there are any amounts owed to ADP on account of prepetition payroll services.  Similarly, in order to arrange the significant amount of travel required for the smooth operation of the Debtors' business, the Debtors use a third-party travel agent, Egencia LLC ("Egencia").  The Employees book their travel through Egencia and submit the expense as a Reimbursable Expense.  Egencia provides the Debtors with discounted travel and favorable cancellation terms, saving the Debtors a significant amount of money.  Egencia is compensated at the time of booking, and the Debtors generally do not pay a set administrative fee to Egencia.  As of the Petition Date, the Debtors do not believe there are any amounts owed to Egencia other than those that may be included in the Reimbursable Expenses set forth above.

## II.    Employee Benefits Programs.

30.    In addition to the aforementioned payment-related obligations, the Debtors maintain various employee benefit plans and policies for eligible Employees.  The benefit programs fall within the following categories: (a) Medical Benefits Program, (b) Insurance Benefits Program, (c) 401(k) Saving Plan, and (d) Leave Program (each as defined below, and collectively, the "Employee Benefit Programs").  The Debtors estimate that, as of the Petition Date, the aggregate accrued, but unpaid prepetition amounts related to Employee Benefit Programs totals approximately $35,500, which will not exceed the cap set forth in section 507(a)(5) of the Bankruptcy Code on a per Employee basis.  The Employee Benefit Programs are explained in more detail below.

A.      **Medical Benefits Program.**

31.     The Debtors offer their Employees and their dependents the opportunity to participate in a number of health benefits plans, including medical, dental, and vision plans (collectively, the "Medical Benefits Program").  As of the Petition Date, the Debtors estimate that they owe approximately $17,400 on account of the Medical Benefits Program.  The Debtors seek authority to continue paying their obligations under the Medical Benefits Programs in the ordinary course and to pay, in full, any prepetition amounts on account thereof.  Each Medical Benefits Program is set forth in more detail below.

1.      **Medical Plan.**

32.     The Debtors offer medical coverage (the "Medical Plans") to eligible Employees and their dependents through BlueCross BlueShield ("BCBS").  Under the Medical Plans, participants receive coverage for, among other things, preventive care, doctor visits, hospital care, prescription drugs, and wellness.  The Debtors partially or fully subsidize the Medical Plans depending on the plan selected and whether the participant has dependents covered by the plan. The Debtors pay approximately $91,000 a month on account of the Medical Plans.  To the extent the Employee's participation is not fully covered, the participating Employee's contributions are deducted from their paychecks.  Amounts due under the Medical Plans are paid monthly, in advance.  As of the Petition Date, the Debtors do not believe there are any amounts outstanding on account of the Medical Plan.

2.      **Dental Plan.**

33.     The Debtors offer eligible Employees dental coverage (the "Dental Plan") through BCBS.  The Dental Plan is fully funded by the premiums paid by eligible Employees that participate in the program.  The Debtors do not contribute to the Dental Plan, but withhold the applicable premiums from participating Employees' salary and wages each pay period.  Amounts

14

due under the Dental Plan are paid monthly, in advance.  As of the Petition Date, the Debtors do not believe there are any amounts outstanding on account of the Dental Plan.

### 3. Vision Plan.

34.    The Debtors offer eligible Employees vision coverage (the "Vision Plan") through BCBS.   The Vision Plan is fully funded by the premiums paid by eligible employees that participate in the program.   The Debtors do not contribute to the Vision Plan, but withhold the applicable premiums from participating Employees' salary and wages each pay period.   Amounts due under the Vision Plan are paid monthly, in advance.  As of the Petition Date, the Debtors do not believe there are any amounts outstanding on account of the Vision Plan.

### 4. Health Savings Account.

35.    For Employees who participate in the high deductible Medical Plan, the Debtors offer access to health savings accounts ("HSAs") through Optum Bank.  Participating Employees can opt to make pre-tax contributions to their individual HSA through payroll deductions to cover reimbursements under the program up to the maximum amount permitted by the Internal Revenue Service.   The Debtors transfer approximately $45,000 per month in withheld Employee contributions in connection with the HSAs.  For Non-Inspector Employees participating in the HSA program, the Debtors contribute $165 per month per eligible Employee (the "Employer HSA Contributions").  As of the Petition Date, there are approximately $16,700 in accrued but unpaid amounts owed on account of the Employer HSA Contributions.

