## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CYPRESS ENVIRONMENTAL PARTNERS, L.P., *et al.*,[1] | ) Case No. 22-90039 (MI) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) (Emergency Hearing Requested) |

## DECLARATION OF PETER C. BOYLAN III,
## CHAIRMAN & CHIEF EXECUTIVE OFFICER OF THE DEBTORS,
## IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Peter C. Boylan III, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1.      I am the Co-founder, Chairman, Chief Executive Officer, and President ("CEO") of Cypress Environmental Partners, L.P. ("CELP", and together with its above-captioned affiliates as debtors and debtors in possession, the "Debtors").  I have extensive experience as a corporate executive in the energy sector.  I have served as CEO of the Debtors since our formation in 2012. I have also served in executive and/or board leadership positions in the following industries: Energy distribution, energy infrastructure inspection, and environmental services.

2.      From March 2002 to CELP's formation in 2012, I was the Chief Executive Officer of Boylan Partners, LLC, a provider of investment and advisory services.  From 1996 to 2004, I

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Cypress Environmental Partners, L.P. (1523); Cypress Municipal Water Services, LLC (5974); Cypress Environmental Partners, LLC (7385); Cypress Brown Integrity, LLC (3455); Cypress Energy Partners - 1804 SWD, LLC (9110); Cypress Energy Partners - Bakken, LLC (9092); Cypress Energy Partners - Grassy Butte SWD, LLC (9047); Cypress Energy Partners - Green River SWD, LLC (1534); Cypress Energy Partners - Manning SWD, LLC (4247); Cypress Energy Partners - Mork SWD, LLC (0761); Cypress Energy Partners - Mountrail SWD, LLC (4977); Cypress Energy Partners - Tioga SWD, LLC (3230); Cypress Energy Partners - Williams SWD, LLC (3840); Cypress Environmental - PUC, LLC (8637); Cypress Environmental Management - TIR, LLC (5803); Cypress Environmental Management, LLC (4753); Cypress Environmental Services, LLC (7770); Tulsa Inspection Resources - PUC, LLC (2514); and Tulsa Inspection Resources, LLC (4632).  The Debtors' service address for the purposes of these chapter 11 cases is 5727 South Lewis Avenue, Suite 300, Tulsa, Oklahoma 74105.

served in a variety of senior executive management positions of various public and private companies controlled by Liberty Media Corporation, including serving as a board member, Chairman, President, Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of several different companies. I have also served in numerous C-suite executive officer and board of director positions in publicly traded companies. I have served on the board of directors of seven public companies, including serving on audit, risk, compensation, and executive committees. I have also served on the board of directors of numerous not for profit organizations, including an advisory board for the State of Oklahoma and as a special advisor to the former Mayor of the City of Tulsa, Oklahoma.

3.      In my capacity as CEO, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.

4.      I submit this declaration to assist this Court and parties in interest in understanding: (a) the Debtors, their operations, and their capital structure; (b) the circumstances related to the commencement of these chapter 11 cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on May 8, 2022 (the "Petition Date"); and (c) the emergency relief that the Debtors have requested from this Court (the "Bankruptcy Court") pursuant to the motions and applications described herein (collectively, the "First Day Motions").

5.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team, board of directors, and advisors (including auditors and legal counsel), my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring

initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

6.     This Declaration is divided into five sections:

- Section I provides an overview of these cases, including a summary of the need for these Chapter 11 Cases, the Restructuring Support Agreement (as defined below), the Plan confirmation process, DIP financing and the proposed timeline for completion of these Chapter 11 Cases;

- Section II describes the Debtors' organizational structure, business and business segments;

- Section III describes the prepetition capital structure of the Debtors and their affiliates;

- Section IV provides an overview of the circumstances leading to the commencement of these Chapter 11 Cases; and

- Section V summarizes the First Day Motions and the bases for the relief sought therein.

## I.     OVERVIEW OF THE CHAPTER II CASES

### A.     Introduction

7.     The Debtors' suite of services includes inspection, water treatment, and other environmental services that help their customers protect people, property, infrastructure, and the environment with a focus on safety and sustainability.  The Debtors work closely with their customers to help them protect the environment, property, and people.  The Debtors' services also help their clients comply with increasingly complex federal and state environmental and safety rules and regulations.  The substantial majority of the Debtors' environmental services are required services under various federal and state laws.  A further discussion regarding the Debtors business, its operations and history is set forth in Section II.

**B.     The Need for Chapter 11 Protection and the Pre-Petition Sale Process**

8.     The Debtors commenced these Chapter 11 Cases to implement the Restructuring Support Agreement (as defined below), which contemplates eliminating nearly $60 million in prepetition secured debt, paying substantially all of the unsecured creditors in full, and is supported by the Debtors' prepetition lender.  The Debtors entered into the Restructuring Support Agreement principally because for several years they have been unable to refinance their sole funded debt obligation with an outstanding principal amount as of the Petition Date in the amount of $58,853,976, including accrued interest (the "Loans"), under that certain Amended and Restated Credit Agreement dated as of May 29, 2018 (as amended by the certain Amendment No. 1 dated as of March 2, 2021, and as further amended by the certain Amendment No. 2 to the Credit Agreement dated as of August 13, 2021, and as otherwise amended, restated, modified and supplemented from time to time) (the "Credit Agreement") by and among CELP and Tulsa Inspection Resources – Canada ULC, as borrowers, and certain wholly-owned subsidiaries of CELP, as guarantors (collectively, the "Borrowers") and Deutsche Bank AG, New York Branch ("DBNY") as collateral agent (together with any successor collateral agent appointed pursuant to Section 10.9 of the Credit Agreement, in such capacity the "Collateral Agent"), Deutsche Bank Trust Company Americas, as administrative agent (together with any successor administrative agent appointed pursuant to Section 10.9 of the Credit Agreement, in such capacity the "Administrative Agent") and as Lender, Issuing Bank, Swing Line Lender (as defined in the Credit Agreement), and the six other  banks and other financial institutions or entities from time to time parties to this Agreement, as lenders (the "Former Lenders").  The Credit Agreement matures on May 31, 2022 and in the months leading up to the filing of these Chapter 11 Cases, it

became clear that a forbearance, renewal or extension of the Credit Agreement with the Former Lenders would not be possible.