### 5. COBRA.

36.    Under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), Employees and their families who are terminated have the right to continue their health benefits from their employer for a limited period of time and under certain circumstances.  COBRA benefits

are provided to exiting Employees as required by law.  The cost of COBRA is borne by the exiting Employees except for an administration charge based on the number of participating Employees, which is paid in arrears by the Debtors (the "<u>Cobra Administration Fee</u>").  Historically, the Cobra Administration Fee has averaged approximately $200 per month (in the aggregate for all participating COBRA covered individuals).  As of the Petition Date, the Debtors estimate that their total accrued but unpaid obligations on account of the Cobra Administration Fee are approximately $300.

### 6. Wellness Program.

37.     To encourage healthy lifestyle choices, the Debtors offer a voluntary wellness program (the "<u>Wellness Program</u>").  Under the Wellness Program, participating Employees and their dependents aged 14 and older complete a wellness exam within the calendar year.  In exchange, participating Employees are provided with a monthly $50 payment (the "<u>Wellness Incentive Payment</u>").  The Wellness Incentive Payment is issued as a reduction to the participating Employee's Medical Plan premium or a contribution to the participating Employees' HSA.  On average, the Debtors incur approximately $1,100 a month in obligations on account of the Wellness Incentive Payments.  As of the Petition Date, the Debtors estimate that their total accrued but unpaid obligations related to Wellness Incentive Payment are approximately $400.

### B. Insurance Benefits Program.

38.     The Debtors offer insurance benefit plans to the Employees under various policies and programs, in some cases automatically and in others upon election by an eligible Employee. These include the Life and AD&D Insurance Plans, the Supplemental Insurance Plans, the Disability Plans, the Critical Illness Insurance Plan, the Accident Insurance Plan, and the Employee Assistance Program (each defined herein, and together the "<u>Insurance Benefits Program</u>").  As of the Petition Date, the Debtors do not believe there are any amounts owed on

account of the Insurance Benefits Programs.  The Debtors seek authority to continue the Insurance

Benefits Program, and all constituent plans and programs, in the ordinary course of business.  The

Insurance Benefits Program is described in more detail below.

**1.      Life and AD&D Insurance Plans.**

39.      The Debtors provide all employees with life and accidental death and

dismemberment insurance coverage (the "Life and AD&D Insurance Plans"), which is fully

insured by BCBS.  Premiums vary based upon the number of employees who receive coverage

and the plan elections by employees but total approximately $3,500 per month.  The Debtors pay

amounts due and owing under the Life and AD&D Insurance Plans monthly in advance.  As of the

Petition Date, the Debtors do not believe there are any outstanding amounts on account of the Life

and AD&D Insurance Plan.

**2.      Supplemental Insurance Plan.**

40.      Employees can also elect to purchase additional insurance coverage plans

(the "Supplemental Insurance Plans") at their own expense.  The Supplemental Insurance Plans

include additional life and AD&D coverage provided by BCBS.  Premiums for the Supplemental

Insurance Plans are deducted from program participants' payroll and then transferred by the

Debtors to BCBS.  As of the Petition Date, the Debtors do not believe there are any outstanding

amounts on account of the Supplemental Insurance Plans.

**3.      Disability Plans.**

41.      The Debtors provide eligible Employees with long-term disability benefits

(the "Long-Term Disability Benefits").  Eligible Employees can also elect to purchase short-term

disability benefits (the "Short-Term Disability Benefits," and together with the Long-Term

Disability Benefits, the "Disability Plans"), each administered through BCBS.  The Short-Term

Disability Benefits are limited to 60% of the Employee's base weekly earnings up to $2,500 per week and begins fourteen days after disability.  Premiums for the Short-term Disability Benefits are deducted from program participants' payroll and then transferred by the Debtors to BCBS. The Long-Term Disability Benefits are limited to 60% of the employee's base monthly earnings up to $6,000 per month and begins 180 days after disability, lasting until the earlier of the date at which the employee is no longer disabled or reaches employee social security retirement age.  On average, the Debtors pay approximately $1,000 per month in advance on account of the Long-Term Disability Benefits.  As of the Petition Date, the Debtors do not believe there are any outstanding amounts on account of the Long-Term Disability Benefits.