9.      Recognizing that they were at an impasse, the Debtors and Former Lenders agreed to hire Piper Sandler & Co. ("Piper"), as investment banker, in order to conduct a sale process to effectuate a sale of the business or raise capital for a pending restructuring.  Timing was of the essence and in March 2022, Piper commenced a robust marketing process.  The Debtors and their advisors prepared (1) a comprehensive confidential information memorandum, (2) an electronic data room with the necessary information for investors and bidders to make a proposal, and (3) a detailed bidder log and bidder outreach programs.  Piper made initial contact with over 100 groups; sent confidentiality agreements to 43 groups; received executed confidentiality agreement from and provided the sale materials to 23 groups; provided additional information via email, held management calls with three parties, granted data room access to two interested groups; and received 3 written indications of interest.

10.     One bid was for the purchase of the assets associated with the Environmental Services segment (as defined below).[2]  Another bid was for substantially all of the Debtors' assets but was contingent on additional due diligence.  The third bid from Argonaut Private Equity ("Argonaut"), included an offer to purchase all of the assets of the Debtors or in the alternative, an offer to purchase the Loans of the Former Lenders.[3]  On April 14, 2022, the indications of interest were presented to the Board of Directors (the "Board") of Cypress Environmental Partners GP, LLC, the general partner of CELP, and to the Former Lenders.  At the values set forth in the indications of interest and as the Former Lenders were not willing to provide any post-

---

[2]    As discussed further below, this bid would not have offered sufficient value to the Former Lenders.

[3]    Argonaut previously considered an investment in CELP and based on that has familiarity with the Debtors and their business.

petition financing of the Debtors, the Debtors and Former Lenders determined that a stalking horse bid for the assets followed by a chapter 11 section 363 sale process would provide little to no residual value to the Former Lenders and subject the Former Lenders and the Debtors' business to substantial execution risk.

11.     After considering the indications of interest, the Former Lenders, with the consent of the Debtors and the Board, began discussions with Argonaut regarding the sale of their Loans.

12.     On April 22, 2022, the Former Lenders sold all of their right, title, and interest in and to the loan and loan documents related to the Credit Agreement to Argonaut (the "Loan Sale") and Argonaut succeeded as collateral agent, administrative agent and Lender under the Credit Agreement.

**C.     The Restructuring Support Agreement and the Plan Process**

13.     Immediately after completion of the Loan Sale, the Debtors and Argonaut commenced negotiations regarding a comprehensive reorganization of the Debtors' business and capital structure.  The Debtors engaged with Argonaut and discussed the various options available for Argonaut to acquire the Debtors' assets, focusing on a stalking horse bid that would establish a baseline value for the Debtors' assets against which the Debtors could solicit higher or better offers from alternative buyers to be effectuated through a chapter 11 section 363 sale process or a chapter 11 plan of reorganization pursuant to which Argonaut would exchange its debt for the Debtors' equity.  Those discussions culminated in the execution of the Restructuring Support Agreement (the "Restructuring Support Agreement") on May 6, 2022 that provides the Debtors with a clear and expedited path to a confirmable chapter 11 plan of reorganization and a significantly deleveraged balance sheet, leaving mainly disputed general unsecured claims and rejection damage claims only.

14.     Pursuant to the Restructuring Support Agreement, Argonaut agreed to vote in favor of the Debtors' *Joint Prepackaged Chapter 11 Plan of Reorganization for Cypress Environmental Partners, L.P. and Its Debtor Affiliates*, dated May 8, 2022, (the "Plan").  The Restructuring Support Agreement, and the Plan, contemplate a debt-to-equity recapitalization transaction, whereby Argonaut will receive 100% of the new equity interests of reorganized CEP (as defined below), subject to dilution by a management incentive plan, in exchange for extinguishing the obligations remaining under the Credit Agreement (the "Reorganization Transaction").

15.     The Restructuring Transaction will provide the Debtors and their business a fresh start, deleveraging their balance sheet, providing a stable platform to grow post-emergence and preserving over 350 quality high paying jobs.  With the relief provided in the First Day Motions, the Debtors should continue to operate in the ordinary course of business during these Chapter 11 Cases with minimal disruption.  In addition, the Restructuring Support Agreement provides for the payment in full of priority and trade claims and a debt or equity commitment to provide working capital to the Debtors upon emergence.

**D.     DIP Financing**

16.     As set forth in the Restructuring Support Agreement and in further support of the Debtors' restructuring efforts, Argonaut has committed to provide the Debtors with $5 million of debtor-in-possession financing (the "DIP Financing"), which should be sufficient to finance the Debtors through completion of these Chapter 11 Cases in accordance with the timelines set forth in the Restructuring Support Agreement (as defined herein).  It is critical that the Debtors have access to the DIP Financing to provide them necessary liquidity to continue operating their business in the ordinary course to maximize value and maintain customers and employees.  The

DIP Financing has a maturity date that coincides with the timeline contemplated by the Plan and Restructuring Support Agreement.

17.     The Debtors and their advisors sought alternative DIP financing proposals to ensure that the DIP Financing was the best available postpetition financing option under the circumstances.  As described in greater detail by the Debtors' investment banker in the *Declaration of Sanjiv Shah in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing and (B) Utilize Cash Collateral of the Prepetition First Lien Secured Parties, (II) Granting Adequate Protection to the Prepetition First Lien Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* filed contemporaneously herewith, the Debtors and its advisors first analysed the Debtors' liquidity needs in a chapter 11 scenario, and then Piper, as the Debtors' retained investment banker, contacted potential third-party financing sources to solicit offers for postpetition financing that would adequately satisfy the Debtors' liquidity needs.  Due to the fact that any alternate DIP financing would be junior to the aggregate outstanding principal amount of the Loans under the Credit Agreement, which as of the Petition Date was $58,853,976, including accrued interest, the Debtors' precarious financial position and the existing capital structure, the Debtors and Piper did not receive any actionable alternative financing proposals.

**E.     Proposed Timeline for Chapter 11 Cases**

18.     Although, the DIP Financing provides the Debtors with a necessary infusion of capital, accomplishing an expeditious resolution of these Chapter 11 Cases is crucial to preserving and maximizing the value of the Debtors for the benefit of all its stakeholders.  Particularly within the Debtors' industry, where customers and employees are able to quickly shift their business and

jobs, respectively, to another inspection provider, a prolonged chapter 11 process may imperil the Debtors' ability to reorganize effectively.  Accordingly, the Debtors have agreed to certain chapter 11 milestones, memorialized in the Restructuring Support Agreement and the debtor in possession credit agreement (the "Milestones").  Specifically, the Milestones are the following key dates:[4]

    i.      No later than May 16, 2022, the Petition Date shall have occurred;

    ii.      On Petition Date, the Debtors shall have filed initial versions of the Plan, the Disclosure Statement, and a Disclosure Statement Motion;

    iii.      On the Petition Date, the Debtors shall have filed a motion seeking entry of the DIP Orders;

    iv.      No later than the date that is four (4) days after the Petition Date, the Debtors shall have obtained entry by the Bankruptcy Court of the Interim DIP Order.

    v.      Subject to the Bankruptcy Court's availability, no later than the date that is thirty five (35) days after the Petition Date, the combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing") shall have commenced;

    vi.      Subject to the Bankruptcy Court's availability to conduct the Confirmation Hearing, no later than the date that is forty (40) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

    vii.      No later than the date that is fifteen (15) days after the entry of the Confirmation Order, the Effective Date shall have occurred.