### 4. Critical Illness Plan.

42.    The Employees can elect to purchase critical illness insurance (the "Critical Illness Plan") at their own expense.  The Critical Illness Plan is administered by BCBS.  The Debtors withhold the applicable amount from participating Employees' wages and transfer those premiums to BCBS monthly.  As of the Petition Date, the Debtors do not believe there are any outstanding amounts on account of the Critical Illness Plan.

### 5. Accident Insurance Plan.

43.    The Employees can elect to purchase accident insurance (the "Accident Insurance Plan") at their own expense.  The Accident Insurance Plan is administered by BCBS.  The Debtors withhold the applicable amount from participating Employees' wages and remit those premiums to BCBS.  As of the Petition Date, the Debtors do not believe there are any outstanding amounts on account of the Accident Insurance Plan.

6.        **Employee Assistance Program.**

44.        The Debtors provide the Employees with an Employee Assistance Program ("EAP") that provides Employees and eligible family members access to counseling, legal, and financial services through a program administered by ComPsych Corporation ("ComPsych").  The cost of the EAP is bundled with the costs of the Life and AD&D Insurance Plans.  As of the Petition Date, the Debtors do not believe there are any outstanding amounts on account of the EAP.

C.        **401(k) Savings Plan**

45.        The Debtors maintain a defined contribution plan for the benefit of all eligible Employees (the "401(k) Savings Plan") meeting the requirements of sections 401(a) and 401(k) of the Internal Revenue Code.  The 401(k) Savings Plan is primarily funded by withholdings from Employees' wages and salaries (the "401(k) Savings Plan Withholdings").  The Debtors remit the 401(k) Savings Plan Withholdings to the plan trustee, Bank of Oklahoma Financial (the "401(k) Plan Trustee"), as soon as practicable after a contributing Employee's payroll is processed.  In addition, as part of the 401(k) Savings Plan, the Debtors match 100 percent of Inspector 401(k) contributions for the first three percent of such contributions and 50 percent for the next two percent of contributions.  The Debtors fund these matches concurrent with the Inspector contributions.  As of the Petition Date, the Debtors estimate that they will owe approximately $18,100 in unpaid prepetition match contributions.  The Debtors seek authority to continue to honor their obligations under the 401(k) Savings Plan in the ordinary course and to remit and pay any prepetition amounts on account of the 401(k) Savings Plan, including matching contributions consistent with historical practices.

**D.** **Leave Policy.**

46.     The Debtors provide eligible employees with paid and unpaid time off benefits that include holidays, vacation days, sick days, personal days, family emergencies, military leave, and other permitted purposes (the "Leave Policy").

47.     As part of the Leave Policy, eligible Employees generally accrue paid time off ("PTO") monthly based on their years of service to the Debtors:  (i) Employees with 5 years or less of service earn 6.67 hours of PTO a month or up to two weeks of PTO a year; (ii) Employees with 6 to 10 years of service earn 10 hours of PTO a month or up to three weeks of PTO a year; and (iii) Employees with 11 or more years of service earn 13.34 hours of PTO a month or up to four weeks of PTO a year.  Under the Debtors' PTO policy, any PTO earned within a calendar year must be used in the same calendar year.  Generally, PTO does not carry over year to year.  However, in limited circumstances, an Employee may carry a PTO balance from one calendar year to the next with the approval of the Debtors' management team.

48.     Under the Debtors' PTO policies, when an Employee leaves the Debtors and provides two weeks' notice or his or her service is terminated, he or she may be entitled to receive payment for their unused PTO (the "PTO Obligations").  For the avoidance of doubt, the Debtors are seeking authority to permit Employees to take PTO during the pendency of these Chapter 11 Cases in the ordinary course of business.  To the extent that any Employees are entitled to a cash out of accrued PTO, the Debtors seek authority to pay any such amounts, subject to applicable statutory caps.[3]

49.     The Debtors believe that the continuation of the Leave Policy in accordance with prior practice is essential to maintaining employee morale during these Chapter 11 Cases.  Further,

---

[3]     The Debtors reserve all rights to seek later relief to pay any required cash out in excess of the statutory cap.

the Leave Policy is a broad-based program upon which employees have come to depend.  Finally, the Debtors anticipate that most of their employees will use any accrued paid leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.  The Debtors request authority to continue the Leave Policy in the ordinary course and consistent with past practice and to honor any amounts accrued thereunder prior to the Petition Date (subject to any applicable statutory caps).