---

[4] Capitalized terms used in the Milestones but not otherwise defined herein have the meanings given to such terms in the Restructuring Support Agreement.

## II.     THE DEBTORS' BUSINESS

### A.     Corporate Structure

19.     CELP, a publicly traded limited partnership, was formed in 2013.[5]  Trading of CELP's common units began in January 2014 on the New York Stock Exchange under the symbol "CELP".  After the IPO, insiders owned approximately 70% of the common units and no board members or executive officers have ever sold any of their equity.  CELP is the direct parent of, and owns 100% of the equity interests in, Cypress Environmental Partners, LLC ("CEP").  In turn, CEP is the direct or indirect parent of all of the remaining Debtor entities, controlling (either directly or indirectly) 100 percent of the equity interests of all of the remaining Debtors except for Cypress Brown Integrity, LLC, of which CEP owns 51 percent. A chart summarizing the Debtors' organizational structure is attached hereto as Exhibit A (the "Structure Chart").

20.     Cypress Environmental Partners GP, LLC (the "General Partner"), a non-Debtor, is the general partner of CELP.  All of the equity interests in the General Partner are indirectly owned by Cypress Environmental Holdings, LLC ("Holdings"), a non-Debtor, and its affiliates. Holdings is controlled by Charles C. Stephenson, Jr., entities related to Mr. Stephenson's family, Mr. Stephenson's daughter, Cynthia A. Field, Henry Cornell, Cornell Investment Partners L.P., and CEP Capital Partners, LLC, an entity controlled by me.

### B.     Business Overview

21.     The Debtors' suite of services includes inspection, water treatment, and other environmental services that help their customers protect people, property, infrastructure, and the environment with a focus on safety and sustainability.  The Debtors' services also help their clients comply with increasingly complex federal and state environmental and safety rules and

---

[5]     Since its formation, CELP has been audited by Ernst & Young and has been represented by Latham & Watkins for certain corporate, tax and SEC matters.

regulations.  The substantial majority of the Debtors' environmental services are required services under various federal and state laws.

22.    The Debtors' business is organized into two reportable segments:  (1) inspection services ("Inspection Services"), comprising the operations of the "Inspection Entities" (as noted on the Structure Chart); and (2) water and environmental services ("Environmental Services"), representing the water treatment operations of the "Salt Water Disposal Entities" (as noted on the Structure Chart.  Historically CELP had a pipeline and process services segment ("PPS") that was discontinued in 2021.

C.    **Inspection Services**

23.    The Inspection Services segment generates revenue primarily by providing essential environmental services, including inspection and integrity services on a variety of infrastructure assets such as midstream pipelines, oil and gas well gathering systems, natural gas plants, storage facilities, pumping stations, compression stations, and natural gas distribution systems.  These services are offered on existing infrastructure as well as new construction.  This segment generally follows a just in time business model whereby the Debtors only hire inspectors when there is work to perform for a customer.  Customers are generally regulated by the Department of Transportation ("DOT") and Pipeline and Hazardous Materials Safety Administration ("PHMSA").  The Debtors hire these inspectors as W-2 employees from their proprietary database based upon qualifications, certifications, and experience.  These inspectors utilize their own four-wheel drive vehicles to conduct their inspection services and the Debtors therefore do not have substantial capital expenditure requirements.  Additional services include non-destructive examination, in-line inspection support, pig tracking, survey, data gathering, and supervision of third-party contractors.

24.     The Debtors safety record is exemplary and helps distinguish the Debtors from certain competitors.  Revenues in this segment are driven primarily by the number of inspectors that perform services for the Debtors' customers and the fees that they charge for those services, which depend on the type, skills, certifications, training, experience, technology, equipment, and number of inspectors used on a particular project, the nature of the project, and the duration of the project.  The number of inspectors engaged on projects is driven by the type of project, prevailing market rates, the age and condition of a customers' assets, which are comprised of pipelines, gas plants, compression stations, pump stations, storage facilities, and gathering and distribution systems, including the legal and regulatory requirements relating to the inspection and maintenance of those assets under DOT and PHMSA.  The Debtors also bill customers for the inspectors' per diem charges, mileage, and other reimbursement items.  The Debtors generally do not earn any margin on pass-through expenses such as per diem charges and mileage that they offer to their field inspectors who generally travel away from their family and residence.  Revenue and costs in this segment are subject to seasonal variations and interim activity may not be indicative of yearly activity, considering that many of the Debtors' customers develop yearly operating budgets and enter into contracts during the winter season for work to be performed during the remainder of the year.  Additionally, inspection work throughout the United States during the winter months (especially in the northern states) may be hampered or delayed due to inclement weather.  This seasonality generally leads to higher activity levels in the second and third quarter of each year.

25.     Customers of the Debtors' Inspection Services segment are principally owners and operators of pipelines and other infrastructure or natural gas public utilities and local distribution companies that provide natural gas to homes and businesses.  In 2021 and 2020, this segment had

approximately 44 and 59 customers, respectively.  The five largest customers in this segment generated 71% and 59% of the segment's revenue in 2021 and 2020, respectively.  In 2021 and 2020, CELP had two customers that individually accounted for more than 10% of the segment's revenues.  In 2021 and 2020, PG&E (as defined below) accounted for 36% and 21%, respectively, of the segment's revenues.  In 2019, pre-pandemic, we had more customers and inspectors.

26.     As of December 31, 2021, Inspection Services employed 333 inspectors, all of whom were employed in the United States.  2019 was the best year in CELP's history.  2020 started with a Russia and Saudi Arabia global price war with oil, followed by the global pandemic. Customers began cancelling projects and demanding price concessions.  Oil prices went negative in May 2020 for the first time in history and many customers were under duress.  In response to adverse market conditions in 2020 and 2021, the Debtors implemented significant cost reductions in the administrative staff that supports the Inspection Services segment, including furloughs, layoffs, and temporary salary and hour reductions.  I offered a 40% reduction in my salary, and other officers offered reductions as high as 30% to retain jobs for other employees. Further, our CFO,  Mr. Herbers, and I elected to defer receipt of their bonuses for the 2021 plan year, pending the resolution of our financing plans and to date those bonuses have not been paid.