### III.    Workers' Compensation Program.

50.    The Debtors maintain workers' compensation insurance for employees at the levels required by laws in the states in which the Debtors operate (collectively, the "Workers' Compensation Program").   The Debtors maintain coverage for the Workers' Compensation Program for non-monopolistic states through a policy with the coverage period of October 1, 2021 to October 1, 2022 (the "Zurich Policy") issued by Zurich Insurance Group Ltd. ("Zurich"), who also administers the Workers' Compensation Program.  The annual premium for the Zurich Policy is approximately $606,000, which is financed by Zurich.[4]  There are no deductibles associated with the Zurich Policy.  The Debtors also purchase coverage from government-operated funds for the states of North Dakota, Ohio, Wyoming, and Washington (the "State Policies").[5]   The aggregate annual premium for the State Policies is approximately $56,000.  As of the Petition Date, the Debtors do not believe there are any outstanding amounts on account of the State Policies.

---

[4]    The Debtors are seeking authority to pay unpaid amounts on account of the Zurich Policy pursuant to the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Program and Surety Bond Program and (B) Pay All Obligations with Respect Thereto And (II) Granting Related Relief*, filed contemporaneously herewith.

[5]    The coverage period for each state varies and is as follows:  North Dakota, October 22, 2021 to October 14, 2022; Ohio, July 1, 2021 to July 1, 2022; Washington, July 8, 2021 to July 8, 2022; Wyoming, June 25, 2021 to June 25, 2022.

51.     The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[6]  As of the Petition Date, the Debtors believe that there are approximately eight open claims under the Workers' Compensation Program. The Debtors do not pay claims under the Workers' Compensation Program because they are fully insured under the Zurich Policy and the State Policies.

52.     The Debtors request (a) authority to continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis, including by renewing or replacing the Zurich Policy or State Policy and (b) that the Court modify the automatic stay solely to allow Employees to assert claims, if any, under the Workers' Compensation Program.

**IV.     Employee Incentive Programs.**

53.     In the ordinary course of business, to encourage and reward outstanding performance and attract and retain valuable employees, the Debtors offer certain Employees the opportunity to earn additional compensation under certain programs (collectively, "Employee Incentive Programs"), including, (a) the Inspector Retention Program, (b) Prepetition Incentive Programs, and (c) Employee Referral Program (each as defined below).

**A.     Inspector Retention Program.**

54.     The Debtors have historically maintained a retention program for certain Inspectors who are not enrolled in the Medical Plans (the "Inspector Retention Program").  None of the Inspectors participating under the Inspector Retention Program are "insiders" of the Debtors, as

---

[6]     The Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary, subject to applicable law.

that term is defined in section 101(13) of the Bankruptcy Code (an "Insider").  The Inspector Retention Program ensures that the Inspectors generally receive equal benefits by paying certain Inspectors not enrolled in the Medical Plans an amount approximately equal to the Debtors' contribution to the Medical Plans.  Currently, the maximum amount paid to any given Inspector under the plan is equal to approximately $900 a month.  Eligible Inspectors are paid either monthly or quarterly, and amounts under the Inspector Retention Program accrue on the last business day of the month or quarter, as applicable.  For Inspectors paid monthly, amounts are generally paid in the first payroll cycle of the month following accrual.  For Inspectors paid quarterly, amounts are generally paid in the final payroll cycle of the quarter.  As of the Petition Date, the Debtors estimate that they owe approximately $43,600 on account of the Inspector Retention Program, comprising amounts accrued for the month of April.

### B.    Prepetition Incentive Programs.

55.    Historically, the Debtors have maintained incentive programs to drive performance among their Employees (the "Prepetition Incentive Programs"), including a short-term incentive program (the "STIP") and a long-term incentive program (the "LTIP").  Under the Prepetition Incentive Programs, the Debtors' board of directors implemented metrics and issued awards to Employees based on the past performance of the Debtors and expected future performance of the eligible Employees.  Awards issued under the STIP were generally cash amounts, and awards issued under the LTIP were generally units in Debtor Cypress Environmental Partners, L.P.  By this Motion, the Debtors are ***not*** seeking authority to make any payments under the Prepetition Incentive Programs.  However, the Debtors reserve the right to seek such authority from the Court or enter into new incentive programs plans, subject to this Court's approval and applicable provisions of the Bankruptcy Code.