27.     Inspector compensation packages vary based on customer requirements, certifications, experience, geographic and other factors.  The Debtors offer high paying jobs to inspectors who generally only have high school educations.  In 2022, the Debtors modified their inspector compensation packages to include company-paid health, dental, and vision benefits and a 401(k) match for inspectors.  Certain inspectors who serve one of the Debtors' customers that is a public utility company are members of a union and are covered by a collective bargaining

agreement.  As of December 31, 2021, 66 inspectors were members of this union.  None of CELP's other employees are covered by collective bargaining agreements.

28.     Revenues of the Inspection Services segment (i) decreased from $372.0 million in 2019 to $181.5 million in 2020, a decrease of 51% with gross margins in this segment decreasing from $40.5 million in 2019 to $19.8 million in 2020, a decrease of 51%; and (ii) decreased from $181.5 million during 2020 to $113.0 million during 2021, a decrease of 38% with gross margins in this segment decreasing from $19.8 million during 2020 to $13.0 million during 2021, a decrease of 34%.  This extraordinary decline in revenues and gross margins left CELP with too much debt despite the material cost reductions.

### D.     Environmental Services

29.     The Environmental Services segment owns and operates nine (9) water treatment facilities with ten (10) EPA Class II injection wells in the Bakken shale region of the Williston Basin in North Dakota.  The Debtors wholly-own eight of these water treatment facilities and own a 25% interest in the other facility, which is managed by the Debtors.  These water treatment facilities are connected to ten (10) pipeline gathering systems, including two (2) that the Debtors developed and own, and three (3) other potential connections available.  The Debtors specialize in the treatment, recovery, separation, and disposal of waste by-products generated by customers during the lifecycle of an oil and natural gas well to protect the environment and our drinking water.  All of the water treatment facilities utilize specialized equipment, technology, and remote monitoring to minimize the facilities' downtime and increase the facilities' efficiency for peak utilization.  Revenue is generated on a fixed-fee per barrel basis for receiving, separating, filtering, recovering, processing, and injecting produced and flowback water.  The Debtors also sell recovered oil, receive fees for pipeline transportation of water, and receive fees from a partially owned water treatment facility for management and staffing services.  The volume of water

processed at the water treatment facilities is driven by water volume generated from existing oil and natural gas wells during their useful lives and new oil wells that are drilled and completed. Customers' willingness to invest in new drilling is determined by a number of factors, the most important of which are the current and projected prices of oil; the cost to drill and operate a well; the availability and cost of capital; and environmental and governmental regulations.  The Debtors generally expect the level of drilling to correlate with long-term trends in oil prices.

30.     Environmental Services segment customers are primarily E&P companies that own, drill, and operate oil wells in North Dakota.  These customers include publicly traded energy companies, independents, trucking companies, and third-party purchasers of residual oil.  In 2021 and 2020, this segment had approximately 45 customers; the ten largest customers generated 90% of the segment's revenue; and four customers individually accounted for more than 10% of the segment's revenues.

31.     Environmental Services employed 7 people as of December 31, 2021, all of whom work at the Debtors' North Dakota facilities, which are generally open every day of the year.  Most of these employees have been employed with the Debtors for a number of years.   The compensation structure for field employees includes wages and health benefits.  During 2020, in response to challenging market conditions, the Debtors implemented a cost reduction plan that included a combination of temporary salary reductions and a reduction in workforce.

32.     Revenues of CELP's Environmental Services segment (i) decreased from $10.3 million in 2019 to $5.8 million in 2020, a decrease of 44% with gross margins in this segment decreasing from $7.3 million in 2019 to $3.7 million in 2020, a decrease of 49%; and (ii) decreased from $5.8 million in 2020 to $4.3 million in 2021, a decrease of 25% with gross

margins in this segment decreasing from $3.7 million in 2020 to $2.6 million in 2021, a decrease of 32%.

### E.     Corporate

33.     As of the Petition Date, the Debtors' employed 69 people in their corporate offices. These employees provide various services, including management, business development, human resources, compliance, information technology, billing, collections, safety, legal, payroll, tax, treasury, and accounting, among others.   The compensation cost for these employees is allocated among the Debtors and certain non-Debtor affiliates based on estimates of the amount of time these employees spend on the Debtors' businesses relative to those of their affiliates.   The Debtors' primary corporate office is in Tulsa, Oklahoma and they have a smaller corporate office in Houston, Texas.

### F.     CF Inspection

34.     The Debtors also have a joint venture with CF Inspection Management, LLC ("CF Inspection"), a nationally certified woman-owned business.   The Joint venture with CF Inspection allows CELP to offer various services to clients that require the services of an approved Women's Business Enterprise ("WBE").   CF Inspection is certified as a WBE by the Supplier Clearinghouse in California and as a National Women's Business Enterprise by the Women's Business Enterprise National Council.   The Debtors own 49% of CF Inspection and Cynthia A. Field, an affiliate of Holdings, CELP's largest common unit holder, and a director of the General Partner, owns the remaining 51% of CF Inspection.   For the years ended December 31, 2021, 2020, and 2019, CF Inspection, which is part of the Inspection Services segment, represented 9%, 6%, and 3% of CELP's consolidated revenue, respectively.

### III.    Prepetition Capital Structure

#### A.    Secured Debt

35.    The obligations under the Credit Agreement are secured by a first priority lien on substantially all of the Borrowers' assets.  As amended, the Credit Agreement has a total capacity of $70.0 million, subject to various customary covenants and restrictive provisions, and matures on May 31, 2022.  Any borrowings in excess of $60.0 million may only be used to fund working capital needs.  As of the Petition Date, the outstanding principal amount of the Loans under the Credit Agreement was $58,853,976, including accrued interest.

36.    The audit report from the Debtors' independent registered public accounting firm on the financial statements in CELP's Annual Report on Form 10-K contains a going concern uncertainty paragraph, which is an event of default under the Credit Agreement.  In addition, on April 15, 2022, the Debtors failed to make an interest payment due under the Credit Agreement, which is an event of default.  Upon the occurrence and during the continuation of an event of default, subject to the terms and conditions the Credit Agreement, the lenders may declare any outstanding principal, together with any accrued and unpaid interest, to be immediately due and payable and may exercise the other remedies set forth or referred to in the Credit Agreement.