### C. Employee Referral Program.

56.     In the ordinary course of business, eligible Employees who refer candidates that are hired by the Debtors are eligible for a referral bonus ("Employee Referral Program").  Employees who meet the requirements of the Employee Referral Program receive a referral bonus of $250 after the referral has been employed for 60 days and another $250 after the referral has been employed for 6 months.  In the 12 months prior to the Petition Date, the Debtors paid $500 on account of the Employee Referral Program.  As of the Petition Date, the Debtors estimate that there are no amounts outstanding under the Employee Referral Program.

## V. Board Fees.

57.     In the ordinary course of business, the Debtors pay fees ("Board Fees") to three independent directors (the "Independent Directors") of the board of directors (the "Board") of their direct parent company, non-Debtor Cypress Environmental Partners GP, LLC, which oversees all of the Debtors operations.  The Board Fees include an (a) annual amount of $75,000 for two of the Independent Directors and $87,500 for the third Independent Director, whose compensation is incrementally higher because he serves as Chairman of two Board committees, and (b) a fee of $1,000 per special meeting of the Board.  The Board Fees are generally paid quarterly.  In addition, the Debtors reimburse the members of the Board for reasonable and documented out-of-pocket expenses.  As of the Petition Date, the Debtors do not believe that any Board Fees are due and owing.  The Debtors seek authority, in the abundance of caution, to continue paying Board Fees in the ordinary course of business after the Petition Date.

**BASIS FOR RELIEF**

**I.     Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits.**

    **A.     Certain Compensation and Benefits Are Entitled to Priority.**

58.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Compensation and Benefits owed to the Employees to priority treatment.  Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code requires the Debtors to pay wages, salaries, commissions, vacation, severance, sick leave, and contributions to employee benefits plans as administrative priority claims up to a limit of $15,150 per individual.  Because such claims are priority claims, the Debtors are required to pay them in full to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan).  Thus, granting the relief requested herein with respect to payment of certain amounts up to the priority cap will likely only affect the timing of such payments, and should not negatively affect recoveries for general unsecured creditors. Payment of the Compensation and Benefits at this time enhances value for the benefit of all interested parties as the continued operation of the Debtors' business relies on the employees, without whom the Debtors would have to shut down operations and the enterprise value of their business would greatly decline.

    **B.     Payment of Certain Compensation and Benefits Is Required by Law.**

59.     The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks.  Certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf.

See 11 U.S.C. §§ 541(b)(1), (d).  Furthermore, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority.  26 U.S.C. §§ 6672, 7501(a); *see In re Chabrand*, 301 B.R. 468, 475–81 (Bankr. S.D. Tex. 2003) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes).  Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

60.    Similarly, state laws require the Debtors to pay the Employer Payroll Taxes and maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program or pay the Employer Payroll Taxes, state and federal laws may prohibit the Debtors from operating.  Payment of all Workers' Compensation Program and Employer Payroll Tax amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring.

## II.    Payment of the Employee Compensation and Benefits Is Warranted Under Sections 105(a), 363(b), and 1107 of the Bankruptcy Code.

61.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *Inst'l Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l*

*Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale.").

62.    Further, section 105(a) of the Bankruptcy Code provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity."  11 U.S.C. § 105(a).  The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity").  Additionally, section 1107 of the Bankruptcy Code provides that a debtor in possession has, among other things, an "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'"  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. at 497).

63.    Payment of the Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases.  The Debtors believe that the vast majority of the Debtors' employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, the Employees will be exposed to significant financial difficulties

if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Consequently, the relief requested is necessary and appropriate.

64.    Moreover, the Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that, absent the payment of the Compensation and Benefits owed to the Employees, the Debtors may experience turnover and instability at this critical time. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships they may face, causing them to elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their employees, which cannot be replaced without significant efforts—which efforts may not be successful given the potential overhang and stigma associated with being a debtor in possession. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. Payment of the prepetition obligations with respect to the Compensation and Benefits is thus a necessary and critical element of the Debtors' efforts to preserve value and will provide the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

65.    Accordingly, the Debtors request that the Court authorize the Debtors to pay the prepetition and postpetition obligations specified herein and to continue the Compensation and Benefits in the ordinary course of business and consistent with past practice.

## III.    A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

66.    Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the

commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).

67.     Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1).  Cause exists here to modify the automatic stay to permit the Employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum.  Staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees.