#### B.    Trade Claims

37.    As of the Petition Date, the Debtors had outstanding obligations due and owing to trade claims in the amount of approximately $250,048 and other general unsecured creditors in the amount of approximately $74,000.  The Debtors' cash on hand as of the Petition Date is approximately $3.568 million.

#### C.    Equity Interests

38.    CELP is a publicly traded limited partnership.  On April 8, 2022, there were 12,361,090 common units outstanding, including 5,403,741 publicly traded common units

held by public unitholders and Holdings held 6,957,349 common units representing an aggregate 56% of CELP's common units. In addition, CELP's Series A Preferred Units may be converted into common units at the then-applicable conversion rate. CELP's Series A Preferred Units are owned by Mr. Stephenson.

## IV.    CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES

39.    The Debtors have faced back-to-back energy downturns starting with an OPEC price war from 2015-2017, and then on March 8, 2020, Saudi Arabia initiated a price war on oil with Russia, facilitating a 65% quarterly fall in the price of oil. In the first few weeks of March 2020, US oil prices fell by 34%, crude oil fell by 26%, and Brent oil fell by 24%. The price war was triggered by a break-up in dialogue between the Organization of the Petroleum Exporting Countries ("OPEC") and Russia over proposed oil-production cuts in the midst of the COVID-19 pandemic. Then in early April 2020 and again in June 2020, Saudi Arabia and Russia agreed to oil production cuts. Oil production can be slowed, but not stopped completely, and even the lowest possible production level resulted in greater supply than demand and those holding oil futures actually began to pay money to sell their oil contracts due to their inability to store the oil. These market events, the start of a global pandemic, and material litigation under the Fair Labor Standards Act (the "FLSA") had a material adverse impact on the Debtors. These factors, discussed further below, created the perfect storm that forced the Debtors to commence these Chapter 11 Cases.

### A.    Market Forces and the Global Pandemic

40.    In November 2014, shortly after CELP made its initial public offering, OPEC started a price war in the oil market that led to a downturn that lasted through 2017. The Debtors, their industry, and their customers benefitted from a market rebound in 2018 and 2019. During that time, many companies in the industry were active in constructing new energy infrastructure,

such as pipelines, gas plants, compression stations, pumping stations, and storage facilities, which created new business opportunities for the Debtors to provide inspection and integrity services on these projects.  As a result, CELP had its best year in history in 2019, generating over $400 million in revenue and $31.4 million in Adjusted EBITDA.

41.     That period of activity was short-lived and the commodity price decline in 2020 led customers to change their budgets and decrease their spending on capital expenditures.  This, in turn, had an impact on regular maintenance work and the construction of new pipelines, gathering systems and related energy infrastructure.  Lower exploration and production activity also affected the Debtors' industry and led to delays and cancellations of projects and ultimately the Debtors' revenue declines.  The volatility in crude oil prices is illustrated in the chart below, which shows the average monthly spot price for West Texas Intermediate crude oil from 2018 through 2021:



42.     Recognizing that the oil price volatility and the COVID-19 pandemic would materially impact their business, the Debtors took swift and decisive actions in 2020 to reduce overhead and other costs through a combination of suspending the distributions to common equity unit holders, temporary salary reductions, reductions in workforce, and other cost-cutting

measures.  To help save jobs, the executive leadership team took voluntary reductions in salary. I reduced my base salary by 40% and substantially all other members of the executive leadership team offered 20-30% reductions in their base salaries.  The Debtors also elected to defer some discretionary capital expenditures and remained focused on opportunities to reduce working capital needs.

43.     In early 2021, the Debtors further reduced costs through additional reductions in workforce.  In July 2020 CELP suspended payment of common unit distributions, which enabled the Debtors to retain more cash to manage working capital and financing requirements during these challenging market conditions.  In October 2021, the Debtors decided to wind down their survey service line, which represented less than 1% of the total revenues of the Inspection Services segment during 2021.  In May 2021, the Debtors hired Raymond James to attempt to sell its hydro testing business known as the PPS segment, that was losing money to pay down debt. Unfortunately, the extensive sales process did not lead to any bids.  The Debtors then shut down the business and sold the assets.

44.     These cost cutting actions significantly lowered general and administrative costs but the Debtors still needed new customer contracts to survive.  During the pandemic, winning new customer contracts was very difficult because in-person sales meetings were not allowed by customers, and new business development is difficult via video conference.  Further, existing customers were facing the same market forces and business difficulties that the Debtors were facing through the pandemic and in order to maintain certain customers, the Debtors often were forced to give discounts, further eroding revenue and gross margins.  CELP also was required to disclose its declining financial condition in its SEC filings, which led to significant concern with customers and employees and competitors acted to take advantage of those concerns.  In addition,

the Former Lenders were unwilling to enter into a renewal of the Credit Agreement with a term that was long enough to allow the Debtors to eliminate these risks.

45.     Finally in 2021 and early 2022, the price of crude oil increased, with the average daily spot price for West Texas Intermediate crude oil increasing from $48.35 per barrel at December 31, 2020 to approximately $104 per barrel on April 29, 2022.  This increase is based in part on easing of COVID-19 restrictions, increased vaccinations, the Russian invasion of Ukraine and the resulting sanctions imposed on Russia by various countries.  Normally, a sustained increase in crude oil prices would lead customers to ramp up maintenance and capital spending creating opportunities for the Debtors but unfortunately, the current price increase has not yet resulted in increased activity from customers sufficient to offset the effects of the past 2 years and the Debtors' business development efforts have not resulted in any new significant customers in the first three months of 2022.

        **B.    FLSA Litigation**

46.     Historically, the Debtors, their customers, and competitors in the industry hired inspectors and paid them extremely well on a day rate basis rather than on an hourly basis.  The day rate pay was a product of the fact that inspectors worked remotely on customer sites, making it difficult to verify the number of hours worked.  Each day's work schedule would vary based upon weather, time of year, and the contractors' schedules.  The upside of day rate pay is that it offered lucrative high paying jobs, in which qualified inspectors could earn $100,000-$250,000 per annum without a college degree.  The day rate pay practice has been part of the industry for

over thirty-five years, preceding the formation of CELP and its subsidiary Tulsa Inspection Resources, LLC, which was formed in 2003.