## IV.   Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Funds Transfer.

68.     The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of anticipated access to debtor-in-possession financing and use of cash collateral.  In addition, under the Debtors' cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits, as applicable.  Accordingly, the Debtors believe there is minimal risk that checks, ACH transfers, or wire transfer requests the Court has not authorized will be made inadvertently.  Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, ACH transfers, or wire transfer requests in respect of the relief requested in this Motion.

## EMERGENCY CONSIDERATION

69.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which allows this Court to grant relief within the first twenty-one (21) days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid

immediate and irreparable harm." An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations, and any delay in granting the relief requested could jeopardize the Debtors' ability to restructure. The Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis in order to preserve the ongoing value of the Debtors' estates.

### WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

70.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### RESERVATION OF RIGHTS

71.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a waiver of any claims or causes of action which may exist against any creditor or interest holder; (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; (h) an admission as to the validity, priority, enforceability, or perfection of any lien on,

security interest in, or other encumbrance of property of the Debtors' estates; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended and should not be construed as an admission as to the validity or priority of any claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## NOTICE

72.    The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Prepetition First Lien Lender and Prepetition First Lien Agent (each as defined in the DIP Motion);[7] (d) the DIP Lender and DIP Agent (each as defined in the DIP Motion); (e) the Office of the United States Attorney for the Southern District of Texas; (f) the state attorneys general for states in which the Debtors conduct business; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (j) ADP; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In view of the nature of the relief requested, the Debtors respectfully submit that no other or further notice need be provided.

---

[7]    "DIP Motion" means the *Debtors' Emergency Motion for the Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing and (B) Utilize Cash Collateral of the Prepetition First Lien Secured Parties, (II) Granting Adequate Protection to the Prepetition First Lien Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, filed contemporaneously herewith.

The Debtors respectfully request entry of the Order, granting the relief requested in this Motion and such other and further relief as the Court deems appropriate under the circumstances.

Dated: May 9, 2022
Houston, Texas

/s/ *James Grogan*

**PAUL HASTINGS LLP**
James Grogan (TX Bar No. 24027354)
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone:  (713) 860-7300
Facsimile:  (713) 353-3100
Email: jamesgrogan@paulhastings.com

-and-

Justin Rawlins (*pro hac vice* admission pending)
1999 Avenue of the Stars, 27th Floor
Century City, California 90067
Telephone:  (310) 620-5700
Facsimile:  (310) 620-5899
Email:  justinrawlins@paulhastings.com

-and-

Matthew Micheli (*pro hac vice* admission pending)
Matthew Smart (*pro hac vice* admission pending)
Michael Jones (*pro hac vice* admission pending)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:  (312) 499-6000
Facsimile:  (312) 499-6100
Email:  mattmicheli@paulhastings.com
         matthewsmart@paulhastings.com
         michaeljones@paulhastings.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ James Grogan*
James Grogan


## **Certificate of Service**

I certify that on May 9, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ James Grogan*
James Grogan

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CYPRESS ENVIRONMENTAL PARTNERS, L.P., *et al.*[1] | ) Case No. 22-90039 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) **Re: Docket No. ___** |

**ORDER (I) AUTHORIZING THE DEBTORS (A) TO PAY**
**PREPETITION WAGES, SALARIES, OTHER COMPENSATION,**
**AND REIMBURSABLE EXPENSES AND (B) TO CONTINUE EMPLOYEE**
**BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") authorizing (i) authorizing the Debtors to (a) pay prepetition wages, salaries, compensation, reimbursable expenses, incentives, and certain severance obligations to Employees and (b) continue providing Employees with Benefits pursuant to the Employee Benefits Programs in the ordinary course of business, including payment of certain prepetition obligations related thereto and (ii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Cypress Environmental Partners, L.P. (1523); Cypress Municipal Water Services, LLC (5974); Cypress Environmental Partners, LLC (7385); Cypress Brown Integrity, LLC (3455); Cypress Energy Partners - 1804 SWD, LLC (9110); Cypress Energy Partners - Bakken, LLC (9092); Cypress Energy Partners - Grassy Butte SWD, LLC (9047); Cypress Energy Partners - Green River SWD, LLC (1534); Cypress Energy Partners - Manning SWD, LLC (4247); Cypress Energy Partners - Mork SWD, LLC (0761); Cypress Energy Partners - Mountrail SWD, LLC (4977); Cypress Energy Partners - Tioga SWD, LLC (3230); Cypress Energy Partners - Williams SWD, LLC (3840); Cypress Environmental - PUC, LLC (8637); Cypress Environmental Management - TIR, LLC (5803); Cypress Environmental Management, LLC (4753); Cypress Environmental Services, LLC (7770); Tulsa Inspection Resources - PUC, LLC (2514); and Tulsa Inspection Resources, LLC (4632).  The Debtors' service address for the purposes of these chapter 11 cases is 5727 South Lewis Avenue, Suite 300, Tulsa, Oklahoma 74105.