47.     Between 2015 and 2017 there was a significant downturn in the industry following the OPEC induced global price war that left many inspectors unemployed and unable to replace their lucrative annual earnings.  I believe this marked the start of targeted litigation under the FLSA against the Debtors, their customers, and numerous competitors in the industry.  Many inspectors preferred being paid on a day rate basis, but the litigation was started by contingent fee plaintiff attorneys who began sophisticated digital solicitation campaigns targeting unemployed inspectors via social media.  This litigation materially impacted the Debtors and numerous competitors.  Certain of the Debtors' then current and former inspectors who were compensated on a day rate filed lawsuits and arbitration claims against the Debtors, alleging that they were entitled to hourly wages with overtime under the FLSA.  Inspectors have, in many circumstances, also sued the Debtors' customers, asserting that the customers were co-employers for FLSA purposes.  Those customers have in turn asserted indemnification claims against the Debtors pursuant to contract.  Many of the Debtors' competitors are experiencing similar litigation claims, several have gone out of business.

48.     Counsel to the plaintiffs in the FLSA litigation have been very active and their strategies have continued to evolve, further impacting the Debtors and their business.  During the pandemic, when many inspectors were out of work, the FLSA litigation increased.  The Debtors spent millions of dollars defending these cases over the last four years.  In 2021, the Debtors incurred $1.9 million of legal fees and spent significant time defending against these claims.  These costs include defending numerous arbitration claims from individual inspectors, defending the Debtors' rights to enforce the arbitration provisions in employment agreements with inspectors,

assisting customers in their defense of the claims, and monitoring various lawsuits unrelated to the Debtors that could create negative precedents.  FLSA litigation is a significant cash drain on the Debtors' business as it is generally not covered by insurance.

49.      In early 2022, the Debtors agreed to settle 64 of the FLSA claims for a combined amount of approximately $1.0 million.  This settlement covers most of the known claims asserted directly against the Debtors.  Nevertheless, the Debtors continue to incur significant legal costs to defend suits that have been filed against customers alleging they were co-employers in circumstances where the Debtors have ongoing indemnification obligations under the applicable agreements.  The Debtors' have comprehensive insurance policies but those policies generally do not offer coverage for FLSA claims.  On Monday May 2, 2022, the U.S. Supreme Court decided to hear a case under the FLSA regarding whether an oil rig worker earning six figures is entitled to overtime pay under the Fair Labor Standards Act, teeing up a fight on a foundational principle of wage and hour law.  The Supreme Court granted a petition by Helix Energy Solutions Group Inc. to review a Fifth Circuit decision finding that an oil rig worker making over $200,000 per year was also entitled to overtime because he was paid a day rate instead of on a salary basis.  Day rates have plagued the Debtors, their customers, competitors and the industry as a whole and this Supreme Court case has resonated across the industry.  Attorneys general from Mississippi, Alabama, Louisiana, Montana, Utah and West Virginia filed amicus briefs as well as industry groups.  While this case will not resolve the FLSA issues that the Debtors have already defended and settled, it highlights the negative impact this litigation can have for businesses in this industry.

C.      **Loss of Inspectors and Employees**

50.      In January 2022, the Debtors made significant changes to their inspector remuneration programs to permanently curtail further FLSA litigation and converted all inspectors

from day rates to hourly rates.  Although the day rate pay method was a defensible, longstanding industry practice, it proved costly to defend.  As part of the pay conversion process, the Debtors also significantly modified compensation and added a variety of new benefits, including increased hourly wages, a 401(k) match, retention bonuses, and subsidized health, dental, vision, and life insurance.  These changes were designed to give each inspector the same or greater remuneration than they received under the previous pay structure, but some inspectors preferred the old pay practices.  Notwithstanding the FLSA litigation, most of the Debtors' competitors continue their day rate and other similar pay practices.  As a result, in early 2022, approximately 20% of the Debtors' inspectors resigned and began working for other inspection service providers that continue the old pay practices.  The pay practice changes that were implemented were necessary to address the FLSA litigation, and will likely provide a long term competitive advantage, but in the short term the loss of employees further damaged the Debtors' business.

51.     During the pandemic, the Debtors also lost two critical employees in their Inspection Services segment: (i) the Co-founder, President, and CEO of the Inspection Services segment became unable to work, and (ii) the number two executive (EVP & COO) elected to retire in the summer of 2020 for personal reasons given COVID risks.

52.     This left the Inspection Services segment particularly vulnerable.  The third most senior person in the Inspection Services segment (the "Former Employee") had limited experience and only worked for the Debtors for a short time.  Given the management losses, the Debtors were compelled to give him a battlefield promotion.  However, under his leadership, the Inspection Services segment failed to achieve budget and important goals, and suffered the loss of several key customers and many inspectors.  In a meeting with the CEO on September 30, 2021, the Former Employee indicated that he wished to resign at the beginning of 2022 to pursue a new

career in another industry.   In October 2021, the Debtors promoted a proven and respected executive who had worked for the Debtor since 2013 to the newly created position of SVP & COO to manage the Former Employee.  Unfortunately, the Former Employee was ultimately terminated a few weeks ahead of his planned resignation date, due to a conflict of interest he created after he approached certain members of the Board in early December of 2021 with a proposal to purchase the Inspection Services segment from the Debtors.  The Former Employee's proposal would have wiped out common equity, been detrimental to preferred equity, and lead to material losses for the Former Lenders, while materially benefitting the Former Employee and another former employee. After his termination, the Debtors learned that the Former Employee and his father formed a new company on July 15, 2021, while he was still serving as Vice President and General Manager of the Debtors' Inspection Services segment, to compete with the Debtors' business.

53.     After his termination, the Former Employee retained counsel and presented a demand letter seeking significant compensation with various threats.  The Board met on multiple occasions with outside counsel and directed outside counsel to negotiate a settlement with the Former Employee, even offering mediation.   The Former Employee and his counsel were unwilling to mediate.  I believe the Former Employee continued to pursue a new business venture that was competitive to the Debtors, in violation of his continuing obligations to the Debtors. Thereafter, to protect the Debtors' business on March 7, 2022, with Board approval, CELP and Cypress Environmental Management, LLC ("CEM") filed a lawsuit in the District Court of Tulsa County, State of Oklahoma, Case No. CJ-2022-686, against the Former Employee alleging that he breached his duty of loyalty as an officer, conspired against CELP and interfered with certain of CELP's customer relationships (the "Initial Complaint").   CELP and CEM filed the Initial Complaint after receiving a payment demand from the Former Employee alleging wrongful

termination.  On April 14, 2022, the Former Employee filed an answer to the Initial Complaint, as well as counterclaims against CELP, CEM, the General Partner, Holdings, Tulsa Inspection Resources LLC (a Debtor), the Chairman of the Conflicts and Audit committee of the Board of Directors, two other Board members, the CEO, and the General Counsel.  The Debtors and the non-Debtors named in the counterclaims believe those claims are meritless and intend to vigorously defend them in the state court action.