[2]  Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Motion.

proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and due, sufficient, and proper notice of the Motion having been provided under the circumstances and in accordance with the Bankruptcy Rules and the Bankruptcy Local Rules, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "Hearing"); and upon consideration of the First Day Declaration and the record of the Hearing and all of the proceedings had before the Court; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors, their stakeholders, and all other parties in interest, and that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1.      The Debtors are authorized to pay, honor, and/or reimburse all prepetition and postpetition obligations on account of the Compensation and Benefits as set forth in the Motion; *provided* that the Debtors shall not make any payments to any Employee that exceeds the priority cap amounts set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

2.      The Debtors are authorized to continue, administer, modify, change, and/or discontinue the Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these Chapter 11 Cases and without need for further Court approval, subject to applicable law; *provided* that the Debtors shall provide five business days' advance notice to the U.S. Trustee and any statutory committee appointed in these

Chapter 11 Cases prior to making any material modifications or changes to the Compensation and Benefits (including Board Fees).

3.     The Debtors are authorized to forward or pay any unpaid amounts on account of the Withholding Obligations, Employer Payroll Taxes, and Administration Fees to the appropriate third-party recipients or Taxing Authorities in accordance with the Debtors' prepetition policies and practices.

4.     The Debtors are authorized to reimburse the Employees for all Reimbursable Expenses and to make direct payments to third parties on account of amounts owed in connection with the Reimbursable Expenses.

5.     The Debtors shall maintain a matrix/schedule of amounts paid to the Employees related to the Compensation and Benefits, made pursuant to this Order, including the following information:  (a) the category or type of payment, as further described and classified in the Motion; (b) the date and amount of the payment; and (c) the Debtor or Debtors that made the payment.  The Debtors shall provide a copy of such matrix/schedule to the U.S. Trustee and any statutory committee appointed in these chapter 11 cases every 30 days beginning July 7, 2022, unless these cases are confirmed prior to that time.

6.     The Debtors shall not make any bonus, incentive, retention, or severance payments to any Insiders (as such term is defined in section 101(31) of the Bankruptcy Code) without further order of this Court.

7.     Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business.  This

modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

8.      Nothing herein shall be deemed to authorize the payment of any amounts which violates or implicates section 503(c) of the Bankruptcy Code; *provided* that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

9.      Neither this Order, nor any payments made by the Debtors pursuant to the Motion or this Order, shall be deemed to change the classification of any claim or to in any way change the rights or create new rights of any Employees or any other person, including, without limitation, the creation of any right to payment entitled to administrative expense priority pursuant to sections 503 and 507 of the Bankruptcy Code.

10.     The Debtors' banks and financial institutions shall be, and hereby are, authorized, when requested by the Debtors in their sole discretion, to process, honor, pay, and, if necessary, reissue any and all checks, including prepetition checks that the Debtors reissue postpetition, and electronic fund transfers drawn on the Debtors' bank accounts relating to the Employee Compensation and Benefits, whether such checks were presented or funds transfer requests were submitted prior to or subsequent to the Petition Date; *provided* that sufficient funds are available in the applicable accounts to make the payments.

11.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or

admission that any particular claim is of a type specified or defined in the Motion or any order granting the relief requested by the Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a waiver of any claims or causes of action which may exist against any creditor or interest holder; (f) a request to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; (h) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance of property of the Debtors' estates; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

12.     The requirements set forth in Bankruptcy Local Rule 9013-1(b) are satisfied by the contents of the Motion.

13.     The Court finds and determines that the requirements of Bankruptcy Rule 6003(b) are satisfied and that the relief is necessary to avoid immediate and irreparable harm.

14.     Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

15.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

16.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

17. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the enforcement of this Order.

Dated: _____, 2022
   Houston, Texas

       _____
       THE HONORABLE MARVIN ISGUR
       UNITED STATES BANKRUPTCY JUDGE