**D.     NYSE Delisting**

54.     On Friday December 17, 2021, the NYSE notified CELP that it was being monitored for compliance with certain listing requirements.  Section 802.01C of the NYSE Listed Company Manual requires that CELP's common units trade at a minimum average closing price of $1.00 per common unit over a consecutive 30 trading day period.  Section 802.01B of the NYSE Listed Company Manual requires that either CELP's market capitalization (inclusive of common and preferred equity) or CELP's total owners' equity exceed $50 million.  Pursuant to the rules of the NYSE, if CELP fails to maintain these listing requirements, CELP will have a six-month period in which to regain compliance or be delisted.  In addition, CELP's common units could also be delisted if its average market capitalization over a consecutive 30 trading day period is less than $15 million.  The NYSE continues to monitor CELP and when the average thirty day closing price drops below $0.83 per unit CELP will automatically be delisted.  On Monday April 25, 2022, the NYSE requested a phone call with executive management, during which the NYSE notified CELP that the NYSE has the discretion to automatically cease trading if, in their judgement, the unit price falls further prior to the end of the thirty-day test.  If CELP permanently ceases trading, the Debtors

may face additional litigation despite material disclosures over the last several years about various risks.

### E.      Negotiations with Lenders

55.      The back-to-back energy downturns, a global pandemic and FLSA litigation put substantial pressure on the industry and the Debtors' business.  The business downturn impacted the Debtors' ability to meet their covenants under the Credit Agreement.  Accordingly, in Spring 2018 the board of directors retained Evercore, as investment banker, to explore strategic alternatives including a sale or third party equity investment.  Despite a substantial marketing process, no viable options materialized.

56.      The Debtors had very few options with the loan maturing in May 2018, and the Former Lenders were demanding a solution.  CELP had already cut the distribution to equity investors by 50% in 2017 and had sold its water treatment facilities in West Texas to pay down debt.  The Debtors also hired Bank of Montreal to market the water treatment division which proved unsuccessful.  In May 2018, Mr. Stephenson, whose family controlled the General Partner, agreed to provide a $43.5 million preferred equity investment as part of the negotiations with the Former Lenders for a three-year renewal on the credit facility.  The terms of the preferred equity investment were on favourable terms (relative to terms offered by 3rd parties) that benefited the Debtors, the Former Lenders, the minority owners and management and provided material liquidity to allow the business to recover from the downturn.  At the time, the FLSA litigation risk did not appear to be significant but unfortunately, that issue and other factors arose that further damaged the business.

57.      In summer of 2018, the Debtors signed a letter of intent with a private equity group to recapitalize the Debtors and to acquire control of the General Partner.  The FLSA litigation led

to termination of this opportunity.  In Spring of 2019, the Debtors won an important FLSA ruling that that denied certification of a collective action against the Debtors.  Following this decision, the private equity investor returned and a new letter of intent was executed on substantially similar terms as the previous letter of intent.  In early 2020, however, energy prices collapsed, the pandemic hit, and the Debtors' business began to significantly decline and the private equity group terminated the letter of intent and pursuit of a transaction.

58.     In January 2019, PG&E Corporation and its wholly-owned subsidiary Pacific Gas and Electric Company (collectively, "PG&E"), one the Debtors' most significant customers, commenced bankruptcy proceedings.  The Debtor was exposed to approximately $12 million in unpaid accounts receivable representing years' worth of profits with PG&E given the low margins in this industry.  The bankruptcy of PG&E impacted the Debtors' business but over time, the Debtors were able to file liens and recover a significant portion of their prepetition receivables and maintain their relationship with PG&E, which still remains strong.  In August 2019, Sanchez Energy Corporation and certain of its affiliates (collectively, "Sanchez"), a former client, commenced bankruptcy proceedings.  In 2021, the Debtors wrote off the remaining balance of approximately $500,000 due from Sanchez representing the largest loss in the Debtors' history and more profit than they ever made from Sanchez.

59.     In late 2020 and early 2021, the Debtors were engaged in discussions with another potential private equity investor regarding a recapitalization and go private transaction.  The discussions progressed to due diligence and a signed letter of intent.  Unfortunately, due to the continued decline in the business during the pandemic, discussions on a transaction terminated in May 2021.

60.     The Debtors continued to explore all strategic alternatives in order to preserve the business, including refinancing loans under the Credit Agreement (scheduled to mature in May 2021) through the Main Street Lending Program supported by the Federal Reserve.[6]  Under this pandemic driven program, the Federal Reserve would have held a ninety (95%) of the loan and the Collateral Agent, Administrative Agent and Former Lenders would have held the balance. For reasons that are not clear, after almost seven months of discussions the Collateral Agent and Administrative Agent declined to initiate the loan.  This loan would have provided the Debtors with a five year, long term solution to recover and reduced the Former Lenders' risk.  Following this disappointing setback, in March 2021 the Former Lenders offered a one-year renewal of the Credit Agreement, which reduced the size of the credit facility and introduced more expensive pricing.  The Debtors continued to pursue other options but after unsuccessful discussions with two alternate capital sources, the Debtors only option was to accept the one-year renewal from the Former Lenders.[7]

61.     Industry issues and the pandemic continued to pressure the business and the Debtors were unable to meet the financial covenants under the Credit Agreement.  For the period ending June 30, 2021, the Debtors had to request a covenant waiver.  The Debtor negotiated for over two months with the Agent and a split group of lenders, and reached an amendment on August 13, 2021 when four of the seven banks agreed to the amendment.  In exchange for the waiver, the Former Lenders required the Debtors to comply with significant restrictions and incur significant

---

[6] The Main Street Expanded Loan Facility ("Facility"), which had been authorized under section 13(3) of the Federal Reserve Act, was intended to facilitate lending to small and medium-sized businesses by eligible lenders. Under the Facility, the Federal Reserve Bank of Boston would commit to lend to a single common special purpose vehicle ("SPV") on a recourse basis.  The SPV would purchase 95% participations in the upsized tranche of eligible loans from eligible lenders. Eligible lenders would retain 5% of the upsized tranche of each eligible loan. The Department of the Treasury, using funds appropriated to the CARES Act, would make a $75 billion equity investment in the single common SPV to issue the loans.

[7] The Debtor had too many employees to qualify for the payroll protection plans offered by Congress.

expenditures, including retention of FTI Consulting ("<u>FTI</u>") as financial advisor who was engaged to prepare weekly cash flow forecasts, a three-year business plan and assist the Debtors in extensive additional reporting requirements.  FTI presented a three-year business plan to the Board in late September 2021 and then to the Former Lenders.  The business model showed the business recovering over time but also required an additional and more material renewal of the Credit Agreement.  The Debtors advised the Former Lenders that time was of the essence on a renewal with the upcoming Quarterly Report on Form 10-Q filed in November 2021 that required substantial disclosures of risks associated with the Former Lenders.  These disclosures caused additional concerns with customers and employees that led to the loss of talent and business.  The Debtors and FTI presented a renewal to the Former Lenders in November 2021 to implement the long-term business plan.  In late December 2021, the Former Lenders presented a counter proposal that the Debtors could not satisfy, nor would the counter proposal put the Debtors in a good position to attract future business or retain concerned customers and employees. Through the end of 2021 and into early 2022, the Debtors and FTI continued to engage with the Former Lenders in negotiations on various proposals but there was no material progress.

62.     Without a solution to the Debtors liquidity and capital structure issues, the business continued to suffer and the Debtors continued losing customers and employees.  In early 2022, the Former Lenders hired their own financial advisor Riveron Consulting, LP ("<u>Riveron</u>") to be paid for by the Debtors, and this hiring added to the building restructuring costs and concerns among customers and employees.  The parties continued to negotiate a potential one-year renewal term sheet. The negotiations were challenging with Riveron, the seven lenders, and the requirement for a unanimous consent.  In March 2022, the Board believed that a viable solution with the Former Lenders was not possible and the parties had reached an impasse.  At this point, the Debtors and

Former Lenders agreed to hire Piper and commenced the marketing sale process. This ultimately led to the Loan Sale to Argonaut, the Restructuring Support Agreement and Plan, as discussed further in Section I of this Declaration.

## V.    FIRST DAY MOTIONS

63.    Contemporaneously herewith, the Debtors filed numerous First Day Motions in this Chapter 11 Case seeking orders granting various forms of relief intended to provide stability and facilitate the Debtors' continued operations and the efficient administration of the Chapter 11 Case. The Debtors seek by the First Day Motions to, among other things, (i) ensure the continuation of their business operations and cash management system without interruption and (ii) preserve valuable relationships with employees, inspectors, customers, trade vendors and other creditors who might be able to successfully assert liens over the Debtors' assets or otherwise interrupt their operations, to the detriment of all stakeholders.

64.    I have read and understand each of the First Day Motions and the relief requested therein. Based on my review, and to the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference. I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases. Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtors, their business, and their estates.

65.    A description of the relief requested and the facts supporting each of the First Day Motions is attached hereto as Exhibit B. Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Bankruptcy Court should grant the relief requested in each of the First Day Motions.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 8, 2022
Tulsa, Oklahoma

Peter C. Boylan III
Chairman & Chief Executive Officer

**Exhibit A**

**(Corporate Organizational Chart)**



1 – Cypress Environmental Partners, L.P. is a publicly filed Master Limited Partnership.

**Exhibit B**

**(First Day Motions and Requested Relief)**

**I. <u>Administrative Motions</u>**

A. <u>Joint Administration Motion</u> – By this motion, the debtors are seeking entry of an order directing the joint administration of the Chapter 11 Cases and granting related relief.

B. <u>Claims Agent Retention Motion</u> – By this motion, the Debtors are seeking entry of an order authorizing the retention and appointment of Kurtzman Carson Consultants LLC ("<u>KCC</u>") as claims, noticing, and solicitation agent in lieu of the Clerk of the Court in the Debtors' chapter 11 cases with full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases and granting related relief.

C. <u>Consolidated List of Creditors Motion</u> – By this motion, the Debtors are seeking entry of an order authorizing the Debtors to file a consolidated creditor matrix, file a consolidated top 30 creditors list, redact certain personal information, waive the requirement to file a list of and provide notice directly to CELP's equity security holders, approve the form and manner of notifying creditors of the commencement of the chapter 11 cases and other information, and granting related relief.

D. <u>Schedules and Statements Motion</u> – By this motion, the Debtors are seeking entry of an order authorizing an extension of 16 days (for a total of 30 days) for the period to file schedules and statements and a corresponding extension of the time period to file financial reports for non-Debtor affiliates, and granting related relief

**II. <u>Operational Motions</u>**

E. <u>Cash Management Motion</u> – By this motion, the Debtors are seeking entry of an order authorizing the Debtors to continue operating their cash management system, maintaining their existing bank accounts and business forms, paying related prepetition obligations, performing intercompany transactions, and granting related relief.

F. <u>Employee Wages Motion</u> – By this motion, the Debtors are seeking entry of an order authorizing the Debtors to pay prepetition wages, salaries, compensation, reimbursable expenses, and certain incentives to employees and continue providing employees with benefits pursuant to the Employee Benefits Programs in the ordinary course of business, including payment of certain prepetition obligations related thereto and granting related relief

G. <u>Insurance and Performance Bond Motion</u> – By this motion, the Debtors are seeking entry of an order authorizing the Debtors to continue their insurance coverage and performance bond program entered into prior to the commencement of the Chapter 11 Cases and to satisfy prepetition obligations related thereto including to amend, extend, renew, rollover, replace, or

obtain new insurance policies, premium financing arrangements, or performance bonds and to take all appropriate actions in connection therewith in the ordinary course of business, and granting related relief.

H.  <u>Utility Motion</u>  -- By this motion, the Debtors are seeking entry of an order approving the Debtors' proposed adequate assurance of payment for future utility services, prohibiting utility providers from altering, refusing, or discontinuing services, approving the Debtors' proposed procedures for resolving additional assurance requests, and granting related relief.

I.  <u>Taxes and Fees Motion</u> – By this motion, the Debtors are seeking entry of an order authorizing the payment of various local, state, and federal taxing and regulatory authorities on account of taxes that arose prepetition and in the ordinary course, and granting related relief.

J.  <u>DIP Motion</u> -- By this motion, the Debtors are seeking entry of interim and final orders authorizing the Debtors to obtain postpetition financing through the DIP documents, grant liens and superpriority claims, use cash collateral, and granting related relief.

M.  <u>Solicitation Procedures Motion</u> – By this motion, the Debtors are seeking entry of orders (1) scheduling the a combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan; (2) establishing the objection deadline for the adequacy of the Disclosure Statement and confirmation of the Plan and approving certain related procedures; (3) conditionally approving the solicitation procedures; (4) approving the form and manner of the combined notice, the notice of non-voting status, and the opt-out form; (5) directing that the U.S. Trustee not convene the creditors' meeting if the Plan is confirmed within 60 days of the Petition Date; and (6) granting related relief.