**<u>Exhibit A</u>**

**Revised Proposed Order**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) )  Chapter 11 |
| CYPRESS ENVIRONMENTAL PARTNERS, L.P., *et al.*,[1] | ) )  Case No. 22-90039 (MI) |
| Debtors. | ) )  (Joint Administration Requested) )  **Re: Docket No. 13** |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL OF THE PREPETITION FIRST LIEN SECURED PARTIES, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION FIRST LIEN SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the Motion[2] filed by the above-referenced debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"), pursuant to sections 105, 361, 362, 363(c), 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Cypress Environmental Partners, L.P. (1523); Cypress Municipal Water Services, LLC (5974); Cypress Environmental Partners, LLC (7385); Cypress Brown Integrity, LLC (3455); Cypress Energy Partners - 1804 SWD, LLC (9110); Cypress Energy Partners - Bakken, LLC (9092); Cypress Energy Partners - Grassy Butte SWD, LLC (9047); Cypress Energy Partners - Green River SWD, LLC (1534); Cypress Energy Partners - Manning SWD, LLC (4247); Cypress Energy Partners - Mork SWD, LLC (0761); Cypress Energy Partners - Mountrail SWD, LLC (4977); Cypress Energy Partners - Tioga SWD, LLC (3230); Cypress Energy Partners - Williams SWD, LLC (3840); Cypress Environmental - PUC, LLC (8637); Cypress Environmental Management - TIR, LLC (5803); Cypress Environmental Management, LLC (4753); Cypress Environmental Services, LLC (7770); Tulsa Inspection Resources - PUC, LLC (2514); and Tulsa Inspection Resources, LLC (4632).  The Debtors' service address for the purposes of these chapter 11 cases is 5727 South Lewis Avenue, Suite 300, Tulsa, Oklahoma 74105.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the DIP Credit Agreement, as applicable. In the event of any discrepancy between the terms of this Interim Order and the DIP Credit Agreement (or any other DIP Facility Document), the terms of this Interim Order shall control.

Procedure (the "Bankruptcy Rules"), and Local Rule 4001 of the Local Rules of the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Local Bankruptcy Rules"), seeking, among other things:

(i)    authorization for Cypress Environmental Partners, L.P. ("CELP"), as borrower (the "Borrower"), a debtor in possession under the Bankruptcy Code, and each subsidiary of CELP that executes the DIP Credit Agreement (as defined below) as a Guarantor, each as a debtor in possession in the Chapter 11 Cases, to obtain and be obligated in respect of postpetition financing provided under a credit facility (the "DIP Facility") (including requirements for the Debtors' use of Cash Collateral (as defined below)), and for the Guarantors (as defined in the DIP Credit Agreement), to guarantee and be jointly and severally obligated to pay the Borrower's obligations in connection with the DIP Facility consisting of a non-amortizing, new money, multi-draw credit facility in an aggregate principal amount of $5 million (the "DIP Loans"), of which: (i) $3 million in principal amount of new money revolving loans shall be available upon entry of this Interim Order (the "Interim DIP Loans") and (ii) an additional $2 million in principal amount of new money revolving loans (the "Final DIP Loans") shall be available upon entry of the Final Order (as defined below), provided by APE V Cypress, LLC, as lender, and the other lenders party thereto from time to time (collectively, the "DIP Lenders"), for which APE V Cypress, LLC shall act as administrative agent (in such capacity, the "DIP Agent"), pursuant to the terms of this Interim Order and that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement* by and among the Borrower, the Guarantors, the DIP Lenders, and the DIP Agent, substantially in the form attached hereto as **Exhibit 1** (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and this Interim Order, the "DIP

Credit Agreement"),[3] and any related security agreements, fee letters, and other documents required to be executed or delivered by or in connection with the DIP Credit Agreement (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and this Interim Order, collectively, the "DIP Facility Documents");

(ii)    authorization for the Debtors to execute and deliver the DIP Facility Documents and to perform such other and further acts as may be required in connection with the DIP Facility Documents;

(iii)    authorization for the Debtors, (a) upon entry of the Interim Order to borrow the Interim DIP Loans, and (b) subject to entry of the Final Order, to borrow the Final DIP Loans;

(iv)    the granting as adequate protection of the liens and security interests in favor of APE V Cypress, LLC, a Delaware limited liability company, in its capacity as agent (the "Prepetition First Lien Agent"), on behalf of and for the benefit of itself and the Prepetition First Lien Lenders (as defined below and together with the Prepetition First Lien Agent, the "Prepetition First Lien Secured Parties") under the Prepetition First Lien Security Documents (as defined below), which Prepetition First Lien Collateral (as defined below) is being consensually primed by the liens securing the repayment of the DIP Facility, in accordance with this Interim Order;

(v)    authorization for the Debtors' use of cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, including, without limitation, any accounts receivable and general intangible and any other cash or right that would be included in such definition of "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code) constituting Prepetition

---

[3]    To the extent of any conflict between the terms of the DIP Credit Agreement and this Interim Order, the terms of this Interim Order shall control.

First Lien Collateral (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Prepetition First Lien Borrowers (as defined below) in any deposit or securities account or accounts as of the Petition Date), and any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition First Lien Collateral or the DIP Collateral (as defined below) (together, the "<u>Cash Collateral</u>") on the terms and conditions set forth in this Interim Order and in the DIP Credit Agreement and in accordance with the Approved DIP Budget[4] (as defined in the DIP Credit Agreement) (including the Permitted Variance (as defined herein)), and the granting of adequate protection to the Prepetition First Lien Secured Parties with respect to such use of their interest in Cash Collateral;

(vi)   approval of certain stipulations by the Debtors as set forth in this Interim Order and the DIP Credit Agreement with respect to the Prepetition First Lien Claim Documents and the Prepetition First Lien Facility (each as defined below) and the liens and security interests arising therefrom;

(vii)   authorization for the Debtors to grant security interests, liens, and superpriority claims (including superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Agent for the benefit of each of the DIP Lenders (together with the DIP Agent, and any other holder of DIP Obligations (as defined below), collectively, the "<u>DIP Secured Parties</u>") in each case payable from, and having recourse to, all prepetition property, including, but not limited to, all Prepetition First Lien Collateral, and postpetition property of the Debtors' estates and all proceeds thereof (but excluding, for the

---

[4]  A copy of the Approved DIP Budget is annexed hereto as **Exhibit 2**.

avoidance of doubt, Avoidance Actions (as defined below), but not (subject to entry of a Final Order) the Avoidance Proceeds (as defined below)); *except*, that the DIP Liens (as defined below) shall be subject and subordinate in all respects only to the Carve-Out (as defined below) and the Non-Primed Excepted Liens (as defined in the DIP Credit Agreement);

(viii)   authorization for the DIP Agent, at the direction of the DIP Lenders, to (1) terminate the DIP Credit Agreement in accordance with its terms; (2) declare the DIP Facility to be immediately due and payable in full, to the extent permitted by the terms thereof; (3) be granted relief from the automatic stay to foreclose on the DIP Liens; and (4) for the benefit of the DIP Secured Parties, subject to the Carve-Out, to freeze, take possession of, set off against, and otherwise exercise any remedy available to a secured party at law or in equity with respect to all DIP Collateral (as defined below and including Cash Collateral) until the DIP Obligations and the obligations and the rights granted in this Interim Order, have been indefeasibly paid in full in cash, each upon the occurrence of an Event of Default (as such term is defined in the DIP Credit Agreement);

(ix)   subject only to, and effective upon, entry of a Final Order, modification of the Debtors' right to assert claims to surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code to the extent set forth in paragraph 7 hereof;

(x)   modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors and the DIP Secured Parties to implement and effectuate the terms and provisions of the DIP Facility Documents and this Interim Order, as applicable;

(xi)   the scheduling of a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order," and collectively with this Interim Order, the "DIP Orders"), substantially

in the form of this Interim Order, granting the relief requested in the Motion on a final basis, authorizing the balance of the borrowings under the DIP Facility Documents on a final basis as set forth in the Motion and the DIP Facility Documents, and approving the Debtors' notice procedures with respect thereto; and

    (xii)   waiver of any applicable stay (including under Rule 6004 of the Bankruptcy Rules) and the provision of immediate effectiveness of this Interim Order.

The Court having considered the relief requested in the Motion, the exhibits attached thereto, the *Declaration of Sanjiv Shah in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Postpetition Financing, and (B) Utilize Cash Collateral of the Prepetition First Lien Secured Parties, (II) Granting Adequate Protection to the Prepetition First Lien Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, the *Declaration of Peter C. Boylan III in Support of Chapter 11 Petitions and First Day Motions*, the DIP Credit Agreement, and the evidence submitted and arguments made at the interim hearing commenced on May 9, 2022 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and the Debtors, the DIP Agent and the Prepetition First Len Agent having agreed to modify the relief requested in the Motion, as reflected in this Interim Order, based on concerns expressed by the Court at the Interim Hearing; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in

the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' property; and it appearing that the Debtors' entry into the DIP Credit Agreement and other DIP Facility Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[5]**

A.     ***Background.***  On May 8, 2022 (the "Petition Date"), the Borrower and each of the other Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court of the Southern District of Texas, Houston Division (the "Court"), commencing the above referenced chapter 11 cases (collectively, the "Chapter 11 Cases").  The Debtors have continued to operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.  The Chapter 11 Cases are being jointly administered for procedural purposes only.  As of the date of the Interim Hearing, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") had not appointed an official committee of unsecured creditors in the Chapter 11 Cases.  If the U.S. Trustee appoints an official committee of unsecured creditors in the Chapter 11 Cases in the future, such official committee of unsecured creditors shall be defined as the "Committee" hereunder.

---

[5]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      ***Prepetition First Lien Secured Parties Consent***.  Subject to the terms of this Interim Order, the Prepetition First Lien Secured Parties have agreed (i) to permit the Debtors to use the Cash Collateral and (ii) not to object to the DIP Facility, including the DIP Liens contemplated in connection therewith, pursuant to the DIP Credit Agreement.

C.      ***Jurisdiction***.  This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  Venue of the Chapter 11 Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, and 9014.

D.      ***Notice***.  Notice of the Motion and the Interim Hearing constitutes due, sufficient and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b) and (c), and 9014, the Bankruptcy Local Rules and the Complex Case Procedures, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

E.      ***Debtors' Stipulations***.  Without prejudice to the rights of the Committee or any other party in interest (but which rights are subject to the limitations thereon contained in paragraphs 16 and 17 hereof), the Debtors admit, stipulate, and agree that:

(i)      Pursuant to that certain *Amended and Restated Credit Agreement*, dated as of May 29, 2018, as last amended by Second Amendment dated as of August 13, 2021 (as amended, the "Prepetition First Lien Credit Agreement"), among Cypress Environmental Partners, L.P, Tulsa Inspection Resources—Canada ULC (together with the Borrower's Agent and each Additional Borrower (each as defined in the Prepetition First Lien Credit Agreement), collectively, the "Prepetition First Lien Borrowers"), the Prepetition First Lien Agent, and the

several banks and other financial institutions or entities from time to time party to the Prepetition First Lien Credit Agreement as lenders (the "Prepetition First Lien Lenders"), the Prepetition First Lien Agent and the Prepetition First Lien Lenders agreed to extend a credit facility to the Prepetition First Lien Borrowers in an aggregate principal amount of up to $75,000,000 (the "Prepetition First Lien Facility").

(ii)      Pursuant to (a) that certain *Security Agreement*, dated as of May 29, 2018 (the "Prepetition First Lien Security Agreement"), by and among the Prepetition First Lien Borrowers and the Prepetition First Lien Agent, and (b) and that certain *General Security Agreement* dated as of December 24, 2013 (the "Prepetition First Lien Canadian Security Agreement", and, together with the Prepetition First Lien Security Agreement, the "Prepetition First Lien Security Agreements") executed by Tulsa Inspection Resources – Canada ULC, Tulsa Inspection Resources – Acquisition ULC, and Foley Inspection Services ULC in favor of the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties, (c) each Mortgage and Security Agreement (as defined in the Prepetition First Lien Credit Agreement) executed in connection with the Prepetition First Lien Credit Agreement, (d) all other security agreements, control agreements, or other instruments, agreements, or documents delivered by any Borrower to create or grant to the Prepetition First Lien Secured Parties any lien on any property as security for the Obligations (as defined in the Prepetition First Lien Credit Agreement) or to perfect, assure, or preserve any lien or any rights or remedies created thereby, including any other Security Documents (as defined in the Prepetition First Lien Credit Agreement) (clauses (a), (b), (c) and (d), together, the "Prepetition First Lien Security Documents," and together with the Prepetition First Lien Credit Agreement, the "Prepetition First Lien Claim Documents"), the Prepetition First Lien Borrowers granted to the Prepetition First Lien Secured Parties, to secure

the Obligations, a lien on and first priority security interest in all right, title, and interest in all right, title, and interest in the all property and interests in property of the Prepetition First Lien Borrowers, then owned or thereafter acquired, pursuant to the Prepetition First Lien Security Documents, including all proceeds and products of any and all of the foregoing, in each case whether then existing or thereafter acquired, in each case to the extent provided for in the Prepetition First Lien Security Documents (collectively, the "Prepetition First Lien Collateral").

(iii)    As of the Petition Date, the aggregate amount of the Obligations (as defined in the Prepetition First Lien Security Documents) due and payable by the Prepetition First Lien Borrowers to the Prepetition First Lien Secured Parties under the Prepetition First Lien Credit Agreement, equaled approximately $58,853,976, inclusive of outstanding principal and accrued and unpaid interest as of the Petition Date (collectively, the "Prepetition First Lien Secured Claim").

(iv)    The Prepetition First Lien Secured Claim constitutes the legal, valid, and binding obligations of the Prepetition First Lien Borrowers, enforceable against them in accordance with the terms of the Prepetition First Lien Claim Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code).

(v)    No portion of the Prepetition First Lien Facility, the Prepetition First Lien Secured Claim, or any payment on account thereof is subject to avoidance, recharacterization, recovery, reduction, subordination, disallowance, impairment, or any other challenges pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and the Debtors do not have, hereby forever release, and are forever barred from bringing any "claims" (as such term is defined in the Bankruptcy Code), counterclaims, cross claims, causes of action, defenses, recoupment, or setoff rights, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition

First Lien Secured Parties, solely in their capacities as the Prepetition First Lien Secured Parties, respectively, and not in any other capacity or in respect to any other relationship the Prepetition First Lien Secured Parties may have, or have had, with or in respect to the Debtors, whether arising at law or in equity, including, without limitation, any recharacterization, subordination, avoidance, or other claim arising under the Bankruptcy Code or otherwise.

(vi)   The liens and security interests granted to, or for the benefit of, the Prepetition First Lien Secured Parties, including with respect to the Cash Collateral, pursuant to the Prepetition First Lien Security Documents and in connection with the Prepetition First Lien Secured Claim constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code) and perfected first priority liens (subject to Non-Primed Excepted Liens, as defined in the DIP Credit Agreement) on and security interests in the Prepetition First Lien Collateral and are not subject to defense, counterclaim, avoidance, recharacterization, recovery, disallowance, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by any person or entity, except insofar as such liens and security interests are subject and subordinate to the DIP Liens, any Non-Primed Excepted Liens, and the Carve-Out hereunder.

F.   ***Findings Regarding the DIP Facility and Use of Cash Collateral.***

(i)   Good cause has been shown for the entry of this Interim Order, including immediate and irreparable harm to the Debtors' estates, if relief is not immediately granted.

(ii)   The Debtors need to obtain immediate access to the postpetition financing under the DIP Facility and to use Cash Collateral to, among other things, permit the orderly continuation of the operation of their businesses, maintain business relationships with vendors and suppliers, make capital expenditures, satisfy other working capital and operational needs, and fund

the administration and prosecution of the Chapter 11 Cases. The immediate access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of postpetition financing under the DIP Facility, and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtors' estates and to a successful reorganization of the Debtors.

(iii)    The Debtors are unable to obtain sufficient financing on more favorable terms from sources other than the DIP Lenders under the DIP Facility Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the DIP Agent and the DIP Secured Parties, subject and subordinate to the Carve-Out and any Non-Primed Excepted Liens as provided for herein, the DIP Liens and the Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and in the DIP Facility Documents. The only available and sufficient source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility. The Debtors require both financing under the DIP Facility and the continued use of Cash Collateral under the terms of this Interim Order to satisfy their postpetition liquidity needs.

(iv)    The DIP Agent and the DIP Lenders are willing to provide the DIP Facility, and the Prepetition First Lien Secured Parties are willing to consent to the Debtors' use of their Cash Collateral, in each case subject to the terms and conditions set forth in the DIP Facility Documents and the provisions of this Interim Order, as applicable, including satisfaction of the DIP Milestones (as defined in the DIP Credit Agreement); *provided* that the DIP Liens, the Superpriority Claims, the Adequate Protection Obligations (as defined below), and other

protections granted by this Interim Order and the DIP Facility Documents will not be affected by any subsequent reversal or modification of this Interim Order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility and the use of Cash Collateral approved by this Interim Order.  The DIP Agent and the DIP Lenders have acted in good faith in agreeing to provide the DIP Facility approved by this Interim Order, as further evidenced by the DIP Facility Documents, and the Prepetition First Lien Secured Parties have acted in good faith in consenting to the Debtors' use of their Cash Collateral pursuant to the terms of this Interim Order, and their reliance on the assurances referred to above is in good faith.

(v)     The DIP Facility Documents and the DIP Facility provided for thereunder, and the Debtors' use of Cash Collateral, each as authorized hereunder, have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition First Lien Secured Parties, respectively, and the terms of the DIP Facility and the use of Cash Collateral, respectively, are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  All of the obligations and the rights granted in this Interim Order, including without limitation, all loans and other financial accommodations made to, or guaranties issued by, the Debtors pursuant to the DIP Facility Documents (all of the foregoing collectively, the "DIP Obligations"), and the Adequate Protection Obligations, are being extended or received, as applicable, by the DIP Secured Parties and the Prepetition First Lien Secured Parties (and the successors and assigns of each of the foregoing) in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of

13

section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(vi)     The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(1) and 4001(c)(1).  The authorization granted herein on an interim basis to use Cash Collateral, to enter into the DIP Facility Documents, and to borrow an aggregate initial amount of $3 million of Interim DIP Loans is necessary to preserve the going concern value of the Debtors and their estates.  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility and the use of Cash Collateral in accordance with this Interim Order and the DIP Facility Documents, as applicable, are therefore in the best interests of the Debtors and their estates and creditors.

NOW, THEREFORE, based on the Motion of the Debtors and the record before this Court with respect to the Motion, including the record made during the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.     *Approval of Motion.*  The Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the relief granted in this Interim Order that have not been withdrawn, waived, or settled are hereby denied and overruled.

2.     *Authorization of the DIP Facility and the DIP Facility Documents.*

(i)     Each of the Debtors is hereby authorized to execute, issue, deliver, enter into, and adopt, as the case may be, the DIP Facility Documents, including the DIP Credit Agreement, and the other DIP Facility Documents are hereby approved.

(ii)     The Borrower is hereby authorized to borrow up to the principal amount of the Interim DIP Loan on an interim basis, and the Guarantors are hereby authorized to guarantee

such borrowings, prior to the entry by the Court of the Final Order, on the terms and subject to the conditions set forth in this Interim Order and the DIP Facility Documents (including compliance with the DIP Milestones), which borrowings may be used for all purposes permitted under the DIP Facility Documents, pursuant to the Approved DIP Budget, including, without limitation: (1) to provide agreed working capital for the Debtors; (2) to pay Adequate Protection Obligations to the Prepetition First Lien Secured Parties, (3) to pay Lender Professional Fees to the Prepetition First Lien Secured Parties and the DIP Secured Parties, as applicable, (4) to pay, subject to the Approved DIP Budget (including the Permitted Variance (as defined below)), administrative expenses, (5) to pay allowed fees and expenses of Professionals (defined below),[6] (6) to pay any other fees and expenses required under the DIP Facility Documents and the Chapter 11 Cases, and (7) to pay such other expenses to which the DIP Lenders may consent in their sole discretion (subject to the limitations thereon contained in paragraph 17 hereof), which borrowings shall be comprised of an aggregate principal amount not to exceed $3 million, plus interest, fees, and other expenses and amounts provided for in the DIP Facility Documents.

(iii)    In furtherance of the foregoing and without further approval of this Court, each Debtor hereby is authorized and directed to perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, pledges, and financing statements), and, without further application to the Court, to promptly pay all fees set forth in the DIP Facility Documents, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility Documents, including, without limitation:

---

[6]    For the avoidance of doubt, the payment of allowed fees and expenses of Professionals shall not be subject to the Approved DIP Budget.

(a)      the execution, delivery, and performance of the DIP Facility Documents and any exhibits and schedules attached thereto, including, without limitation, the DIP Credit Agreement and all related documents contemplated thereby;

(b)      the execution, delivery, and performance of one or more amendments to, modifications of, or waivers relating to the DIP Facility Documents for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the DIP Facility among the DIP Lenders, in each case in such form as the Debtors and the DIP Secured Parties (or any portion thereof as provided in the DIP Facility Documents) may agree (it being understood that no further approval of the Court shall be required for non-material amendments to or waivers relating to the DIP Credit Agreement and, subject to and effective only upon entry of this Interim Order, any fees paid in connection therewith) or modifications of the Approved DIP Budget; and

(c)      the performance of all other acts required under or in connection with the DIP Facility Documents.

(iv)      Upon execution and delivery of the DIP Facility Documents, the DIP Facility Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Facility Documents and this Interim Order.  No obligation, payment, transfer, or grant of security interest under the DIP Facility Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment, or counterclaim.

3.      ***Superiority Claims.***  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims against each

of the Debtors (without the need to file any proof of claim or request for payment of administrative expense) with priority over any and all other administrative expenses, adequate protection claims, diminution claims (including all Adequate Protection Obligations) and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 503(b), 506(c) (with any claims arising only under section 506(c) subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code (the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and postpetition property of the Debtors and their estates and all proceeds thereof (excluding all Avoidance Actions, but including, subject to entry of a Final Order, any Avoidance Action Proceeds); *provided*, *however*, that the Superpriority Claims shall be subject and subordinate only to the Carve-Out.

4.      ***Carve-Out.***

(i)      For purposes of this Interim Order, the "Carve-Out" shall mean the sum of: (a) all fees required to be paid to the Clerk of the Court and all fees required to be paid to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (d) below); (b) all reasonable fees and expenses up to $60,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (d) below); (c) solely to the extent allowed at any time, whether by interim order,

final order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and a committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professionals") at any time before the delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below); and (d) the Allowed Professional Fees of (x) the Debtor Professionals in an aggregate amount not to exceed that set forth in the Approved DIP Budget for the relevant period, (y) the Committee Professionals in an aggregate amount not to exceed $60,000 incurred beginning on the first day following delivery by the DIP Agent of a Carve-Out Trigger Notice plus (z) the amount of any Allowed Professional Fees arising from any restructuring, sale, completion, success, or other similar fees (a "Transaction Fee") of any investment banker or financial advisor of the Debtors, in each case to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise (the amounts set forth in this clause (d) being the "Post-Carve Out Trigger Notice Cap"); *provided that*, notwithstanding the foregoing, the "Carve-Out" shall not include (1) in the event that the Debtors' Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, any Transaction Fee that becomes earned and payable pursuant to the terms of such Debtor Professional's engagement agreement as a result of (A) the entry into a restructuring or sale transaction that would trigger a Transaction Fee during the pendency of such chapter 7 cases, and (B) the consummation of such a transaction during the pendency of such chapter 7 cases; or (2) any fees, costs, and expenses incurred by the Debtor Professionals in connection with investigating liens of the Prepetition First Lien Agent and the Prepetition First Lien Lenders and asserting any challenges to any stipulations of the Debtors in the DIP Orders within the Challenge Period (as defined below)

18

and shall only include any fees, costs, and expenses incurred by the committee (if any) to investigate liens of the Prepetition First Lien Agent and the Prepetition First Lien Lenders and to assert any challenges to any stipulations of the Debtors in the DIP Orders within the Challenge Period up to an amount not to exceed $35,000.  For the avoidance of doubt and notwithstanding anything to the contrary contained herein or in the DIP Orders, the DIP Facility Documents, or the Prepetition First Lien Claim Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Obligations, all Superpriority Claims, all claims arising under the Prepetition First Lien Claim Documents, and all liens securing such claims thereunder, the adequate protection liens, all adequate protection superpriority claims, any and all other forms of adequate protection securing or on account of the claims arising under the Prepetition First Lien Claim Documents, and any claims against or other obligations of the Debtors, including any post-petition intercompany claims among the Debtors.

(ii)     For purposes of the foregoing, "Carve-Out Trigger Notice" means a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Order then in effect or the DIP Credit Agreement, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been delivered, the Debtors shall be permitted to pay and/or reimburse, as applicable, Allowed Professional Fees that are allowed by the Bankruptcy Court and payable under sections 328, 330,

and 331 of the Bankruptcy Code and compensation procedures approved by the Bankruptcy Court, and the payment and/or reimbursement of same shall not reduce the Carve-Out.

(iii)    None of the Carve-Out, the Post-Carve-Out Trigger Notice Cap, nor the Approved DIP Budget shall be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors and their estates.

5.    **DIP Liens**.  As security for the DIP Obligations effective and perfected as of the Petition Date and without the necessity of the execution by the Debtors (or recordation or other filing) of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by any DIP Secured Party of, or over, any DIP Collateral, the following security interests and liens, hereby are granted by the Debtors to each of the DIP Secured Parties (all property of the Debtors identified in clauses (i), (ii), and (iii) below being collectively referred to as the "DIP Collateral"), subject and subordinate to the Carve-Out (all such liens on and security interests in the DIP Collateral granted to the DIP Secured Parties pursuant to this Interim Order, and the DIP Facility Documents, the "DIP Liens"):

(i)    First Lien on Any Unencumbered Property.  Subject to the Carve-Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date or the date acquired (if acquired after the Petition Date) is not subject to valid, perfected, and non-avoidable liens, if any (collectively, "Unencumbered Property"), (a) including, without limitation, any unencumbered cash of the Debtors (wherever maintained) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment,

general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and any claims and causes of action of the Debtors; (b) without limiting the generality of the foregoing, the corporate headquarters of CELP located at 5727 South Lewis Avenue, Suite 300, Tulsa, Oklahoma 74105, and any other real property owned or leased by the Debtors; and (c) subject to entry of the Final Order, any proceeds, or property recovered in connection with, any of the Debtors' causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law (such claims or causes of action, the "Avoidance Actions") (but excluding, for the avoidance of doubt, the Avoidance Actions, and including, for the avoidance of doubt, subject to entry of a Final Order, any proceeds of the Avoidance Actions and any property recovered in connection therewith (the "Avoidance Action Proceeds")).

(ii)     Liens Senior to Prepetition First Lien Secured Parties' Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, first priority (subject and subordinate to the Carve-Out and any Non-Primed Excepted Liens, as defined in the DIP Credit Agreement) senior priming security interest in and lien upon all pre- and postpetition property of the Debtors (including, without limitation, Cash Collateral), whether now existing or hereafter acquired, of the same nature, scope, and type as the Prepetition First Lien Collateral.  Such security interests and liens shall be senior in all respects to the interests in such property of the Prepetition First Lien Secured Parties arising from current and future liens of the Prepetition First Lien Secured Parties (including, without limitation, the Adequate Protection Liens granted hereunder).

(iii)    <u>Liens Junior to Certain Other Liens</u>.   Subject and subordinate to the Carve-Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all pre- and postpetition property of the Debtors (other than the property described in clauses (i) or (ii) of this paragraph 5, as to which the liens and security interests in favor of the DIP Agent for the benefit of the DIP Secured Parties, will be as described in such clauses), whether now existing or hereafter acquired, that is (a) subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date or (b) subject to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Secured Parties, are and shall be junior to such valid, perfected, and unavoidable liens.

(iv)    <u>Liens Senior to Certain Other Liens</u>.   Subject only to the Carve-Out and any Non-Primed Excepted Liens, the DIP Liens shall not be subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.

6.    ***Protection of the DIP Secured Parties' Rights***.

(i)    So long as any DIP Obligations are outstanding or the DIP Lenders have any outstanding commitments under the DIP Credit Agreement, the Prepetition First Lien Secured Parties shall (a) have no right to and shall take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Prepetition First Lien Claim Documents or this Interim Order, or otherwise exercise or seek to exercise any enforcement rights or remedies against any DIP Collateral without the prior written consent of the DIP Lenders, except as authorized by

a further order of this Court entered after the date hereof and (b) be deemed to have consented to any release of DIP Collateral authorized under the DIP Facility Documents.

(ii)     Upon the occurrence and during the continuation of an Event of Default, the DIP Agent is hereby authorized to file a motion on shortened notice of no less than five (5) business days seeking relief from the automatic stay in order to permit the DIP Agent to exercise any or all rights and remedies set forth in this Interim Order and the DIP Documents, pursuant to and subject to the terms and provisions of this Interim DIP Order and the DIP Documents.

(iii)     Subject to the entry of a Final Order, in no event shall any of the DIP Secured Parties or the Prepetition First Lien Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to their respective liens and security interests upon and in the DIP Collateral or the Prepetition First Lien Collateral, as applicable.  Any DIP Secured Party's delay or failure to exercise rights and remedies under the DIP Facility Documents or this Interim Order shall not constitute a waiver of any DIP Secured Party's rights hereunder, thereunder, or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Credit Agreement.  Further, subject only to and effective upon entry of the Final Order, in no event shall the "equities of the case" exception of section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition First Lien Secured Parties.

(iv)     No rights, protections, or remedies of the DIP Secured Parties granted by the provisions of this Interim Order or the DIP Facility Documents shall be limited, modified, or impaired in any way by (a) any actual or purported withdrawal of the consent of any party to the Debtors' use of Cash Collateral, (b) any actual or purported termination of the Debtors' authority

to use Cash Collateral, or (c) the terms of any other order or stipulation related to the Debtors' use of Cash Collateral or any other matter, or the provision of adequate protection to any party.

7.      ***Limitation on Charging Expenses against Collateral.***   Subject only to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no claim may be asserted against any of the DIP Secured Parties, or the Prepetition First Lien Secured Parties, each in its capacity as such, to (i) charge any expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, against the DIP Collateral or the Prepetition First Lien Collateral or (ii) recover such expenses from the DIP Collateral or the Prepetition First Lien Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, in each case without the prior written consent of the DIP Secured Parties and the Prepetition First Lien Secured Parties, and no such consent shall be implied from any other action, inaction, or acquiescence by any of the DIP Secured Parties or the Prepetition First Lien Secured Parties.

8.      ***Use of Cash Collateral.***   The Debtors are hereby authorized, subject to the terms and conditions of the DIP Facility Documents and this Interim Order, to use Cash Collateral, including, without limitation, Cash Collateral on which the DIP Secured Parties and the Prepetition First Lien Secured Parties hold a lien to fund (a)(i) working capital, (ii) general corporate purposes, (iii) restructuring expenses, and (iv) any fees required under the DIP Credit Agreement or any other DIP Facility Document, in each case with respect to clauses (i) through (iv), pursuant to the Approved DIP Budget, subject to Permitted Variances, and (b) fees and expenses incurred by Professionals; *provided*, *however*, that no Cash Collateral shall be used in a manner that would violate paragraph 17 hereof.  The Debtors' right to use any such Cash Collateral (other than with respect to the payment of fees and expenses of Professionals) shall be in accordance with the

Approved DIP Budget, subject to Permitted Variances, and such right shall terminate automatically upon the earliest of (x) the Maturity Date and (y) five (5) Business Days' written notice provided by the DIP Agent to the U.S. Trustee, the Debtors, and the Committee through their respective counsel, or provided by the Debtors to the DIP Secured Parties and the Prepetition First Lien Secured Parties, through each of their respective counsel, of the occurrence and continuance of any Event of Default under the DIP Facility Documents.

9. ***Compliance with Approved DIP Budget.*** The Debtors' aggregate expenditures under the Approved DIP Budget will be tested on each weekly Test Date (as defined in the DIP Credit Agreement), on which date the Debtors shall deliver to the DIP Agent a weekly variance report (the "Variance Report"). The Variance Report shall measure performance, on a cumulative basis for (i) all disbursements made in the prior week against the amount budgeted therefor in the Approved DIP Budget and (ii) all disbursements made in the prior four weeks (or, if applicable, such shorter number of weeks elapsed since the delivery of the initial Approved DIP Budget) against the amount budgeted therefor in the Approved DIP Budget, and shall include calculations that demonstrate that the Debtors are in compliance with the Permitted Variance (as defined below). The Debtors shall not be required to test receipts in the Variance Report. On each Test Date, the Debtors shall demonstrate in each such Variance Report that, in the period covered by such Variance Report, the aggregate actual disbursements for the applicable time period, excluding any Professional Fees, shall not exceed the sum of the aggregate amount budgeted therefor in the Approved DIP Budget for the applicable time period set forth above by more than fifteen percent (15%) of the budgeted amount (the "Permitted Variance") on a cumulative basis for all disbursements made during the applicable time period. Certification of compliance shall be provided on such Test Date, concurrently with delivery of each Variance Report, and shall have

been certified by the Debtors' chief financial officer as being true and correct in all material respects (except with respect to any forward-looking statements or information), and be in a form and substance reasonably satisfactory to the DIP Agent.

10.     Additionally, commencing on May 25, 2022 and continuing every second Wednesday thereafter, the Debtor Professionals shall provide to the Debtors and counsel to the DIP Agent a summary of fees and expenses accrued by such Debtor Professionals for the prior two calendar weeks (excluding fees and expenses accrued on or prior to the Petition Date) and for which such Debtor Professionals intend to submit applications for compensation and reimbursement.  By way of example, on May 25, 2022, the Debtor Professionals shall provide a summary of fees and expenses accrued from the Petition Date through May 22, 2022.  In the event the amount of accrued fees and expenses for such Debtor Professionals for any such period exceed the amount set forth in the Approved Budget for the applicable period (the "Bi-Weekly Estimate") plus a 10% variance, the DIP Agent shall meet and confer with the Debtors and such Debtor Professionals to discuss a good-faith modification to the Approved Budget and the Bi-Weekly Estimate regarding the fees and expenses of such Debtor Professionals.  For the avoidance of doubt, nothing in this paragraph shall serve as a cap or a limitation on the allowance, payment, or amount of the fees and expenses of any Debtor Professional or the Carve-Out.  To the extent the amount of the actual fees and expenses of the Debtor Professionals for any two-week period is less than the applicable Bi-Weekly Estimate, such excess amount may be rolled forward to increase the amount of the Bi-Weekly Estimate for any subsequent period.

11.     ***Optional and Mandatory Prepayments.***  The Borrower may voluntarily prepay the principal of the Loans, in whole or in part, in accordance with Section 2.09(b) of the DIP Credit

Agreement.  Pursuant to the terms and conditions set forth in Section 2.09(a) of the DIP Credit Agreement, the Borrower shall make mandatory prepayments of the principal amount of the Loans.

12.    ***Adequate Protection.***  The Prepetition First Lien Secured Parties are entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition First Lien Collateral, including Cash Collateral, for and to the extent of any diminution in the value of the Prepetition First Lien Secured Parties' interests in the Prepetition First Lien Collateral during the Chapter 11 Cases, including, without limitation, any such diminution during the Chapter 11 Cases resulting from the sale, lease, or use by the Debtors (or other decline in value) of Cash Collateral and any other Prepetition First Lien Collateral, the priming of the Prepetition First Lien Secured Parties' valid, unavoidable, and perfected security interests and liens in the Prepetition First Lien Collateral by the DIP Secured Parties pursuant to the DIP Facility Documents, this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (any such diminution in value, "<u>Diminution in Value</u>").  As adequate protection, the Prepetition First Lien Secured Parties are hereby granted the following adequate protection solely to the extent of any Diminution in Value (collectively, the "<u>Adequate Protection Obligations</u>"):

(i)    <u>Adequate Protection Liens</u>.  Effective and perfected as of the Petition Date and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, or other agreements, a valid, binding, continuing, enforceable, fully perfected replacement security interest in and lien upon the Prepetition First Lien Collateral, which replacement security interests and liens in favor of the Prepetition First Lien Agent, are and shall be subject and subordinate only to the DIP Liens, the Carve-Out and Non-Primed Excepted Liens (the "<u>Adequate Protection Liens</u>").

(ii)     Adequate Protection Superpriority Claims.  Allowed superpriority claims against each of the Debtors (the "Adequate Protection Superpriority Claims") with priority over any and all other administrative expenses, and other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 503(b), subject to entry of the Final Order 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding all Avoidance Actions, but including, subject to entry of a Final Order, any Avoidance Action Proceeds); *provided*, *however*, that the Adequate Protection Superpriority Claims shall be subject and subordinate only to (a) the Superpriority Claims and (b) the Carve-Out.

(iii)     Reporting.  The Prepetition First Lien Lenders shall be entitled to receive the financial and all other reporting, including the periodic provision of budgets and forecasts, provided to the DIP Secured Parties, as described in the DIP Facility Documents.

13.     ***Reservation of Rights of Prepetition First Lien Secured Parties.***  Under the circumstances, the Court finds that the adequate protection provided in this Interim Order is reasonable and sufficient to protect the interests of the Prepetition First Lien Secured Parties. However, the Prepetition First Lien Secured Parties may request further or different adequate protection, and the Debtors or any other party may contest any such request; *provided* that any

such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Secured Parties granted under this Interim Order, the DIP Facility Documents, and the Carve-Out.  Except as expressly provided herein, nothing contained in this Interim Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to the Prepetition First Lien Secured Parties or the DIP Secured Parties.

14.    ***Perfection of DIP Liens and Adequate Protection Liens.***

(i)    The DIP Secured Parties are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction, or take any other action, in each case, to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Secured Parties choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it under this Interim Order, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination, as of the Petition Date.  The Prepetition First Lien Secured Parties, without any further consent of any party, are authorized to take, execute, deliver, and file such instruments (in each case without representation or warranty of any kind) to enable the DIP Secured Parties to further validate, perfect, preserve, and enforce the DIP Liens, and for the Prepetition First Lien Secured Parties to further validate, perfect, preserve, and enforce the Adequate Protection Liens.  The Debtors shall execute and deliver to the DIP Secured Parties and/or the Prepetition First Lien Secured Parties all such agreements, financing statements, instruments, and other documents as the DIP Secured Parties and/or the Prepetition First Lien

29

Secured Parties may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the DIP Liens and for the Prepetition First Lien Secured Parties to further validate, perfect, preserve, and enforce the Adequate Protection Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(ii)     A certified copy of this Interim Order may, in the discretion of the DIP Secured Parties or the Prepetition First Lien Secured Parties, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of the Interim Order for filing and recording.  For the avoidance of doubt, the automatic stay of section 362(a) of the Bankruptcy Code shall be, and hereby is, modified to the extent necessary to permit the DIP Secured Parties and the Prepetition First Lien Secured Parties to take all actions, as applicable, referenced in this subparagraph (ii) and in the immediately preceding subparagraph (i).

(iii)    Subject to and effective only upon entry of this Interim Order, any provision of any lease or other license, contract or other agreement that requires (a) the consent or approval of one or more landlords or other parties or (b) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other postpetition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the transactions granting postpetition liens on (x) such leasehold interest or (y) the proceeds of any assignment and/or sale thereof by any Debtor in favor of any DIP Secured Party or the Prepetition First Lien Secured Parties in accordance with the terms of the DIP Facility Documents or this Interim Order.

15.     ***Preservation of Rights Granted Under the Interim Order***.

(i)     Except as expressly provided herein and subject to the Carve-Out and Non-Primed Excepted Liens, (a) no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Secured Parties or the Prepetition First Lien Secured Parties, respectively, shall be granted or allowed while any portion of the DIP Facility or the commitments thereunder or the DIP Obligations or the Adequate Protection Obligations remain outstanding, and (b) the DIP Liens and the Adequate Protection Liens shall not be (1) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (2) subordinate to or made *pari passu* with any other lien or security interest, whether under section 364 of the Bankruptcy Code or otherwise.

(ii)     Each Guarantor's guarantee of each Borrower's obligations in connection with the DIP Facility (the "DIP Guarantees"), and any liens granted thereunder by each Guarantor to secure the obligations and liabilities arising pursuant to the DIP Guarantees, shall not constitute a fraudulent conveyance or fraudulent transfer under section 548 of the Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the provisions of any applicable fraudulent conveyance or fraudulent transfer law or similar law of any state, nation, or other governmental unit, as in effect from time to time.

(iii)     Unless all DIP Obligations shall have been indefeasibly paid in full in cash in accordance with the DIP Credit Agreement and the Adequate Protection Obligations shall have been paid in full, no Debtor shall assert, file or seek, or consent to the filing or the assertion of or joinder in, and it shall constitute an Event of Default under the DIP Credit Agreement and terminate the right of the Debtors to use any and all Cash Collateral if any of the Debtors asserts, files or seeks, or consents to the filing or the assertion of or joinder in, or if there is entered, without

31

the prior written consent of each of the DIP Secured Parties and the Prepetition First Lien Secured Parties, (a) any reversal, modification, amendment, stay, or vacatur of this Interim Order; (b) an order dismissing any of the Chapter 11 Cases under sections 105, 305, or 1112 of the Bankruptcy Code or otherwise; (c) an order converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (d) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; (e) an order appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in any of the Chapter 11 Cases; or (f) an order granting a change of venue with respect to any Case.  If a Debtor-initiated motion or order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority Claims, Adequate Protection Superpriority Claims, and other administrative claims granted under this Interim Order, the DIP Liens, and the Adequate Protection Liens granted to the DIP Secured Parties and, as applicable, the Prepetition First Lien Secured Parties, pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all of the DIP Obligations and the Adequate Protection Obligations shall have been paid and satisfied in full (and that such Superpriority Claims, Adequate Protection Superpriority Claims, the other administrative claims granted under this Interim Order, the DIP Liens, and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) the Court shall retain jurisdiction notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(iv)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, stay, modification, or vacatur shall not affect (a) the

validity, priority, or enforceability of any DIP Obligations or the Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent, the DIP Lenders or the Prepetition First Lien Secured Parties, as applicable, of the effective date of such reversal, stay, modification, or vacatur or (b) the validity, the priority, or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations or Adequate Protection Obligations.  Notwithstanding any such reversal, stay, modification, or vacatur, any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to any of the DIP Secured Parties and/or the Prepetition First Lien Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Secured Parties and/or the Prepetition First Lien Secured Parties, as the case may be, of the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties and the Prepetition First Lien Secured Parties shall be entitled to all of the rights, remedies, privileges, and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order, and pursuant to the DIP Facility Documents with respect to all such uses of Cash Collateral and proceeds of the DIP Facility, all DIP Obligations and all Adequate Protection Obligations.

(v)     Except as expressly provided in this Interim Order or in the DIP Facility Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, and all other rights and remedies of the DIP Secured Parties and the Prepetition First Lien Secured Parties granted by the provisions of this Interim Order and the DIP Facility Documents shall survive, and shall not be modified, impaired, or discharged by (a) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases, terminating the joint administration of

33

the Cases, or by any other act or omission, (b) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Facility Documents), or (c) except as may otherwise be provided in a plan of reorganization with respect to any allowed claims for diminution, the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases, and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations and Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Facility Documents shall continue in the Chapter 11 Cases, in any successor cases thereto (the "Successor Cases") if the Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the Superpriority Claims and all other administrative claims granted pursuant to this Interim Order, the Adequate Protection Obligations, and all other rights and remedies of the DIP Secured Parties and the Prepetition First Lien Secured Parties granted by the provisions of this Interim Order and the DIP Facility Documents shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full in cash.

16.     ***Effect of Stipulations on Third Parties.***  The stipulations and admissions contained in this Interim Order, including, without limitation, in paragraph E hereof, shall be binding in all circumstances upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors), the Debtors' estates, and, subject to the entry of a Final Order, all parties in interest, including, without limitation, any committee (including the Committee) or any other person or entity acting on behalf of the Debtors, unless and solely to the extent that (i) a properly authorized adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in paragraph 17) has been

commenced by the Committee or any other party in interest with requisite standing other than the Debtors (or if the Cases are converted to cases under chapter 7 or a chapter 11 trustee is appointed prior to the expiration of the Challenge Period, the chapter 7 trustee in such successor case or chapter 11 trustee, as applicable) (a) challenging the validity, enforceability, priority, or extent of the Prepetition First Lien Secured Claim, the Prepetition First Lien Claim Documents, or the Prepetition First Lien Secured Parties' liens on the Prepetition First Lien Collateral or (b) otherwise asserting or prosecuting any action for preferences, fraudulent conveyances, other avoidance power claims, subordination, recharacterization, or any other claims, counterclaims, or causes of action, objections, contests, or defenses (collectively, "Claims and Defenses") against any of the Prepetition First Lien Secured Parties or any of their affiliates, representatives, attorneys, or advisors in connection with matters related to the Prepetition First Lien Secured Claim, the Prepetition First Lien Claim Documents, the Prepetition First Lien Collateral, or the Prepetition First Lien Secured Parties' liens on the Prepetition First Lien Collateral, as applicable (such adversary proceeding or Claims and Defenses, a "Challenge"), by the earlier of (1) in the case of the Committee, no later than the date that is sixty (60) days after the date that notice of the formation of a Committee appointed under section 1102 of the Bankruptcy Code in the Chapter 11 Cases is filed on the docket of such Chapter 11 Cases, (2) in the case of other parties in interest with requisite standing other than the Debtors or the Committee, no later than the date that is sixty (60) days after the date of entry of this Interim Order, and (3) in any case, no later than the date of commencement of the hearing on confirmation of the Debtors' chapter 11 plan (such time period established by the earlier of clauses (1) through (3) above, or such later date as has been agreed to, in writing, by the Prepetition First Lien Secured Parties in their sole discretion, the "Challenge Period"); and (ii) there is a final order in favor of the plaintiff sustaining any such

35

Challenge in any such properly authorized and timely filed adversary proceeding; *provided* that, as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Petition Date. Notwithstanding the foregoing, if a chapter 11 trustee is appointed or the Chapter 11 Cases are converted to chapter 7 prior to the expiration of the Challenge Period, the chapter 11 trustee or chapter 7 trustee, as applicable, shall have until the later of the Challenge Period or the sixtieth (60th) day after the appointment of the chapter 11 trustee or the conversion of the Chapter 11 Cases to chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court for cause. If no such properly authorized adversary proceeding or contested matter is timely filed, then (x) to the extent not theretofore indefeasibly repaid, the Prepetition First Lien Secured Claim and all related obligations of the Debtors shall constitute allowed claims not subject to counterclaim, setoff, recoupment, subordination, recharacterization, defense, or avoidance, for all purposes, in the Chapter 11 Cases and any subsequent chapter 7 cases, (y) the Prepetition First Lien Secured Parties' liens on the Prepetition First Lien Collateral shall be deemed to have been, as of the Petition Date, and to be legal, valid, binding, and perfected liens not subject to defense, counterclaim, recharacterization, subordination, or avoidance, and (z) the Prepetition First Lien Secured Claim, the Prepetition First Lien Claim Documents, and the liens of the Prepetition First Lien Secured Parties on the Prepetition First Lien Collateral shall not be subject to any other or further challenge by the Debtors, any committee, or any party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any of the Debtors with respect thereto). If any such properly authorized adversary proceeding or contested matter is timely filed, the stipulations and admissions contained in

paragraph E hereof shall nonetheless remain binding and preclusive (as provided in this paragraph) on any committee, whether official, *ad hoc*, or other (including the Committee), and any other person or entity, except to the extent that any such findings and admissions were expressly and successfully challenged in such properly authorized and timely filed adversary proceeding. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any committee (including the Committee), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Claims and Defenses with respect to the Prepetition First Lien Facility, the Prepetition First Lien Secured Claim, the Prepetition First Lien Claim Documents, or the Prepetition First Lien Secured Parties' liens on the Prepetition First Lien Collateral.  Except as expressly provided in this Interim Order, the rights and remedies of the Prepetition First Lien Secured Parties granted by the provisions of this Interim Order shall (x) survive and shall not be modified or affected by the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of the Chapter 11 Cases or by any other act or omission, and (y) continue in the Chapter 11 Cases or in any successor cases in full force and effect.

17.     ***Limitation on Use of Financing Proceeds and Collateral***.  Notwithstanding anything to the contrary herein or in any other order by this Court, none of the proceeds of the Loans and none of the DIP Obligations, the Cash Collateral, the DIP Collateral, or the Carve-Out may be used for the following purposes, including any fees or expenses incurred by any professional in connection therewith:  (i) an assertion or joinder in (but excluding any investigation into) any claim, counter-claim, action, proceeding, application, motion, defense, or other contested matter seeking any order, judgment, determination or similar relief (a) challenging the legality, validity, priority, perfection, or enforceability of any amount due under the DIP Facility

Documents, the Prepetition First Lien Facility, or the Prepetition First Lien Claim Documents or the liens, security interests, or claims granted under this Interim Order, the DIP Facility Documents, or the Prepetition First Lien Claim Documents; (b) invalidating, setting aside, recharacterizing, avoiding, or subordinating in whole or in part any amount due under the DIP Facility Documents, the Prepetition First Lien Facility, or the Prepetition First Lien Claim Documents or the liens, security interests, or claims granted under this Interim Order, the DIP Facility Documents, or the Prepetition First Lien Claim Documents; (c) challenging or objecting to payment of any amount due under the DIP Facility Documents, the Prepetition First Lien Facility, or the Prepetition First Lien Claim Documents pursuant to the chapter 11 plan of reorganization in any of the Chapter 11 Cases; (d) preventing, hindering, or delaying the assertion or enforcement by any of the DIP Secured Parties or the Prepetition First Lien Secured Parties of any of their respective liens, claims, rights, or security interests or realization upon the Prepetition First Lien Collateral, the DIP Collateral, the DIP Liens, the Secured Obligations, or the DIP Obligations; or (e) seeking to modify any of the rights granted to any of the DIP Secured Parties or the Prepetition First Lien Secured Parties hereunder or under the DIP Facility Documents or the Prepetition First Lien Claim Documents, in each of the foregoing cases without such parties' prior written consent; (ii) the commencement or prosecution of any action or proceeding of any claims, causes or action, or defenses against any of the DIP Secured Parties or the Prepetition First Lien Secured Parties or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, including, without limitation, any attempt to recover or avoid any claim or interest from any of the DIP Secured Parties or the Prepetition First Lien Secured Parties under Chapter 5 of the Bankruptcy Code; *provided, however*, that the Debtors may comply with discovery requests (and use such proceeds of the Loans, Cash Collateral, and Carve-Out in

connection with such compliance to the extent permitted by the DIP Facility Documents and this Interim Order) in connection with any such action or proceeding in accordance with applicable law; or (iii) selling or otherwise disposing of any DIP Collateral, using or seeking to use any insurance proceeds, or incurring any indebtedness not permitted under the DIP Facility Documents or without the DIP Agent's express prior written consent.  Notwithstanding the foregoing, funds advanced under the DIP Credit Facility or Cash Collateral may be used to pay the fees earned by and expenses incurred of counsel to any Committee in an amount not to exceed $35,000 to review the Prepetition First Lien Secured Claim, the Prepetition First Lien Claim Documents, and any lien or security interest granted thereby, and to investigate the foregoing matters described in the preceding sentence and assert any Challenges to one or more of the Debtors' stipulations or the releases set forth herein.

18.     ***Sales of Collateral, Right to Credit Bid.***  Upon entry of this Interim Order, the DIP Lenders and the Prepetition First Lien Secured Parties, with respect to the Prepetition First Lien Secured Claim, respectively, shall have the right to credit bid up to the full amount of the DIP Obligations or the Prepetition First Lien Secured Claim (subject to any Challenge), as applicable, in connection with any sale of the DIP Collateral conducted (i) pursuant to a plan of reorganization subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code or (ii) pursuant to section 363 of the Bankruptcy Code.  No sale of any DIP Collateral shall constitute a waiver by any DIP Lender or the Prepetition First Lien Secured Parties of any deficiency claim under any applicable law, regardless of whether the DIP Agent, any DIP Lender, or any Prepetition First Lien Secured Party consents to or opposes such sale and regardless of whether the DIP Obligations are credit bid in connection with such sale.  For the avoidance of doubt, as part of the Adequate Protection Obligations, the Prepetition First Lien Secured Parties shall be allowed to

credit bid the full amount of the Prepetition First Lien Secured Claim (subject to any Challenge) with respect to any sale of the Prepetition First Lien Collateral not in the ordinary course of business pursuant to a plan of reorganization or section 363 of the Bankruptcy Code.

19.    ***Insurance.***   APE V Cypress, LLC, as the DIP Agent for the benefit of the Prepetition First Lien Secured Parties, shall be deemed to be the loss payee or additional insured, as applicable, under the Debtors' applicable insurance policies, shall act in such capacities, and, subject to the terms of the DIP Facility Documents, distribute any proceeds recovered or received in respect of any such insurance policies, *first*, to the payment in full of the DIP Obligations, *second*, to the payment of the Adequate Protection Obligations, and, *third*, to the payment of the Prepetition First Lien Secured Claim.

20.    ***Proofs of Claim.***   The Prepetition First Lien Secured Parties will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases in respect of any claims arising under or related to Prepetition First Lien Secured Claim or the Prepetition First Lien Claim Documents.   The Debtors' stipulations and admissions contained in this Interim Order shall be deemed to constitute a timely proof of claim for the Prepetition First Lien Secured Parties upon approval of this Interim Order, and the Prepetition First Lien Secured Parties shall be treated under section 502(a) of the Bankruptcy Code as if the Prepetition First Lien Secured Parties have filed a proof of claim and shall have an allowed claim (subject to any Challenge) with respect to the Prepetition First Lien Secured Claim for the purposes of credit bidding.   Nothing in this paragraph shall waive, alter, or modify the Prepetition First Lien Secured Parties' right to file, amend, and/or supplement, in its sole discretion, a proof of claim(s) in each of the Chapter 11 Cases or Successor Cases for any claim allowed herein.

21.     ***Modifications of DIP Facility Documents*.**  Without further order of the Court, the Debtors and the DIP Secured Parties are hereby authorized to implement, in accordance with the terms of the respective DIP Facility Documents, any modifications to the Approved DIP Budget, any extension of the maturity subject to the conditions set forth in the DIP Facility Documents, non-material modifications of the DIP Facility Documents (that do not shorten the maturity of the extensions of credit thereunder, increase the commitments thereunder, or otherwise do not materially change the terms of the DIP Facility Documents in a manner adverse to the interests of the Debtors) or waivers with respect to the DIP Facility Documents; *provided*, *however*, any material modification or amendment to the respective DIP Facility Documents not expressly authorized hereby or pursuant to the DIP Facility Documents shall be subject to court approval after notice and a hearing.

22.     ***Order Governs*.**  Until such time as an amended interim order or Final Order shall have been entered, the DIP Facility Documents and this Interim Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Secured Parties; *provided* that in the event of any inconsistency between the provisions of the DIP Facility Documents and this Interim Order, the provisions of this Interim Order shall govern.

23.     ***Binding Effect; Successors and Assigns*.**  Subject to a Final Order and the Challenge Period, the DIP Facility Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, each of the DIP Secured Parties and the Prepetition First Lien Secured Parties, any committee (including the Committee) appointed in the Chapter 11 Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP

Secured Parties and the Prepetition First Lien Secured Parties, any committee (including the Committee) appointed in the Chapter 11 Cases, and the Debtors and their respective successors and assigns; *provided*, *however*, that none of the DIP Secured Parties shall have any obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan or other financial accommodation under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Facility Documents, none of the DIP Secured Parties, individually or collectively, shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq*., as amended, or any similar federal or state statute).

24.     ***DIP Fees and Expenses.***  The Debtors shall pay, without the need for the DIP Agent or the DIP Lenders to file retention motions or fee applications, in accordance with paragraph 26 of this Interim Order: (a) all reasonable and documented out-of-pocket fees, charges, and expenses incurred by the DIP Lenders on or after the Closing Date in connection herewith in an aggregate amount not to exceed (1) $150,000 *less* (2) the amount of the Pre-Closing Prepetition First Lien Lender Fees (such amount, the "DIP Lender Fee Cap") and subject to the Approved DIP Budget; and (b) all reasonable and documented out-of-pocket fees, charges, and expenses incurred by the DIP Agent on or after the Closing Date in connection herewith, including (1) the reasonable and documented out-of-pocket fees, charges, and expenses of counsel and other outside consultants for the DIP Agent including (a) Frederic Dorwart PLLC and (b) such other professionals or consultants (including legal counsel) as may be retained or may have been retained

42

from time to time by the DIP Agent, in its sole discretion, and (2) all costs and expenses incurred by the DIP Agent in connection with any filing, registration, recording, or perfection of any security interest contemplated or permitted by the DIP Credit Agreement or any other DIP Facility Document (collectively, the "DIP Professional Fees").

25.     ***Professional Fee Procedural Requirements.***   A copy of each invoice for DIP Professional Fees shall be submitted to the Debtors (to the extent incurred by such professionals on or after the Closing Date), the U.S. Trustee, and counsel for the Committee (if any), the payment of which is authorized by paragraph 24 this Interim Order.  The invoices for such DIP Professional Fees shall include the number of hours billed and a reasonably detailed description of the services provided and the expenses incurred by the applicable professional; *provided*, *however*, that any such invoice (i) may be redacted to protect privileged, confidential, or proprietary information and (ii) shall not be required to contain individual time detail.  None of the DIP Professional Fees shall be required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any payment on account thereof shall be required to file with respect thereto any interim or final fee application with the Court.  Any objections raised by the Debtors, the U.S. Trustee, or any official committee with respect to the DIP Professional Fees must be raised within ten (10) Business Days after receipt of such invoices and shall be resolved by the Court (absent prior consensual resolution by the parties).  Pending such resolution, and subject to the DIP Lender Fee Cap and the Approved DIP Budget, as applicable, any undisputed amounts of such invoices shall be promptly paid by the Debtors.

26.     The Debtors are authorized and empowered to jointly and severally indemnify and hold harmless the DIP Agent (solely in its capacity as an administrative agent), each DIP Lender

43

(solely in its capacity as a DIP Lender), and each other Indemnitee (as defined in the DIP Credit Agreement) to the fullest extent provided in the DIP Credit Agreement.

27.    ***Effectiveness*.**  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable effective as of the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

28.    ***Retention of Jurisdiction*.**  The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

29.    ***Final Hearing.***  The Final Hearing on the Motion shall be held on May 31, 2022, at 9:30 a.m., prevailing Central Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Central Time, on May 27, 2022, and shall be served on: (i) the Debtors at 5727 South Lewis Avenue, Suite 300, Tulsa, Oklahoma 74105, Attn: Richard Carson; (ii) proposed counsel to the Debtors, Paul Hastings LLP, (a) 1999 Avenue of the Stars, 27th Floor, Century City, California 90067, Attn: Justin Rawlins; (b) 600 Travis Street, 58th Floor, Houston, Texas 77002, Attn: James Grogan; (c) 71 South Wacker Drive, Suite 4500, Chicago, Illinois 60606, Attn:  Matthew Micheli, Matthew Smart, and Michael Jones; (iii) counsel to the DIP Agent, Fredric Dorwart PLLC, 124 East Fourth Street, Tulsa, Oklahoma, 74103, Attn: Samuel S. Ory and Ari Rotenberg; (iv) counsel to any statutory committee appointed in these cases; and (v) the Office of The United States Trustee, 515 Rusk St., Ste. 3516, Houston, Texas 77002, Attn: Stephen D. Statham, Esq.  In the event no objections to entry of a final order

on the Motion are timely received, this Court may enter such final order without need for the Final

Hearing.

Dated:  May _____, 2022
          Houston, Texas


_____
THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1 to Interim DIP Order**

**DIP Credit Agreement**

**Filing Version:  May 8, 2022**

**SUPERPRIORITY SENIOR SECURED**
**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of**

**[_____], 2022**

**among**

**CYPRESS ENVIRONMENTAL PARTNERS, L.P.,**
**as Borrower and a debtor and debtor-in-possession under the Bankruptcy Code**

**Each Subsidiary of the Borrower party hereto as a Guarantor,**

**The Lenders from time to time party hereto**

**and**

**APE V CYPRESS, LLC,**
**as DIP Agent and a Lender**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ............................................................................................................. 1

    SECTION 1.01. Defined Terms. ............................................................................................. 1
    SECTION 1.02. Terms Generally. ........................................................................................ 19
    SECTION 1.03. Accounting Terms; GAAP. ....................................................................... 19
    SECTION 1.04. Divisions. ................................................................................................... 19

ARTICLE II THE CREDITS.......................................................................................................... 20

    SECTION 2.01. New Money Term Commitments. ............................................................. 20
    SECTION 2.02. Loans and Borrowings. ............................................................................. 20
    SECTION 2.03. Requests for Borrowings. ......................................................................... 20
    SECTION 2.04. [Reserved]. ................................................................................................. 21
    SECTION 2.05. Funding of Borrowings. ............................................................................ 21
    SECTION 2.06. [Reserved]. ................................................................................................. 21
    SECTION 2.07. Termination and Reduction of Commitments. ........................................... 21
    SECTION 2.08. Repayment of Loans; Evidence of Debt. .................................................. 22
    SECTION 2.09. Prepayment of Loans. ............................................................................... 22
    SECTION 2.10. Fees. .......................................................................................................... 23
    SECTION 2.11. Interest. ...................................................................................................... 23
    SECTION 2.12. [Reserved]. ................................................................................................. 24
    SECTION 2.13. Increased Costs. ........................................................................................ 24
    SECTION 2.14. [Reserved]. ................................................................................................. 25
    SECTION 2.15. Taxes. ........................................................................................................ 25
    SECTION 2.16. Payments Generally; Pro Rata Treatment; Sharing of Set-offs.......................... 25

ARTICLE III REPRESENTATIONS AND WARRANTIES ........................................................ 26

    SECTION 3.01. Existence; Organization; Powers. ............................................................ 26
    SECTION 3.02. Authorization; Enforceability. ................................................................. 26
    SECTION 3.03. Governmental Approvals; No Conflicts. ................................................... 26
    SECTION 3.04. Financial Condition; No Material Adverse Change. .................................. 27
    SECTION 3.05. Ownership of Properties; Liens; No Burdensome Restrictions.................. 27
    SECTION 3.06. Litigation and Environmental Matters. ..................................................... 27
    SECTION 3.07. Compliance with Laws and Agreements. .................................................. 29
    SECTION 3.08. Investment Company Status. ..................................................................... 29
    SECTION 3.09. Taxes. ........................................................................................................ 29
    SECTION 3.10. ERISA. ....................................................................................................... 29
    SECTION 3.11. Disclosure................................................................................................... 29
    SECTION 3.12. Use of Loans. ............................................................................................ 30
    SECTION 3.13. Subsidiaries. .............................................................................................. 30
    SECTION 3.14. Jurisdiction of Incorporation or Organization. ......................................... 30
    SECTION 3.15. [Reserved]. ................................................................................................. 30
    SECTION 3.16. Insurance. ................................................................................................... 30
    SECTION 3.17. [Reserved]. ................................................................................................. 30
    SECTION 3.18. [Reserved]. ................................................................................................. 30
    SECTION 3.19. Hedging Transactions................................................................................. 31
    SECTION 3.20. Restriction on Liens. ................................................................................. 31
    SECTION 3.21. Intellectual Property. ................................................................................. 31
    SECTION 3.22. Business. ..................................................................................................... 31
    SECTION 3.23. Accounts...................................................................................................... 31

# TABLE OF CONTENTS
## (continued)

SECTION 3.24. Licenses, Permits, Etc. ............................................................. 31
SECTION 3.25. Fiscal Year. ............................................................................... 31
SECTION 3.26. Security Instruments. ................................................................ 31
SECTION 3.27. Default under Material Contracts, Assumed Executory Contracts
    or Assumed Unexpired Leases. ................................................... 31
SECTION 3.28. New Material Leases. ................................................................ 32
SECTION 3.29. Anti-Corruption Laws and Sanctions. ...................................... 32
SECTION 3.30. DIP Orders. ............................................................................... 32
SECTION 3.31. Budget. ...................................................................................... 32

ARTICLE IV CONDITIONS ...................................................................................... 32
SECTION 4.01. Conditions Precedent to Effectiveness and New Money Interim
    Loans. .......................................................................................... 32
SECTION 4.02. Conditions Precedent to New Money Final Loans. .................. 34
SECTION 4.03. Conditions Precedent to Lending. ............................................ 35

ARTICLE V AFFIRMATIVE COVENANTS ............................................................. 36
SECTION 5.01. Financial Statements; Other Information. ................................ 36
SECTION 5.02. Notices of Material Events. ...................................................... 38
SECTION 5.03. Existence; Conduct of Business. .............................................. 39
SECTION 5.04. Payment of Obligations, Taxes and Material Claims. .............. 39
SECTION 5.05. Maintenance of Properties; Insurance. ..................................... 39
SECTION 5.06. Books and Records; Inspection Rights. .................................... 40
SECTION 5.07. Compliance with Laws. ............................................................ 40
SECTION 5.08. Use of Proceeds of Loans. ........................................................ 41
SECTION 5.09. Environmental Matters. ............................................................ 42
SECTION 5.10. Further Assurances. ................................................................... 42
SECTION 5.11. [Reserved]. ................................................................................ 42
SECTION 5.12. [Reserved]. ................................................................................ 42
SECTION 5.13. ERISA Information and Compliance. ....................................... 42
SECTION 5.14. Business of the Borrower. ......................................................... 43
SECTION 5.15. Permits, Licenses. ..................................................................... 43
SECTION 5.16. Cash Management. .................................................................... 43
SECTION 5.17. Compliance with Anti-Corruption Laws and Sanctions. .......... 43
SECTION 5.18. Keepwell. .................................................................................. 43
SECTION 5.19. Budget Compliance and Permitted Variances. ......................... 44
SECTION 5.20. Agreement to Pledge; Guaranty. .............................................. 44
SECTION 5.21. Bankruptcy Documents. ............................................................ 44

ARTICLE VI NEGATIVE COVENANTS ................................................................... 45
SECTION 6.01. Indebtedness. ............................................................................ 45
SECTION 6.02. Liens. ........................................................................................ 46
SECTION 6.03. Fundamental Changes. .............................................................. 46
SECTION 6.04. Investments, Loans and Advances. .......................................... 46
SECTION 6.05. Hedging Transactions. .............................................................. 47
SECTION 6.06. Restricted Payments. ................................................................ 47
SECTION 6.07. Transactions with Affiliates. .................................................... 47
SECTION 6.08. Restrictive Agreements. ........................................................... 47
SECTION 6.09. Additional Subsidiaries. ........................................................... 48

# TABLE OF CONTENTS
## (continued)

SECTION 6.10. Sale-and-Leaseback.................................................................. 48
SECTION 6.11. Proceeds of Loans. ................................................................... 48
SECTION 6.12. ERISA Compliance. .................................................................. 48
SECTION 6.13. Sale of Properties. .................................................................... 48
SECTION 6.14. Environmental Matters. ............................................................. 49
SECTION 6.15. [Reserved]. .............................................................................. 49
SECTION 6.16. Fiscal Year; Fiscal Quarter ....................................................... 49
SECTION 6.17. [Reserved]. .............................................................................. 49
SECTION 6.18. [Reserved]. .............................................................................. 49
SECTION 6.19. Sale or Discount of Receivables. ............................................... 49
SECTION 6.20. Limitation on Prepayment of Debt; Amendment of Debt
                 Documents. ............................................................................. 49
SECTION 6.21. Acquisition of Debt. .................................................................. 49
SECTION 6.22. Additional Collateral for Prepetition Secured Obligations. ............ 50
SECTION 6.23. Deposit Accounts. ..................................................................... 50
SECTION 6.24. Prepetition Secured Obligations. ............................................... 50
SECTION 6.25. Changes to DIP Orders. ............................................................ 50
SECTION 6.26. Actions Requiring Prior DIP Agent Consent. .............................. 50
SECTION 6.27. Non-Obligor Entities. ............................................................... 50
SECTION 6.28. No Divisions. ............................................................................ 50

ARTICLE VII EVENTS OF DEFAULT; REMEDIES; APPLICATION OF PROCEEDS ..................... 51

SECTION 7.01. Events of Default. ..................................................................... 51
SECTION 7.02. Rights Upon Default. ................................................................ 54
SECTION 7.03. Application of Payments. ........................................................... 54

ARTICLE VIII THE DIP AGENT ............................................................................. 55

SECTION 8.01. Agents as Lenders. ................................................................... 55
SECTION 8.02. Duties and Obligations of DIP Agent. ......................................... 55
SECTION 8.03. Reliance by DIP Agent. ............................................................. 55
SECTION 8.04. DIP Agent May File Proofs of Claim. .......................................... 55
SECTION 8.05. Authority of DIP Agent to Execute Collateral Documents and
                 Release Collateral and Liens. ................................................... 56
SECTION 8.06. Indemnification. ........................................................................ 56

ARTICLE IX GUARANTY .................................................................................... 57

SECTION 9.01. The Guaranty............................................................................ 57
SECTION 9.02. Guaranty Unconditional. ........................................................... 57
SECTION 9.03. Discharge Only Upon Payment In Full; Reinstatement In Certain
                 Circumstances. ....................................................................... 58
SECTION 9.04. Waivers. ................................................................................... 58
SECTION 9.05. Subrogation. ............................................................................ 58
SECTION 9.06. Stay of Acceleration. ................................................................ 58
SECTION 9.07. Subordination of Indebtedness of any Guarantor to any other
                 Guarantor to the Guaranteed Obligations.................................. 59
SECTION 9.08. Limitation on Obligations. .......................................................... 59
SECTION 9.09. Application of Payments. ........................................................... 60
SECTION 9.10. No Waivers. .............................................................................. 60
SECTION 9.11. No Duty to Advise. .................................................................... 60

# TABLE OF CONTENTS
## (continued)

ARTICLE X SECURITY AGREEMENT ................................................................................ 60

SECTION 10.01. Grant of Security Interest. ............................................................. 60
SECTION 10.02. Perfection and Protection of Security Interest. ............................... 62
SECTION 10.03. Delivery of Mortgages. ................................................................. 62
SECTION 10.04. Title to, Liens on, and Use of Collateral. ....................................... 63
SECTION 10.05. Right to Cure. ................................................................................ 63
SECTION 10.06. Power of Attorney. ........................................................................ 63
SECTION 10.07. The DIP Agent's Rights, Duties, and Liabilities. ............................ 63
SECTION 10.08. Site Visits, Observations, and Testing. .......................................... 63
SECTION 10.09. Rights in Respect of Investment Property. ..................................... 64
SECTION 10.10. No Filings Required. ..................................................................... 65

ARTICLE XI MISCELLANEOUS ......................................................................................... 65

SECTION 11.01. Notices. ........................................................................................ 65
SECTION 11.02. Waivers; Amendments. ................................................................. 66
SECTION 11.03. Expenses; Indemnity; Damage Waiver. ......................................... 67
SECTION 11.04. Successors and Assigns. ................................................................ 68
SECTION 11.05. Survival. ....................................................................................... 70
SECTION 11.06. Counterparts; Integration; Effectiveness. ...................................... 70
SECTION 11.07. Severability. .................................................................................. 70
SECTION 11.08. Right of Setoff. ............................................................................. 70
SECTION 11.09. Governing Law; Jurisdiction; Consent to Service of Process. ......... 71
SECTION 11.10. WAIVER OF JURY TRIAL. ......................................................... 71
SECTION 11.11. Headings. ...................................................................................... 71
SECTION 11.12. Confidentiality. ............................................................................. 72
SECTION 11.13. Interest Rate Limitation. ............................................................... 72
SECTION 11.14. No Third Party Beneficiaries. ....................................................... 73
SECTION 11.15. NO ORAL AGREEMENTS. .......................................................... 73
SECTION 11.16. DIP Orders. .................................................................................. 73

SCHEDULES:

Schedule 2.01 – Commitments
Schedule 3.06 – Litigation
Schedule 3.13 – Subsidiaries
Schedule 3.19 – Swap Agreements
Schedule 3.24 – Accounts
Schedule 6.01(c) – Existing Indebtedness
Schedule 6.01(d) – Existing Capital Leases
Schedule 6.02 – Existing Liens
Schedule 6.04 – Investments

EXHIBITS:

Exhibit A – [Reserved]
Exhibit B – Form of Borrowing Request
Exhibit C – Form of Initial Budget
Exhibit D – Form of Note

This **SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of [＿＿＿＿＿＿＿], 2022, by and among **CYPRESS ENVIRONMENTAL PARTNERS, L.P**., a Delaware limited partnership and a debtor and debtor-in-possession under the Bankruptcy Code (the "Borrower"), each Subsidiary (as defined below) of Borrower party hereto as a Guarantor, and **APE V CYPRESS, LLC**, a Delaware limited liability company, as lender (together with any other lenders from time to time party hereto, collectively the "Lenders") and as administrative agent and collateral agent for the Lenders (in such capacity, including any permitted successor thereto, the "DIP Agent").

W I T N E S S E T H :

A.      On or about [＿＿＿＿＿＿], 2022 (i) the Borrower and certain subsidiaries of the Borrower named as Guarantors herein (each a "Debtor" and, together, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (Houston Division) initiating their respective cases (collectively, the "Bankruptcy Court") (the "Cases"). The date such petitions are filed is referred to herein as the "Petition Date."

B.      The Borrower has requested that the Lender make post-petition loans and provide other financial or credit accommodations to the Borrower, and the Lender has agreed, subject to the conditions set forth herein, to extend superpriority priming (subject to the Carve Out (as defined herein)) credit facilities to the Borrower as further described herein.

C.      The Borrower and the Guarantors desire to secure, among other specified obligations, all of the DIP Obligations (as defined herein) by granting to the DIP Agent a security interest in and Lien on substantially all of the property and assets of the Credit Parties, subject to the limitations described herein and, when entered, the DIP Orders.

D.      The Guarantors desire to guarantee, among other specified obligations, all of the DIP Obligations.

E.      The Lender is willing to extend such credit to the Borrower, on the terms and subject to the conditions set forth herein and, when entered, the DIP Orders.

Accordingly, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01. Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"13-Week Budget" means a thirteen-week rolling operating budget and cash flow forecast, in form and substance as set forth in Section 5.01(s) and otherwise acceptable to the DIP Agent, together with such related information and/or materials as the DIP Agent may deem reasonably necessary or desirable in connection therewith, all as certified by the Borrower's chief financial officer as being true and correct in all material respects (except with respect to any forward-looking statements or information) which shall reflect the Borrower's good faith projection of all weekly cash receipts and disbursements in connection with the operation of the Credit Parties' and their respective Subsidiaries' business during such thirteen-week period, including but not limited to, capital expenditures, collections, payroll, and

1

other material cash outlays, in each case on a line item basis, as such budget and forecast may be updated from time to time as required under Section 5.01(s).

"Acceptable Security Interest" means a security interest which (a) exists in favor of the DIP Agent for its benefit, (b) is superior to all other security interests (other than the Permitted Liens), (c) secures the DIP Obligations and (d) is enforceable against the Credit Party which created such security interest.

"Adequate Protection Liens" has the meaning ascribed to such term in the Interim Order or, upon entry of the Final DIP Order, in the Final DIP Order, as applicable.

"Adequate Protection Payments" means the adequate protection payments to the Prepetition Secured Parties pursuant to the terms of the DIP Orders.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means this Superpriority Senior Secured Debtor-in-Possession Credit Agreement, as it may be amended, restated, amended and restated, supplemented and/or otherwise modified and in effect from time to time.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption, including (a) the United States Foreign Corrupt Practices Act of 1977, as amended, (b) the United Kingdom Bribery Act of 2010, as amended, and (c) any other similar law, rule or regulation in any jurisdiction applicable to Borrower or any of its respective Subsidiaries.

"Anti-Money Laundering Laws" means any laws or regulations relating to money laundering or terrorist financing in any jurisdiction applicable to Borrower or any of its Subsidiaries.

"Approved Budget" means each of (i) the Initial Budget and (ii) any 13-Week Budget delivered by the Borrower pursuant to and in accordance with Section 5.01(s) and approved by the DIP Agent; provided that (A) if the DIP Agent does not provide notice of approval or disapproval of any such 13-Week Budget within three Business Days of such receipt thereof, the DIP Agent will be deemed to have disapproved such 13-Week Budget and (B) if a 13-Week Budget is not approved by the DIP Agent (or deemed disapproved) the 13-Week Budget that was last approved by the DIP Agent shall continue to be in effect.  Notwithstanding the foregoing, the Debtors may not modify allocations between tested and non-tested line items within any Approved Budget without the prior written authorization of the DIP Agent.

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) Lender, (b) an Affiliate of Lender or (c) an entity or an Affiliate of an entity that administers or manages Lender.

"Approved Purposes" has the meaning set forth in Section 5.08(a).

"Authorized Officer" means, as to any Person, the president, the chief financial officer, any vice president, the treasurer or any assistant treasurer of such Person. Unless otherwise specified, all references to an Authorized Officer herein shall mean an Authorized Officer of the Borrower.

2

"Availability Period" means the period from and including the Closing Date to but excluding the earlier of the Maturity Date and the date of termination of the Commitments in accordance with the terms hereof.

"Avoidance Actions" has the meaning set forth in Section 10.01(a).

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals hereto.

"Bankruptcy Rules" means shall have the meaning assigned to such term in the Interim Order.

 "Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Borrowing" means any advance of Loans under this Agreement.

"Borrowing Date" means the date any Borrowing of Loans is made.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03 and in the form of Exhibit B.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in Tulsa, Oklahoma are authorized or required by law to close.

"Capital Lease" means any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or finance leases on a balance sheet of such Person under GAAP.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any Capital Lease, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out" shall have the meaning assigned to such term in (a) prior to the entry of the Final DIP Order, the Interim Order and (b) thereafter, the Final DIP Order.

"Cases" shall have the meaning assigned to such term in the recitals hereto.

"Cash Collateral Account" means, in respect of the Credit Parties one or more deposit accounts (including, for avoidance of doubt, any lockboxes or similar accounts, any related securities accounts and any accounts holding Cash Equivalents), with respect to which the DIP Agent shall have a perfected Lien as security for the payment and performance of the DIP Obligations by virtue of, and having the priority set forth herein, any other Collateral Documents or the DIP Orders.

"Cash Collateral" means all cash and Cash Equivalents in any Cash Collateral Account.

"Cash Equivalents" means Permitted Investments described in clauses (a), (b), and (c) of the definition of Permitted Investments.

"Casualty Event" means any loss, casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any Property or asset of Borrower or any Subsidiary.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, state and local analogs, and all rules and regulations and requirements thereunder in each case as now or hereafter in effect.

"CEP" means Cypress Environmental Partners, LLC, a Delaware limited liability company.

"Change in Control" means the occurrence of any of the following events:

(a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and any Permitted Investor) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire (such right, an "option right"), whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of 35% or more of the voting Equity Interests of the General Partner on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right);

(b) the General Partner shall cease to own and control, of record and beneficially, 100% of the general partnership interests of the Borrower free and clear of all Liens, other than Permitted Liens;

(c) the Borrower shall cease to own and control, of record and beneficially, 100% of the limited liability membership interests of CEP free and clear of all Liens, other than Liens of the type permitted pursuant to Section 8.03.

"Change in Law" means (a) the adoption after the date hereof of any applicable law, rule or regulation (including any applicable law, rule or regulation regarding capital adequacy) or any change therein after the date hereof, (b) any change after the date hereof in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or compliance with any request or directive (whether or not having the force of law) of any such Governmental Authority, or (c) the compliance, whether commenced prior to or after the date hereof, by any Lender with the requirements (regardless of the date enacted, adopted, promulgated or issued) of (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor similar authority) or the United States financial regulatory authorities, in each case pursuant to Basel III.

"Closing Date" means the date on which all conditions set forth in Section 4.01 have been satisfied (or waived by the DIP Agent).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all right, title and interest held by any Credit Party in any Property as set forth in the Interim Order, including the Property described in Section 10.01, but excluding any such Property specifically excluded under this Agreement or the applicable DIP Order.

4

"<u>Collateral Documents</u>" means this Agreement, DIP Orders, Guaranty, the Security Agreement, the Mortgages and any and all other agreements, documents or instruments now or hereafter executed and delivered by any Credit Party or any other Person as security for the payment or performance of the DIP Obligations, as such agreements, documents or instruments may be amended, supplemented or restated from time to time in accordance with the terms thereof and to the extent applicable.

"<u>Commitment</u>" means, with respect to Lender, its New Money Commitment.

"<u>Commodity Account</u>" has the meaning assigned to such term in the UCC.

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"<u>Confirmation Order</u>" means an order of the Bankruptcy Court entered in the Cases pursuant to section 1129 of the Bankruptcy Code, which order shall confirm the Plan of Reorganization, and shall be in form and substance satisfactory to the DIP Agent.

"<u>Contractual Obligation</u>" means as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, but excluding any rights under the RSA. "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Credit Party</u>" means any of the Borrower or any other Guarantor; "<u>Credit Parties</u>" means, collectively, the Borrower and each other Guarantor.

"<u>Debtors</u>" is defined in the recitals hereto.

"<u>Default</u>" means (a) any event or condition that constitutes an Event of Default or (b) any event or condition which, upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"<u>Default Rate</u>" has the meaning assigned to such term in <u>Section 2.13(c)</u>.

"<u>Deposit Account</u>" has the meaning assigned to such term in the UCC.

"<u>DIP Agent</u>" shall have the meaning assigned to such term in the introduction hereto.

"<u>DIP Obligations</u>" means all obligations or liabilities of every nature of any Credit Party from time to time owed to the DIP Agent under any Loan Document, in each case, whether for principal, interest, funding indemnification amounts, fees, expenses, indemnification or otherwise.

"<u>DIP Orders</u>" means the Interim Order and the Final DIP Order, as applicable.

"<u>Discharge of DIP Obligations</u>" means (a) the indefeasible payment in full in cash of all DIP Obligations (other than contingent indemnity obligations for which no claim for payment has been made (which indemnity obligations continue to survive as expressly provided in this Agreement or in any other Loan Document)), (b) termination or expiration of all Commitments, and (c) termination of this

Agreement other than indemnity and reimbursement obligations which expressly survive the termination hereof.

"Disclosure Statement" has the meaning assigned to such term in the RSA.

"Disposition" means with respect to any Property, any sale, lease, sale and leaseback transaction, assignment, farmout, exchange, conveyance, transfer or other disposition (including by way of a merger or consolidation, or by way of an allocation of assets among newly divided limited liability companies pursuant to a "plan of division" under any applicable Governmental Requirement) of such Property or any interest therein, including, for the avoidance of doubt, any casualty event; and the terms "Dispose", "Disposed of", "dispose", "disposed of" and words of similar import shall have correlative meanings.

"Disqualified Equity Interests" means any Equity Interests that, by their terms (or by the terms of any security or other Equity Interest into which they are convertible or for which they are exchangeable) or upon the happening of any event or condition, (a) mature or are mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other DIP Obligations that are accrued and payable and the termination of the Commitments), (b) are redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests) (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other DIP Obligations that are accrued and payable and the termination of the Commitments), in whole or in part, (c) provide for the scheduled payment of dividends in cash or other Property or (d) are or become convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 180 days after the Scheduled Maturity Date; provided that if such Equity Interests is issued pursuant to a plan for the benefit of Borrower or its Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"dollars" or "$" refers to lawful money of the United States of America.

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed to by, Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of Borrower or any of its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, license, order, approval, registration or other authorization required by or from a Governmental Authority under Environmental Law.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with Borrower, any Subsidiary thereof, or any Guarantor, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived under the regulations); (b) the withdrawal of Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate from a Plan subject to Section 4063 or Section 4064 of ERISA during a plan year in which any such entity was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA); (c) the filing of a notice of intent to terminate a Plan under Section 4041(c) of ERISA or the treatment of a plan amendment as a termination under Section 4041(e) of ERISA, where such termination constitutes a "distress termination" under Section 4041(c) of ERISA; (d) the failure to make any required contribution to a Plan or Multiemployer Plan or to meet the minimum funding standard of Section 412 of the Code (in either case, whether or not waived in accordance with Section 412(c) of the Code); (e) the determination that any Plan is in "at-risk status" (within the meaning of Section 430 of the Code or Section 303 of ERISA) or that a Multiemployer Plan is in "endangered status," "seriously endangered" or "critical status" (within the meaning of Section 432 of the Code or Section 305 of ERISA); (f) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (g) the incurrence by Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (h) the receipt by Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (i) the occurrence of any event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan or the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA; (j) the complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) of Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate from any Multiemployer Plan; (k) the receipt by Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or terminated, within the meaning of Title IV of ERISA; (l) the imposition of liability on Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA, or (m) the imposition of a Lien upon Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate pursuant to Section 436(f) or Section 430(k) of the Code or Section 303(k) of ERISA.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Excluded Taxes" means, any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from any payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by Borrower under Section 2.17(b)) or (ii) such Lender changes its lending office, except to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to a Recipient's failure to comply with Section 2.15(f) and (d) any Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (and any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreements, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Final DIP Order" means the Final Order entered by the Bankruptcy Court authorizing the Debtors to (a) obtain post-petition secured financing pursuant to this Agreement, (b) use cash collateral during the pendency of the Cases, and (c) granting certain related relief, or any other orders entered in connection therewith, in each case in form and substance reasonably satisfactory to the DIP Agent, as the same may be amended, modified or supplemented from time to time with the prior written consent of the DIP Agent.

"Final DIP Order Date" means the date the Bankruptcy Court issues the Final DIP Order.

"Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended without the prior written consent of the DIP Agent, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice, in substantially the form of the Interim Order and in form and substance satisfactory to the DIP Agent, as the same may be amended, modified or supplemented from time to time with the prior written consent of the DIP Agent.

"Fixture Operating Equipment" means any of the items described in the first sentence of the definition of "Operating Equipment," which, as a result of being incorporated into realty or structures or improvements located therein or thereon, with the intent that they remain there permanently, constitute fixtures under the laws of the state in which such equipment is located.

"Flood Insurance Laws" means, to the extent applicable to any Credit Party, the DIP Agent or any Collateral, the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994, the Biggert-Waters Flood Insurance Reform Act of 2012 and the regulations issued in connection therewith by the Office of the Controller of the Currency, the

8

Federal Reserve Board and other Governmental Authorities, each as it may be amended, reformed or otherwise modified from time to time.

"Foreign Plan" means any employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) that is not subject to U.S. law.

"GAAP" means generally accepted accounting principles in the United States of America.

"General Partner" means Cypress Environmental Partners GP, LLC, a Delaware limited liability company.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement, including, without limitation, Environmental Laws, Flood Insurance Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantor" means Borrower and each Subsidiary of the Borrower that executes this Agreement as a Guarantor or otherwise guarantees the DIP Obligations as of the Closing Date or thereafter, and its successors and assigns.

"Guaranty" means the terms set forth in Article IX.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Highest Lawful Rate" means, on any day, the maximum nonusurious rate of interest permitted for that day by applicable law.

"Indebtedness" means, for any Person (without duplication): (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar

instruments, other than surety or other bonds; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all obligations of such Person (other than for borrowed money) to pay the deferred purchase price of Property or services (but excluding, other than for purposes of Section 6.01, accounts payable incurred in the ordinary course of business that are not more than 60 days past due unless contested in good faith by appropriate proceedings and for which adequate reserves under GAAP have been established therefor, and any guaranties by Borrower or any Subsidiary of such accounts payable); (d) all Capital Lease Obligations; (e) all obligations under Synthetic Leases; (f) all Indebtedness (as described in the other clauses of this definition) of others secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; (g) all Indebtedness (as described in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the debtor to the extent of the lesser of the amount of such Indebtedness and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of others or to purchase the Indebtedness or Property of others; (i) any Indebtedness of a partnership for which such Person is liable either by agreement or because of a Governmental Requirement but only to the extent of such liability; (j) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person to the extent of the value of such property (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business); (k) all obligations, contingent or otherwise, of any such Person relative to the face amount of letters of credit, whether or not drawn, and banker's acceptances issued for the account of any such Person; (l) all obligations of any such Person in respect of Disqualified Equity Interests; (m) all net obligations of such Person under any Swap Agreement; and (n) the outstanding attributed principal amount under any asset securitization program.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 11.03(b).

"Information" has the meaning assigned to such term in Section 11.12(a).

"Initial Budget" means the 13-Week Budget prepared by the Borrower and furnished to the Lenders on the Closing Date in the form of Exhibit C, which has been certified by the chief financial officer of the Borrower as having been prepared in good faith based upon assumptions believed by the Credit Parties to be reasonable at the time made and being true and correct in all material respects.

"Initial Refinanced Loan" has the meaning set forth in Section 2.01(b).

"Interim Order" means the interim order entered by the Bankruptcy Court (i) authorizing, on an interim basis, the Debtors to (a) obtain post-petition secured financing pursuant to this Agreement and (b) use cash collateral during the pendency of the Cases, and (ii) granting, on an interim basis, certain related relief and any other orders entered in connection therewith, in each case in form and substance reasonably satisfactory to the DIP Agent, as the same may be amended, modified or supplemented from time to time with the prior written consent of the DIP Agent.

"IRS" means the United States Internal Revenue Service.

"Lien" means, with respect to any Property, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such Property, (b) the interest of a

vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such Property and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, each Borrowing Request, each Collateral Document, any promissory notes issued pursuant to Section 2.08(f), and any other documents, certificates or agreements that are delivered pursuant to the foregoing, and all amendments, modifications, renewals, extensions, increases and rearrangements of, and substitutions for, any of the foregoing.

"Loan Exposure" means, with respect to Lender, at any time, the sum of (a) the unfunded New Money Commitment of such Lender at such time and (b) the aggregate principal amount of the outstanding Loans held by such Lender at such time.

"Loans" means any loans made or deemed made by Lender pursuant to this Agreement.

"Local Bankruptcy Rules" shall have the meaning assigned to such term in the Interim Order.

"material adverse change" mean any event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

"Material Adverse Effect" means a material adverse effect on (i) the business, Property, liabilities (actual or contingent), condition (financial or otherwise) or results of operations of the Borrower and the Subsidiaries taken as a whole, (ii) the Credit Parties' ability to timely perform their respective obligations under the Loan Documents, (iii) the perfection or priority of the liens granted pursuant to the Collateral Documents, or (iv) the legality, validity or enforceability of any of the Loan Documents or the rights, benefits or remedies of the DIP Agent or the Lenders thereunder; provided that, Material Adverse Effect shall expressly exclude (x) the effect of filing the Cases and any action required to be taken under the Loan Documents and (y) the Interim Order or the Final DIP Order.

"Material Indebtedness" means Indebtedness (other than the Prepetition Secured Obligations) of any one or more of Borrower or any Subsidiary thereof in an aggregate principal amount exceeding the Threshold Amount.

"Maturity Date" means the earliest of (i) the Scheduled Maturity Date, (ii) the consummation of a sale of all or substantially all of the assets of the Credit Parties pursuant to Section 363 of the Bankruptcy Code or otherwise; (iii) the effective date of a plan of reorganization or liquidation in the Cases; (iv) the entry of an order by the Bankruptcy Court dismissing any of the Cases or converting such Cases to a case under Chapter 7 of the Bankruptcy Code; and (v) the date of termination of the Lenders' commitments and the acceleration of any outstanding extensions of credit, in each case, under this Agreement and in accordance with the DIP Orders.

"Milestones" means the following milestones relating to the Cases:

a.      No later than May [16], 2022, the Petition Date shall have occurred;

b.      On the Petition Date, the Debtors shall have filed initial versions of the Plan of Reorganization, the Disclosure Statement, and a motion to approve the Disclosure Statement and other solicitation materials (the "Disclosure Statement Motion");

11

c.       On the Petition Date, the Debtors shall have filed a motion seeking entry of the DIP Orders;

d.       No later than the date that is four (4) days after the Petition Date, the Debtors shall have obtained entry by the Bankruptcy Court of the Interim DIP Order.

e.       Subject to the Bankruptcy Court's availability, no later than the date that is thirty-five (35) days after the Petition Date, the combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan of Reorganization (the "<u>Confirmation Hearing</u>") shall have commenced;

f.       Subject to the Bankruptcy Court's availability to conduct the Confirmation Hearing, no later than the date that is forty (40) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

g.       No later than the date that is fifteen (15) days after the entry of the Confirmation Order, the Effective Date shall have occurred. As used herein, the term "<u>Effective Date</u>" means the date that is the first Business Day after the date the Bankruptcy Court confirms the Plan of Reorganization on which (a) the conditions to the occurrence of the Effective Date under the Plan of Reorganization have been satisfied or waived pursuant to the terms thereof, and (b) no stay of the order confirming the Plan of Reorganization is in effect.

"<u>Moody's</u>" means Moody's Investors Service, Inc.

"<u>Mortgage</u>" means each mortgage or deed of trust and other security documents or instruments (including the DIP Orders) granting a Lien on any real property of the Credit Parties to secure the DIP Obligations, in each case, as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms of this Agreement and the other Loan Documents.

"<u>Multiemployer Plan</u>" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Cash Proceeds</u>" means, with respect to any asset sale, transfer or other disposition or series of related asset sales, transfers or other dispositions, the positive difference, if any, of (a) the sum of cash and Cash Equivalents directly or indirectly received in connection with such transaction, but only as and when so received, minus (b) the sum of (i) if applicable, the principal amount of any Indebtedness that is secured by such asset (if any) and that is required to be repaid in connection with the sale thereof (other than the Loans) and (ii) the reasonable out-of-pocket expenses incurred by the Borrower or their respective Subsidiaries in connection with such transaction (including reasonable broker's fees or commissions, legal, investment, banking and accounting fees, and Taxes) paid within one year from the date such asset sale, transfer or disposition occurred.

"<u>New Money Commitment</u>" means Lender's New Money Interim Commitment and its New Money Final Commitment. The aggregate amount of the New Money Commitment as of the Closing Date is $5,000,000.

"<u>New Money Facility</u>" means the new money term loan facility in a principal amount of up to $5,000,000 as set forth in <u>Section 2.01(a)</u>.

"<u>New Money Final Commitment</u>" means, with respect to Lender, the commitment of Lender to make term loans to the Borrower pursuant to <u>Section 2.01(a)(ii)</u> in an aggregate amount not to exceed the

amount set forth opposite such Lender's name on <u>Part B</u> of <u>Schedule 2.01</u>, as such amount may be adjusted from to time pursuant to this Agreement.

"<u>New Money Final Facility</u>" means, collectively, the New Money Final Commitments and the New Money Final Loans.

"<u>New Money Final Loan</u>" has the meaning set forth in <u>Section 2.01(a)(ii)</u>.

"<u>New Money Interim Commitment</u>" means, with respect to Lender, the commitment of such Lender to make term loans to the Borrower pursuant to <u>Section 2.01(a)(i)</u> in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on <u>Part A</u> of <u>Schedule 2.01</u>, as such amount may be adjusted from to time pursuant to this Agreement.

"<u>New Money Interim Facility</u>" means, collectively, the New Money Interim Commitments and the New Money Interim Loans.

"<u>New Money Interim Loan</u>" has the meaning set forth in <u>Section 2.01(a)(i)</u>.

"<u>New Money Loans</u>" means the New Money Final Loans and the New Money Interim Loans.

"<u>Non-Primed Excepted Liens</u>" means (x) valid, perfected and unavoidable Liens in existence as of the Petition Date in favor of third parties or (y) valid and unavoidable Liens in existence for amounts outstanding as of the Petition Date that are perfected after the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, but in each case under the foregoing clause (x) and (y), only to the extent such valid, perfected and unavoidable liens are senior by operation of law in priority to the Prepetition Liens.

"<u>OFAC</u>" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"<u>Operating Lease</u>" means, as to any Person as determined in accordance with GAAP, any lease of Property (whether real, personal or mixed) by such Person as lessee which is not a Capital Lease.

"<u>Organizational Documents</u>" means (a) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its bylaws, as amended, (b) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, (d) with respect to any limited liability company, its certificate of formation or articles of organization, as amended, and its limited liability company agreement or operating agreement, as amended, and (e) with respect to any other type of Person, any certificate, document or agreement comparable to any of the foregoing.

"<u>Other Connection Taxes</u>" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than a connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to, or enforced, any Loan Document, or having sold or assigned an interest in any Loan Document).

"<u>Other Taxes</u>" means any present or future stamp, court, documentary intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or

13

otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment under Section 2.17(b)).

"Participant" has the meaning set forth in Section 11.04(c).

"Participant Register" has the meaning assigned to such term in Section 11.04(c).

"Patriot Act" has the meaning set forth in Section 11.17.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Investors": Charles C. Stephenson, Jr. and Peter C. Boylan III, together with their respective spouses, children, grandchildren and heirs (and any trusts or family partnerships of which any of the foregoing (or any combination thereof) constitute at least 50.1% of the then-current beneficiaries).

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Permit" means any approval, certificate of occupancy, consent, waiver, exemption, variance, franchise, order, permit, authorization, right or license of or from any Governmental Authority, including without limitation, an Environmental Permit.

"Permitted Investments" means: (a) marketable securities issued or fully guaranteed or insured by the United States Government or any agency thereof and backed by the full faith and credit of the United States having maturities of not more than twelve (12) months from the date of acquisition; (b) commercial paper of an issuer rated at least A-1 by S&P or P-1 by Moody 's at the time of acquisition, and in either case having a tenor of not more than twelve (12) months; (c) certificates of deposit, time deposits, or Eurodollar time deposits, having in each case a tenor of not more than twelve (12) months from the date of acquisition issued by any U S. commercial bank or any branch or agency of a non-U S. commercial bank licensed to conduct business in the U S. having combined capital and surplus of not less than $500,000,000.00 and having a rating of "A" or better by a nationally recognized rating agency; (d) fully collateralized repurchase agreements with a term of not more than seven days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and (e) deposits in money market funds investing exclusively in Investments described in the foregoing clauses (a), (b), (c) and (d).

"Permitted Liens" means:

(i) Liens for Taxes that are not delinquent or that are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(ii) Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations that are not delinquent or that are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(iii) operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law in the ordinary course of business, each of which (x) is in respect of obligations that have not been outstanding more than

60 days, or (y) that are being contested in good faith by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP;

(iv) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, <u>provided</u> that (a) no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board, and (b) no such deposit account is intended by the Borrower or any of their Subsidiaries to provide collateral to the depository institution;

(v) all other non-consensual defects in title (which might otherwise constitute Liens) arising in the ordinary course of Borrower's or its respective Subsidiary's business or incidental to the ownership of their respective Properties; <u>provided</u> that no such Liens shall secure the payment of Indebtedness or shall, in the aggregate, materially detract from the value or marketability of the Property subject thereto or materially impair the use or operation thereof in the operation of the business of Borrower or such Subsidiary;

(vi) encumbrances (other than to secure the payment of borrowed money or the deferred purchase price of Property or services), easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of Borrower or any Subsidiary thereof for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, and defects, irregularities, zoning restrictions and deficiencies in title of any Property that in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by Borrower or any Subsidiary thereof or materially impair the value of such Property subject thereto;

(vii) Liens on cash or securities pledged to secure performance of surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business;

(viii) judgment Liens not giving rise to an Event of Default, <u>provided</u> that (a) any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and (b) no action to enforce such Lien has been commenced; and

(ix) Non-Primed Excepted Liens.

"<u>Permitted Variance</u>" has the meaning set forth in <u>Section 5.19</u>.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Petition Date</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Plan</u>" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Sections 412 and 430 of the Code or Section 302 of ERISA, and in respect of which Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate has any obligation or liability (contingent or otherwise).

15

"<u>Plan of Reorganization</u>" means a plan of reorganization that is prepared and distributed in accordance with the Bankruptcy Code, consistent in all respects with the terms of the RSA and otherwise in form and substance satisfactory to the DIP Agent.

"<u>Prepetition Agent</u>" means Lender, in its capacity as administrative agent and collateral agent under the Prepetition Credit Agreement, or any successor in such capacity.

"<u>Prepetition Credit Agreement</u>" shall mean means that certain senior secured first-lien Amended and Restated Credit Agreement, dated as of May 29, 2018, by and among certain Debtors, as borrowers or guarantors, the Prepetition Agent, the Prepetition Lenders, and the other parties thereto, including all agreements, notes, instruments, and any other document delivered pursuant thereto or in connection therewith (in each case as amended, modified, or supplemented from time to time).

"<u>Prepetition Facility Loans</u>" shall mean the "Loans" as defined in the Prepetition Credit Agreement.

"<u>Prepetition Lenders</u>" shall mean the "Lenders" as defined in the Prepetition Credit Agreement.

"<u>Prepetition Liens</u>" shall mean the Liens securing the Prepetition Secured Obligations.

"<u>Prepetition Secured Obligations</u>" means the "Secured Obligations" as defined in the Prepetition Security Instruments.

"<u>Prepetition Secured Facilities</u>" shall mean the credit facility extended by the Prepetition Lenders to the Borrower and other obligors under the Prepetition Credit Agreement.

"<u>Prepetition Secured Parties</u>" shall mean the holders of Prepetition Secured Obligations.

"<u>Prepetition Security Instruments</u>" means the "Security Documents" as defined in the Prepetition Credit Agreement.

"<u>Professional Fees</u>" means attorneys' fees and the fees of any other professionals payable by the Credit Parties.

"<u>Property</u>" of a Person means any and all property, whether real, personal, tangible, intangible or mixed, of such Person, or other assets owned, leased or operated by such Person.

"<u>Qualified Equity Interests</u>" means any Equity Interests that are not Disqualified Equity Interests.

"<u>Recipient</u>" means the DIP Agent

"<u>Register</u>" has the meaning set forth in <u>Section 11.04(b)(iv)</u>.

"<u>Related Parties</u>" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"<u>Remedies Notice</u>" has the meaning set forth in <u>Section 7.02</u>.

"<u>Requirement of Law</u>" means as to any Person, any law or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in Borrower or any Subsidiary, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in Borrower or any Subsidiary, or any option, warrant or other right to acquire any Equity Interests in Borrower or any Subsidiary.

"RSA" means the Restructuring Support Agreement dated as of [_____], 2022, among the Borrower, certain Affiliates thereof named therein, the DIP Agent, the Lenders, the Prepetition Agent, the Prepetition Lenders party thereto and the other consenting parties thereto, and all annexes, attachments and exhibits thereto, as amended in accordance with the terms thereof.

"Safe Harbor Provisions" means sections 362(b)(6) and (17), and sections 546(e) and (g), 555, 556, 559, 560, 561 and 562 of the United States Bankruptcy Code.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC or the U.S. Department of State), the United Nations Security Council, the European Union, Her Majesty's Treasury of the United Kingdom, Global Affairs Canada or other relevant sanctions authority.

"Sanctioned Country" means at any time, a country or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any vessel or Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, any EU member state, the United Kingdom or Canada, or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in clauses (a) and (b).

"Satisfaction Date" has the meaning assigned to such term in the Interim Order or the Final DIP Order then in effect.

"Security Agreement" means the terms set forth in Article X.

"Scheduled Maturity Date" means the date that is three (3) months after the Petition Date.

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

"Securities Account" has the meaning assigned to such term in UCC.

"Stated Rate" has the meaning assigned to such term in Section 11.13.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held by the parent or one or more Subsidiaries of the parent or by the parent and one or more Subsidiaries of the parent. Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of any Credit Party.  For the avoidance of doubt, none of (a) Alati Arnegard,

LLC, (b) TIR-CEM, LLC, (c) CF Inspection Management LLC, or (d) any Subsidiary of the foregoing will be considered a "Subsidiary" of Borrower.

"Swap Agreement" means any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act or any other agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Swap Obligation" means, with respect to any Debtor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap Agreement.

"Synthetic Leases" means, in respect of any Person, all leases that shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the Person liable (whether contingently or otherwise) for the payment of rent thereunder and which were properly treated as indebtedness for borrowed money for purposes of U.S. federal income taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early termination an amount in excess of, 85% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Threshold Amount" means $50,000.00.

"Unused New Money Commitment" means, with respect to Lender at any time, such Lender's New Money Commitment at such time, minus the amount of New Money Loans funded prior to such time by such Lender.

"Unused New Money Interim Commitment" means, with respect to Lender at any time, Lender's New Money Interim Commitment at such time, minus the amount of New Money Interim Loans funded prior to such time by Lender.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regimes" has the meaning assigned to such term in Section 11.18.

"U.S. Tax Certificate" has the meaning assigned to such term in Section 2.15(f)(ii)(B)(3).

"UCC" shall mean the Uniform Commercial Code as the same may be in force and effect from time to time, including as hereafter modified or re-enacted, in the State of Delaware, or in the State of Oklahoma, or in any one or more of any other jurisdictions in which any of the Property or other Collateral securing the DIP Obligations, or any portion of any of the foregoing, is now or hereafter situated, as applicable.

18

"Weekly Test Date" means Friday of each calendar week.

"Withholding Agent" means the Credit Parties and the DIP Agent.

SECTION 1.02. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, and (f) any definition or reference to any applicable law, including, without limitation, the Code, the Commodity Exchange Act, ERISA, the Exchange Act, the PATRIOT Act, the Securities Act of 1933, the Uniform Commercial Code, the Investment Company Act of 1940, the Interstate Commerce Act, the Trading with the Enemy Act of the United States or any of the foreign assets control regulations of the United States Treasury Department, shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such applicable law.

SECTION 1.03. Accounting Terms; GAAP. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the DIP Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of Borrower or any Subsidiary at "fair value", as defined therein. Notwithstanding the foregoing or any other provision contained herein or any other Loan Document, any lease that would have been characterized, classified or reclassified as an operating lease in accordance with GAAP prior to the date of the Borrower's adoption of ASC 842 (and related interpretations) (whether or not such lease was in effect on such date) shall be deemed not to constitute a Capital Lease, and any such lease shall be, for all purposes of this Agreement and the other Loan Documents, treated as though it were reflected on the Borrower's consolidated financial statements in the same manner as an Operating Lease would have been reflected prior to the Borrower's adoption of ASC 842.

SECTION 1.04. Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's

laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

ARTICLE II
THE CREDITS

SECTION 2.01. New Money Term Commitments.

(a)      Subject to the terms and conditions of this Agreement and the DIP Orders and relying upon the representations and warranties herein set forth, Lender agrees to make New Money Loans to the Borrower during the Availability Period; provided, however, that the aggregate principal amount of all New Money Loans actually funded by Lender shall not exceed Lender's New Money Commitment:

(i)      New Money Interim Loans. Subject to satisfaction of the conditions set forth in Section 4.01, in multiple Borrowings from time to time during the period following the Interim Order Date until the Final DIP Order Date and not to exceed the New Money Interim Commitment (collectively the "New Money Interim Loans" and each a "New Money Interim Loan"), and the amount of each such Borrowing of a New Money Interim Loan shall not exceed the least of (A) the aggregate unused New Money Interim Commitments as of such Borrowing date, and (B) the aggregate amount of undrawn New Money Loans permitted to be drawn as of such date under the then-applicable Approved Budget (it being agreed that after giving effect to any Borrowing of New Money Interim Loans, the aggregate amount of all New Money Interim Loans funded by the Lender shall not exceed the New Money Interim Commitments).

(ii)      New Money Final Loans. Subject to satisfaction of the conditions set forth in Section 4.02, in multiple Borrowings from time to time during the period following the Final DIP Order Date through the end of the Availability Period and not to exceed the New Money Final Commitment plus any unfunded portion of the New Money Interim Commitment (collectively the "New Money Final Loans" and each a "New Money Final Loan"), and the amount of each such Borrowing of a New Money Final Loan shall not exceed the least of (A) the aggregate unused New Money Commitment as of such Borrowing date, and (B) the aggregate amount of undrawn New Money Loans permitted to be drawn as of such date under the then-applicable Approved Budget (it being agreed that after giving effect to any Borrowing of New Money Interim Loans and New Money Final Loans, the aggregate amount of all Loans funded by the Lender shall not exceed the New Money Commitment).

(b)      [Reserved].

SECTION 2.02. Loans and Borrowings.

(a)      Each Borrowing shall be in an aggregate amount that is an integral multiple of $50,000 and not less than $100,000, or such other amount as is required to comply with the provisions of Section 2.01(b).

SECTION 2.03. Requests for Borrowings. To request a Borrowing for New Money Loans, the Borrower shall notify the DIP Agent of such request by telephone not later than 12:00 noon, Tulsa time one (1) Business Day (or such shorter time period as agreed to by the DIP Agent in its reasonable discretion) before the date of the proposed Borrowing. Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or e-mail to the DIP Agent of a written

Borrowing Request in a form approved by the DIP Agent and signed by the Borrower. Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)     the aggregate amount of the requested Borrowing;

(ii)    the date of such Borrowing, which shall be a Business Day;

(iii)   the aggregate amount of all New Money Loans (without regard to the requested Borrowing) of Lender and the aggregate amount of all New Money Loans (giving effect to the requested Borrowing) of Lender; and

(iv)    remittance instructions, which shall comply with the requirements of Section 2.05.

SECTION 2.04. [Reserved].

SECTION 2.05. Funding of Borrowings.

(a)     The DIP Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower designated by the Borrower in the applicable Borrowing Request.

(b)     [Reserved].

SECTION 2.06. [Reserved].

SECTION 2.07. Termination and Reduction of Commitments.

(a)     Unless previously terminated, Lender's Commitment shall reduce on the date of each Borrowing by an amount equal to the Loan made by Lender as part of such Borrowing and shall terminate on the Maturity Date.

(b)     The Borrower may at any time terminate, or at any time prior to the date the Loans are funded, reduce, the Commitments; provided that (i) each reduction of the Commitments shall be in an amount that is an integral multiple of $50,000 and not less than $250,000 and (ii) the Borrower shall not terminate or reduce the Commitments if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 2.09, the outstanding principal amount of the Loans would exceed the total Commitments, as so reduced.

(c)     The Borrower shall notify the DIP Agent of any election to terminate or reduce the Commitments under paragraph (b) of this Section at least one (1) Business Day prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; provided that a notice of termination of the Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the DIP Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Commitments shall be permanent.

LEGAL_US_W # 112048364.6

SECTION 2.08. <u>Repayment of Loans; Evidence of Debt</u>.

(a)      The Borrower hereby unconditionally promises to pay to the DIP Agent the then unpaid principal amount of each Loan, together with all accrued and unpaid interest on the Maturity Date.

(b)      [Reserved],

(c)      Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to Lender resulting from each Loan made by Lender, including the amounts of principal and interest payable and paid to Lender from time to time hereunder.

(d)      [Reserved].

(e)      The entries made in the accounts maintained pursuant to paragraph (c) of this Section shall be <u>prima</u> <u>facie</u> evidence of the existence and amounts of the obligations recorded therein absent manifest error; <u>provided</u> that the failure of DIP Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(f)      Lender may request that Loans made by it be evidenced by a promissory note in the form of <u>Exhibit D</u>. In such event, the Borrower shall prepare, execute and deliver to Lender a promissory note payable to Lender (or, if requested by Lender, to Lender and its registered assigns) and in a form approved by the DIP Agent. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to <u>Section 11.04</u>) be represented by one or more promissory notes in such form payable to the payee named therein (or, if requested by such payee, to such payee and its registered assigns).

SECTION 2.09. <u>Prepayment of Loans</u>.

(a)      <u>Mandatory Prepayments</u>. The Borrower shall prepay the outstanding principal amount of the Loans in the manner set forth in <u>clause (c)</u> below:

(i)      in an amount equal to 100% of the Net Cash Proceeds received by any Credit Party in excess of $10,000 from asset sales or series of related asset sales (x) made in the ordinary course of business on terms and conditions not less favorable to any Credit Party than could be obtained on an arm's-length basis from unrelated third parties as an arm's length transaction or (y) as otherwise permitted under the terms of this Agreement, in each case, within three Business Days after receipt of such Net Cash Proceeds;

(ii)      in an amount equal to 100% of insurance and condemnation proceeds (net of any actual and reasonable documented costs incurred by Borrower or any of its respective Subsidiaries in connection with the adjustment or settlement of any claims of Borrower or such Subsidiary in respect thereof) received by any Credit Party within three Business Days after receipt of such proceeds;

(iii)      in an amount equal to 100% of cash proceeds (net of any actual and reasonable documented costs incurred by Borrower or any of its respective Subsidiaries in connection with such issuance, including without limitation attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection with such issuance) received by any Credit Party from the issuance of any post-petition Indebtedness (other than Indebtedness permitted under <u>Section 6.01</u>) or Equity

22

Interests (other than any issuance or sale of the Equity Interests of a Subsidiary to its parent entity or another Credit Party) by any Credit Party within three Business Days after receipt of such net cash proceeds; and

(iv)     in an amount equal to 100% of the proceeds resulting from the termination, liquidation or unwinding of any Swap Agreement within three Business Days after receipt of such proceeds.

(b)     Optional Prepayment of Loans. The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty, but subject to the requirements of Section 2.07(b) and Section 2.14. The Borrower shall notify the DIP Agent by telephone (confirmed by telecopy) of any optional prepayment not later than 12:00 noon Tulsa time, on the date of such prepayment. Such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Borrowings or portion thereof to be prepaid; provided that, if a notice of prepayment is given in connection with a conditional notice of termination of the Commitments as contemplated by Section 2.07, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.07(c). Each partial prepayment of any Borrowings shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.11 and any amount payable under Section 2.14.

(c)     Application of Proceeds of Prepayments. Prepayments made in accordance with clause (a) or (b) of this Section shall be applied to the prepayment of the outstanding principal amount of the Loans and any other amounts then due and payable under this Agreement until paid in full, second, at any time after the Final DIP Order Date, to the outstanding Prepetition Secured Obligations in the order specified in the Prepetition Credit Agreement, until paid in full. Each prepayment of the Loans under this Section shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

SECTION 2.10. Fees.

(a)     Commitment Fee. The Borrower agrees to pay to the DIP Agent an upfront fee in an amount equal to such Lender's pro rata share of the Commitment Fee Amount, which upfront fees shall be earned and due and payable on the Maturity Date. "Commitment Fee Amount" means $50,000.

(b)     Additional Fees. The Borrower agrees to pay to the DIP Agent additional fees, the amount and dates of payment of which are embodied in certain fee letters executed and delivered by Borrower in connection with this Agreement and as may otherwise have been separately agreed upon by Borrower in writing in connection herewith or therewith.

(c)     All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the DIP Agent for its account. Fees paid shall not be refundable under any circumstances, except in the case of any overpayment due to erroneous calculation or invoicing thereof.

SECTION 2.11. Interest.

(a)     The Loans and all other DIP Obligations shall bear interest at a rate per annum equal to 9.00%.

(b)     Notwithstanding the foregoing, during the continuance of an Event of Default, the Loans and other DIP Obligations bear interest at a rate per annum equal to 11.00% (the "Default Rate").

(c)     Accrued interest on each Loan shall be payable in arrears on the Maturity Date and upon termination of the Commitments; provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment. Accrued interest on the amount of all other DIP Obligations shall be payable on demand from time to time as such DIP Obligation becomes due and payable (whether by acceleration or otherwise).

(d)     All interest hereunder shall be computed on basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

SECTION 2.12. [Reserved].

SECTION 2.13. Increased Costs.

(a)     If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, Lender;

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profit Taxes) on its loan, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liability or capital attributable thereto; or

(iii)     impose on Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by Lender;

and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

(b)     If Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by Lender to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to Lender such additional amount or amounts as will compensate Lender or Lender's holding company for any such reduction suffered.

(c)     A certificate of Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

24

(d)       Failure or delay on the part of Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of Lender's intention to claim compensation therefor; provided, further, that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.14. [Reserved].

SECTION 2.15. Taxes.

(a)       General. Any and all payments by or on account of any Credit Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction and withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by any Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings of Indemnified Taxes applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)       Payment of Other Taxes by the Borrower. The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the DIP Agent timely reimburse it for the payment of, any Other Taxes.

(c)       Evidence of Payment. As soon as practicable after any payment of Indemnified Taxes by any Credit Party to a Governmental Authority, the Borrower shall deliver to the DIP Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the DIP Agent.

(d)       Indemnification by the Borrower. The Borrower shall indemnify each Recipient for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts paid or payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. The indemnity under this Section 2.15(d) shall be paid within 10 days after a certificate as to the amount of such payment or liability is delivered to the Borrower by DIP Agent. Such certificate shall be conclusive of the amount so paid or payable absent manifest error.

(e)       Survival. Each party's obligations under this Section 2.15 shall survive any assignment of rights by, or the replacement of, Lender, and the Discharge of DIP Obligations.

SECTION 2.16. Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)     The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, or fees, or of amounts payable under <u>Section 2.13</u>, <u>2.14</u> or <u>2.15</u>, or otherwise) prior to 12:00 p.m. noon, Tulsa time, on the date when due, in immediately available funds, without set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the DIP Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the DIP Agent at its offices as set forth in <u>Section 11.01(a)</u>. The DIP Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(b)     Subject to <u>Section 7.03</u>, if at any time insufficient funds are received by and available to the DIP Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Borrower and each Subsidiary party hereto hereby represents and warrants to the DIP Agent that:

SECTION 3.01. <u>Existence; Organization; Powers</u>. Borrower and each Subsidiary: (a) is duly organized or formed, legally existing and in good standing, if applicable, under the laws of the jurisdiction of its formation, except as to any Subsidiary where the failure to so exist or remain in good standing could not reasonably be expected to have a Material Adverse Effect, (b) has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where failure to have such power and authority could not reasonably be expected to have a Material Adverse Effect, and (c) is qualified to do business in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary and where failure so to qualify could reasonably be expected to have a Material Adverse Effect.

SECTION 3.02. <u>Authorization; Enforceability</u>. Subject to entry and the terms of the DIP Orders and to any restrictions arising solely on account of Borrower's (or any of its Subsidiaries) current status as a "Debtor" under the Bankruptcy Code (and only so long as such status exists) (a) Borrower and each Subsidiary have all necessary power and authority to execute, deliver and perform its obligations under this Agreement and the Loan Documents to which it is a party and (b) the execution, delivery and performance by Borrower and each Subsidiary of this Agreement and the Loan Documents to which it is a party have been duly authorized by all necessary corporate, limited liability company or partnership action, and this Agreement and the Loan Documents constitute the legal, valid and binding obligations of Borrower and each Subsidiary party thereto, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03. <u>Governmental Approvals; No Conflicts</u>.  Subject to entry of the DIP Orders, no authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority (other than the DIP Orders) or any third Person are necessary for the execution, delivery or performance by Borrower or any Subsidiary of this Agreement or the Loan Documents or for

26

the validity or enforceability thereof, except for those third party approvals or consents which, if not made or obtained, would not cause a Default hereunder, could not reasonably be expected to have a Material Adverse Effect and do not have an adverse effect on the enforceability of the Loan Documents. Subject to entry of the DIP Orders, neither the execution and delivery of this Agreement or any Loan Document, nor compliance with the terms and provisions hereof or thereof, will conflict with or result in a breach of, or require any consent that has not been obtained as of the Closing Date under, the respective Organizational Documents of Borrower or any Subsidiary, any Governmental Requirement, or any other material agreement or instrument to which Borrower or any Subsidiary is a party or by which it is bound or to which it or its Properties are subject (in each case except for agreements and instruments subject to the Automatic Stay or Safe Harbor Provisions), or result in the creation or imposition of any Lien upon any of the revenues or assets of Borrower or any Subsidiary other than the Liens created by the Loan Documents, the DIP Orders or expressly permitted hereby.

SECTION 3.04. <u>Financial Condition; No Material Adverse Change</u>.

(a)     The Borrower has heretofore furnished to the DIP Agent its consolidated balance sheet, and the related consolidated or condensed consolidated, as applicable, statements of income, cash flows and shareholders' equity of the Borrower and its Subsidiaries as of and for the fiscal year ended December 31, 2021, audited by Erns & Young LLP, independent certified public accountants, certified by an Authorized Officer that such financial statements present fairly in all material respects, the financial condition and results of operations of the Borrower and its Subsidiaries as of such dates and for such periods. Such financial statements were prepared in accordance with GAAP applied on a consistent basis (subject to the absence of footnote disclosure and normal year-end audit adjustments other than as expressly set forth therein).

(b)     Since the date of the audited financial statements of the Borrower that have most recently been delivered pursuant to <u>Section 5.01(a)</u>, there has been no event or development that has had or could reasonably be expected to have a Material Adverse Effect.

(c)     Except as disclosed to the DIP Agent in writing, none of the Borrower or any Subsidiary has any material contingent liabilities, material liabilities for taxes, unusual and material forward or long-term commitments or material unrealized or anticipated losses from any unfavorable commitments, except as referred to or reflected or provided for in the consolidated balance sheets of the Borrower or as otherwise disclosed to the DIP Agent or its advisors in writing.

SECTION 3.05. <u>Ownership of Properties; Liens; No Burdensome Restrictions</u>.

(a)     Except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title could not reasonably be expected to have a Material Adverse Effect, each Credit Party has defensible title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its tangible personal property, and none of such property is subject to any Lien except for Permitted Liens.

(b)     No requirement of law or Contractual Obligation of any Loan Party has or could reasonably be expected to have a Material Adverse Effect.

SECTION 3.06. <u>Litigation and Environmental Matters</u>.

(a)     Other than the Cases or except as set forth on <u>Schedule 3.06</u>, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge

27

of Borrower, threatened in writing against Borrower or any of its respective Subsidiaries or any of their respective properties (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve this Agreement or the other Loan Documents, and in each case, which are not subject to the Automatic Stay.

(b)        Except as could not be reasonably expected to have an adverse effect of $250,000 or more on the business, Property, liabilities (actual or contingent), condition (financial or otherwise) or results of operations of the Borrower and the Subsidiaries taken as a whole (or with respect to (iii), (iv) and (v) below, where the failure to take such actions could not be reasonably expected to have an adverse effect of $250,000 or more):

(i)        neither any Property of Borrower or any Subsidiary, nor the operations conducted thereon, violate any order or requirement of any court or Governmental Authority or any Environmental Laws;

(ii)        no Property of Borrower or any Subsidiary nor the operations currently conducted thereon or, to the knowledge of Borrower, by any prior owner or operator of such Property or operation, are in violation of or subject to any existing, pending or threatened action, suit, investigation, inquiry or proceeding by or before any court or Governmental Authority (except the Cases) or to any remedial or investigative obligations under Environmental Laws;

(iii)        all notices, permits, licenses or similar authorizations, if any, required to be obtained or filed in connection with the operation or use of any and all Property of Borrower and each Subsidiary, including, without limitation, past or present treatment, storage, disposal or release of a hazardous substance or solid waste into the environment, have been duly obtained or filed, are in full force and effect and not subject to any pending or threatened legal challenge, and Borrower and each Subsidiary are in compliance with the terms and conditions of all such notices, permits, licenses and similar authorizations;

(iv)        all hazardous substances, solid waste and oil and gas exploration and production wastes, if any, generated at any and all Property of Borrower or any Subsidiary have in the past been transported, treated and disposed of in accordance with Environmental Laws and so as not to endanger public health or welfare or the environment, and, to the knowledge of Borrower, all such transport carriers and treatment and disposal facilities have been and are operating in compliance with Environmental Laws and so as not to endanger public health or welfare or the environment, and are not the subject of any existing, pending or threatened action, investigation or inquiry by any Governmental Authority in connection with any Environmental Laws;

(v)        Borrower or a Subsidiary has taken all steps reasonably necessary to determine and have determined that no hazardous substances, solid waste or oil and gas exploration and production wastes have been disposed of or otherwise released, and there has been no threatened release of any hazardous substances on or to any Property of Borrower or any Subsidiary, except in compliance with Environmental Laws and so as not to endanger public health or welfare or the environment;

(vi)        to the extent applicable, all Property of Borrower and each Subsidiary currently satisfies all applicable design, operation and equipment requirements imposed by the Oil Pollution Act of 1990 and no Borrower has any reason to believe that such Property, to the extent subject thereto, will not be able to maintain compliance with the requirements thereof during the term of this Agreement; and

(c)      none of the Borrower or any Subsidiary has any known material contingent liability in connection with any release or threatened release of any oil, hazardous substance or solid waste into the environment.

SECTION 3.07. <u>Compliance with Laws and Agreements</u>. None of the Borrower or any Subsidiary has violated any applicable Governmental Requirement binding upon it or its Properties or failed to obtain any license, permit, franchise or other governmental authorization necessary for the ownership of any of its Properties or the conduct of its business, which violation or failure would have (in the event such violation or failure were asserted by any Person through appropriate action) a Material Adverse Effect. No Default hereunder has occurred and is continuing.

SECTION 3.08. <u>Investment Company Status</u>.  None of the Borrower or any Subsidiary is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

SECTION 3.09. <u>Taxes</u>. Each of the Borrower and the Subsidiaries has (a) timely filed all foreign, U.S. federal, state and local income Tax returns and all other Tax returns and reports that are required to be filed by it and (b) timely paid all foreign, U.S. federal, state and local, and all other Taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except (i) any such Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP or (ii) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.  No Tax lien (other than a Permitted Lien) has been filed and, to the knowledge of Borrower, no material claim is being asserted with respect to any such Tax or other such governmental charge.

SECTION 3.10. <u>ERISA</u>.

(a)      Except as would not reasonably be expected to result in a Material Adverse Effect, each Employee Benefit Plan is in compliance with the applicable provisions of ERISA, the Code and other U.S. federal or state laws. Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter or opinion letter, as applicable, from the Internal Revenue Service to the effect that the form of such plan is qualified under Section 401(a) of the Code, and to the knowledge of Borrower, nothing has occurred that would cause the loss of such tax-qualified status. There are no pending or, to the best knowledge of Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Employee Benefit Plan that would reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Employee Benefit Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(b)      Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, no ERISA Event has occurred or is reasonably expected to occur.

(c)      Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, no Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate has any liability, contingent or otherwise, with respect to a Foreign Plan.

SECTION 3.11. <u>Disclosure</u>. The Borrower has disclosed to the DIP Agent all agreements, instruments and corporate or other restrictions to which its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No written reports, financial statements, certificates or other written information

29

furnished by or on behalf of Borrower to the DIP Agent in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) (other than information of a general industry nature or constituting projections, projected financial information, forward looking information or prospect information) contains, when taken as a whole, any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projections, projected financial information, forward looking information or prospect information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being understood and agreed that financial projections are not a guarantee of financial performance and are subject to significant uncertainties and contingencies many of which are beyond the control of the Borrower and its Subsidiaries, no assurance can be given that any projections may be realized, and actual results may differ from the projections and such differences may be material).   To the knowledge of Borrower and each Subsidiary, there is no fact peculiar to the Borrower or any Subsidiary that has a Material Adverse Effect or in the future is reasonably likely to have (so far as the Borrower can now foresee) a Material Adverse Effect and that has not been set forth in this Agreement or the other documents, certificates and statements furnished to the DIP Agent by or on behalf of Borrower or any Subsidiary prior to, or on, the date hereof in connection with the transactions contemplated hereby.

SECTION 3.12. Use of Loans. Each Credit Party will use the proceeds of the Loans and any Cash Collateral solely for Approved Purposes and pursuant to the Approved Budget in place at the time any such proceeds are used. No Credit Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation U or X of the Board). No part of the proceeds of any Loan will be used for any purpose which violates the provisions of Regulations T, U or X of the Board.

SECTION 3.13. Subsidiaries. Except as set forth on Schedule 3.13 or as disclosed in writing to the DIP Agent (which shall promptly furnish a copy to the Lenders) that shall be a supplement to Schedule 3.13, no Debtor has any Subsidiary other than those listed on Schedule 3.13.

SECTION 3.14. Jurisdiction of Incorporation or Organization. The jurisdiction of organization, name as listed in the public records of its jurisdiction of organization and location of the principal place of business or, if it has more than one place of business, the chief executive office of each Debtor is set forth on Schedule 3.13.

SECTION 3.15. [Reserved].

SECTION 3.16. Insurance. Borrower has, and has caused all of its respective Subsidiaries to have, (i) all insurance policies sufficient for the compliance by each of them with all material Governmental Requirements and all material agreements of the Borrower and the Subsidiaries and (ii) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Borrower and the Subsidiaries. The DIP Agent has been named as an additional insured in respect of such liability insurance policies.

SECTION 3.17. [Reserved].

SECTION 3.18. [Reserved].

SECTION 3.19. <u>Hedging Transactions</u>. Except for the Swap Agreements set forth on Schedule 3.19, no Debtor is party to any Swap Agreements as of the Closing Date.

SECTION 3.20. <u>Restriction on Liens</u>. None of the Borrower or any of the Subsidiaries is a party to any material agreement or arrangement (other than instruments creating Liens permitted by Section 6.02, but then only on the Property subject of such Lien), or subject to any order, judgment, writ or decree other than pursuant to the DIP Orders, that restricts or purports to restrict its ability to grant Liens to the DIP Agent and the Lenders on or in respect of their respective assets or Properties to secure the DIP Obligations.

SECTION 3.21. <u>Intellectual Property</u>. Each Credit Party owns, is licensed to use or has a common law or contractual right to access and use, all material trademarks, trade names, copyrights, patents, technology, know-how and processes necessary for the conduct of its business as currently conducted (the "<u>Intellectual Property</u>") except for those the failure to own or license which could not reasonably be expected to have a Material Adverse Effect. No claim has been asserted nor is pending by any Person challenging or questioning the use by any such Credit Party of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does any Credit Party know of any valid basis for any such claim, except any claim that could not reasonably be expected to have a Material Adverse Effect. The use of such Intellectual Property by the Credit Parties does not infringe on the rights of any Person, except for such claims and infringements that, in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.22. <u>Business</u>.

(a)      The Credit Parties have not entered into any business except any energy related, oil field service or pipeline service related business or activity that produces "qualifying income" as such term is defined in Section 7704(d) of the Code, and any activities reasonably related, complementary or incidental thereto.

SECTION 3.23. <u>Accounts</u>. <u>Schedule 3.24</u> accurately sets forth each bank account of the Credit Parties (whether an operating account, a Deposit Account, a Securities Account, a Commodity Account, or otherwise) maintained by such Credit Party (including the respective account number) and the name of the respective financial institution with which each such account is maintained.

SECTION 3.24. <u>Licenses, Permits, Etc</u>. Subject to the entry of the DIP Orders, Borrower and each of the Subsidiaries possess such valid franchises, certificates of convenience and necessity, operating rights, licenses, permits, consents, authorizations, exemptions and orders of Governmental Authorities, as are necessary to carry on their business as now conducted and as proposed to be conducted, except to the extent a failure to obtain any such item could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.25. <u>Fiscal Year</u>. The fiscal year of Borrower is January 1 through December 31.

SECTION 3.26. <u>Security Instruments</u>. Subject to the entry of the DIP Orders, the security interests created in favor of the DIP Agent under the Collateral Documents constitute an Acceptable Security Interest in the Collateral referred to therein to the extent that the creation, perfection or priority, as applicable, is governed by the laws of the United States or any State thereof.

SECTION 3.27. <u>Default under Material Contracts, Assumed Executory Contracts or Assumed Unexpired Leases</u>.  Except as could not be expected to have a Material Adverse Effect, no default has occurred under (i) any material contractual obligation arising after commencement of the

Cases, or (ii) any executory contract or unexpired lease of any Credit Party assumed pursuant to the Bankruptcy Code.

SECTION 3.28. <u>New Material Leases</u>.  Subject to the entry and terms of the DIP Order, no Credit Party has entered into any material lease for which Liens are not available to secure the DIP Obligations.

SECTION 3.29. <u>Anti-Corruption Laws and Sanctions</u>.

(a)     None of (a) Borrower or any Subsidiary thereof or any of their respective directors, officers, employees or, to the knowledge of any Credit Party, affiliates, or (b) to the knowledge of any Credit Party, any agent or representative of Borrower or any Subsidiary thereof that will act in any capacity in connection with or benefit from the credit facility established hereby, (i) is a Sanctioned Person or currently the subject or target of any Sanctions or (ii) is currently engaging or has engaged in any dealings or transactions with, involving or for the benefit of a Sanctioned Person, or in or involving any Sanctioned Country, in each case in violation of applicable Sanctions.

(b)     Each Credit Party has implemented, maintains in effect and enforces policies and procedures intended to ensure compliance by such Credit Party and any Subsidiary thereof and their respective directors, officers, employees and agents (in their respective activities on behalf of such Credit Party and any such Subsidiary thereof) with applicable Anti-Corruption Laws, Anti-Money Laundering Laws and applicable Sanctions, and each Credit Party and each Subsidiary thereof, its and their respective officers and directors and, to the knowledge of Borrower, employees and agents (in their respective activities on behalf of Borrower and each Subsidiary thereof), are in compliance with applicable Anti-Corruption Laws, Anti-Money Laundering Laws and applicable Sanctions, in each case in all material respects.

SECTION 3.30. <u>DIP Orders</u>. The applicable DIP Order is in full force and effect and has not been vacated, reversed, modified, amended or stayed without the prior written consent of the DIP Agent.

SECTION 3.31. <u>Budget</u>. The Debtors have not failed to disclose any material assumption with respect to the Approved Budget and affirm the reasonableness of the assumptions in the Approved Budget in all material respects.

ARTICLE IV
CONDITIONS

SECTION 4.01. <u>Conditions Precedent to Effectiveness and New Money Interim Loans</u>. This Agreement and the obligations of the DIP Agent to make the initial New Money Interim Loans shall not become effective until the date on which each of the following conditions is satisfied (or waived by the DIP Agent), which such conditions shall be the sole and exclusive conditions to the initial availability of the New Money Interim Loans and the effectiveness of this Agreement:

(a)     <u>Credit Agreement</u>. The DIP Agent shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the DIP Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)     <u>Loan Documents</u>. The DIP Agent (or its counsel) shall have received the following documents: (i) the Loan Documents (other than this Agreement) to be executed and delivered on or prior to the Closing Date, from each party thereto, as applicable, signed on behalf of such party, and (ii) any

32

promissory notes requested by the DIP Agent pursuant to <u>Section 2.08</u> payable to the DIP Agent duly executed and completed by the Borrower.

(c)    <u>Organizational Documents</u>. The DIP Agent shall have received a certificate of an Authorized Officer of each Credit Party dated as of the Closing Date, on which the DIP Agent s may conclusively rely until the DIP Agent receives notice in writing from the Borrower to the contrary, certifying:

(i)    that attached to each such certificate are (1) a true and complete copy of the Organizational Documents of such Credit Party, as the case may be, as in effect on the date of such certificate and (2) a true and complete copy of a certificate from the Governmental Authority of the state of such entity's organization certifying that such entity is duly organized and validly existing in such jurisdiction;

(ii)    that attached to such certificate is a true and complete copy of resolutions duly adopted by the board of directors, manager, sole shareholder, or other applicable authorizing entity of such Credit Party, as applicable, authorizing the execution, delivery and performance of each of the Loan Documents to which such Credit Party is or is intended to be a party; and

(iii)    as to the incumbency and specimen signature of each officer of such Credit Party (1) who is authorized to execute the Loan Documents to which such Credit Party is or is intended to be a party and (2) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby.

(d)    <u>Qualification and Good Standing</u>. The DIP Agent shall have received certificates of the appropriate state agencies with respect to the existence and good standing of Borrower and each Guarantor in the jurisdiction of its organization.

(e)    <u>Closing Date Certificate</u>. The DIP Agent shall have received a certificate of a Responsible Officer of Borrower to the effect that the conditions set forth in <u>Section 4.03(a) – (d)</u> and <u>(f)</u> has been satisfied.

(f)    <u>UCC and Lien Searches; Collateral</u>. The DIP Agent shall have received appropriate UCC search certificates for Borrower and each other Guarantor in its jurisdiction of organization, and any other jurisdiction requested by the DIP Agent, reflecting no prior Liens or security interests encumbering the Collateral other than those being assigned or released on or prior to the Closing Date and Liens permitted by <u>Section 6.02</u> and all filing and recording fees and taxes with respect to such Liens and security interests that are due and payable as of the Closing Date shall have been duly paid. The DIP Agent shall have valid and perfected Liens on the Collateral, to the extent contemplated hereby, and pursuant to the other Loan Documents, including the Interim Order. The Collateral Documents shall be in full force and effect on the Closing Date, and each document (including each UCC financing statement and any certificates representing pledged Collateral, accompanied by instruments of transfer and stock powers endorsed in blank) shall have been delivered to the DIP Agent.

(g)    <u>Insurance</u>. The DIP Agent shall have received insurance certificates and endorsements in accordance with, and evidencing compliance with, <u>Section 5.06(a)</u> and otherwise satisfactory to the DIP Agent.

(h)  <u>Financial Statements</u>. The DIP Agent shall have received the financial statements described in <u>Section 3.04(a)</u>.

(i)  <u>Initial Budget.</u> The DIP Agent shall have received the Initial Budget in form and substance reasonably satisfactory to the DIP Agent.

(j)  <u>Fees and Expenses</u>. The DIP Agent shall have received all invoiced fees and expenses due and payable to the DIP Agent and the Prepetition Secured Parties on or prior to the Closing Date, including reimbursement or payment of all documented out-of-pocket expenses (including fees, charges and disbursements of counsel (including local counsel) and any professional advisor) required to be reimbursed or paid by any Credit Party hereunder or under any other Loan Document.

(k)  <u>Bankruptcy Related Conditions</u>.

(i)  the Credit Parties have filed the Cases with the Bankruptcy Court on the Petition Date;

(ii)  none of the Cases shall have been dismissed or converted to a Chapter 7 case.

(iii)  no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Cases.

(iv)  the Bankruptcy Court shall have entered the Interim Order no later than 3 days after the Petition Date;

(v)   all material governmental and third party consents and approvals necessary in connection with this Agreement and the transactions contemplated hereby shall have been obtained;

(vi)  making any Loan shall not violate any requirement of law in any material respect and shall not be enjoined, temporarily, preliminarily or permanently;

(vii)  the RSA shall not have terminated and shall be in full force and effect; and

(viii)  all "first day orders" entered in the Cases at the time of commencement of the Cases (including a cash management order, employee programs (including incentive, retention or severance programs) or any critical vendor or supplier motions) shall be reasonably satisfactory in form and substance to the DIP Agent.

(l)  <u>Conditions Applicable to all Loans</u>. Each of the conditions in <u>Section 4.03</u> have been satisfied (or waived by the DIP Agent).

The DIP Agent shall notify the Borrower of the Closing Date, and such notice shall be conclusive and binding.

SECTION 4.02. <u>Conditions Precedent to New Money Final Loans</u>. The obligation of the DIP Agent to make the New Money Final Loans shall be subject solely to satisfaction (or waiver by DIP Agent) of the following conditions:

LEGAL_US_W # 112048364.6

(a)     Each of the conditions set forth in <u>Section 4.03</u> shall have been satisfied (or waived by the DIP Agent).

(b)     The Final DIP Order (i) shall have been entered on the docket of the Bankruptcy Court, and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any material respect without the written consent of the DIP Agent.

Each Borrowing of the New Money Final Loans shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a) and (b) of this Section.

SECTION 4.03. <u>Conditions Precedent to Lending</u>. The obligation of DIP Agent to make a Loan on the occasion of any Borrowing shall be subject to the satisfaction (or waiver by the DIP Agent) of the following conditions:

(a)     At the time of and immediately after giving effect to such Borrowing, the representations and warranties of the Borrower and the Guarantors set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects (or, to the extent that a particular representation or warranty is qualified as to materiality, such representation or warranty shall be true and correct in all respects), in each case, on and as of the date of such Borrowing except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, such representations and warranties shall be true and correct in all material respects (or, to the extent that a particular representation or warranty is qualified as to materiality, such representation or warranty shall be true and correct in all respects), in each case, as of such specified earlier date.

(b)     At the time of and immediately after giving effect to such Borrowing, no Default shall have occurred and be continuing.

(c)     At the time of and immediately after giving effect to such Borrowing, no event, development or circumstance has occurred or shall then exist that has resulted in, or could reasonably be expected to have, a Material Adverse Effect.

(d)     The making of such Loan would not conflict with, or cause DIP Agent to violate or exceed, any applicable Governmental Requirement and no litigation shall be pending or, to the knowledge of any party hereto, threatened in writing, which does or, with respect to any threatened litigation, seeks to, enjoin, prohibit or restrain the making or repayment of any Loan, or the consummation of the transactions contemplated by this Agreement or any other Loan Document.

(e)     The receipt by the DIP Agent of a Borrowing Request in accordance with <u>Section 2.03</u>.

(f)     [Reserved].

(g)     the Debtors shall be in compliance in all respects with (i) the DIP Orders and (ii) subject to application of the Permitted Variance, with the Approved Budget most recently delivered.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a) through (g) of this Section.

ARTICLE V
AFFIRMATIVE COVENANTS

Until the Discharge of the DIP Obligations, the Borrower and the Subsidiaries party hereto hereby covenant and agree with the Lenders that:

SECTION 5.01. Financial Statements; Other Information. The Borrower will furnish to the DIP Agent:

(a)        as soon as available, but in any event within one hundred twenty (120) days after the end of each fiscal year, a copy of the audited consolidated balance sheet of the Credit Parties as at the end of such year and the related consolidated statements of income and changes in members' equity and cash flows for such year, prepared in accordance with GAAP and setting forth (x) in the case of the consolidated statements of income, in comparative form the figures for the previous year and (y) in the case of the consolidated balance sheet, in comparative form the figures for the previous year-end, and, in each case, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by Ernst & Young LLP or other independent certified public accountants of nationally recognized standing;

(b)        as soon as available, but in any event not later than forty-five (45) days after the end of the calendar quarter (other than the fourth calendar quarter) the unaudited consolidated balance sheet of the Credit Parties as at the end of such calendar quarter and the related unaudited consolidated statements of income and changes in members' equity and cash flows for such quarter and the portion of the fiscal year through the end of such quarter, prepared in accordance with GAAP, and setting forth (x) in the case of the consolidated statements of income, in comparative form the figures for the previous year and (y) in the case of the consolidated balance sheet, in comparative form the figures for the previous year-end, in each case, certified by an Authorized Officer of the Borrower, as being fairly presented in all material respects (subject to normal year-end and quarter-end adjustments and the absence of footnotes);

(c)        for each calendar month that does not fall at the end of a calendar quarter (except for the last month of the fiscal year, for which this Section 5.01(c) will apply), as soon as available, but in any event not later than forty-five (45) days after the end of such calendar month, the unaudited consolidated balance sheet of the Credit Parties as at the end of such calendar month and the related unaudited consolidated statements of income and changes in members' equity and cash flows for such month and the portion of the fiscal year through the end of such month, prepared in accordance with GAAP, and setting forth (x) in the case of the consolidated statements of income, in comparative form the figures for the previous year and (y) in the case of the consolidated balance sheet, in comparative form the figures for the previous year-end, in each case, certified by an Authorized Officer of the Borrower, as being fairly presented in all material respects (subject to normal year-end and quarter-end adjustments and the absence of footnotes);

(d)        [reserved];

(e)        [reserved];

(f)        promptly upon receipt thereof, a copy of each other material report or letter submitted to Borrower or any of the Subsidiaries by independent accountants in connection with any annual, interim or special audit made by them of the books of Borrower or any Subsidiary, and a copy of any material response by Borrower or any such Subsidiary, or the board of directors (or equivalent governing body) of Borrower or any such Subsidiary, to such letter or report;

(g)        promptly upon its becoming available, each financial statement, report, notice or proxy statement sent by the Borrower to shareholders generally and each Form 10-K, Form 10-Q, registration statement or prospectus filed by the Borrower with any securities exchange or the SEC;

(h)        promptly after the furnishing thereof, copies of any financial statement, report or notice (other than ministerial notices) furnished to any Person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement in respect of Indebtedness in excess of the Threshold Amount, other than this Agreement and not otherwise required to be furnished to the Lenders pursuant to any other provision of this Section 5.01;

(i)        [reserved];

(j)        prompt written notice (and in any event within 30 days prior thereto or such shorter period as may be agreed to by the DIP Agent) of any change in (i) any Credit Party's corporate name, (ii) the location of any Credit Party's chief executive office or principal place of business, (iii) the Credit Party's identity or corporate structure or in the jurisdiction in which such Person is incorporated or formed, (iv) any Credit Party's jurisdiction of organization or such Credit Party's organizational identification number in such jurisdiction of organization and (v) any Credit Party's U.S. federal taxpayer identification number;

(k)        [Reserved];

(l)        [Reserved];

(m)        promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of Borrower or any Subsidiary, or compliance with the terms of this Agreement, as the DIP Agent may reasonably request from time to time;

(n)        as soon as available and in any event (i) no later than 6:00 p.m. on each Weekly Test Date (and at such other times as the Borrower may elect), commencing with the first Friday following the Petition Date, a rolling 13-Week Budget in form and substance acceptable to the DIP Agent in its discretion, which shall reflect the Borrower's good faith projection of all weekly cash receipts and disbursements in connection with the operation of the Credit Parties' and their respective Subsidiaries' business during such thirteen-week period, including but not limited to, capital expenditures, collections, payroll, and other material cash outlays, in each on a line item basis, and (ii) unless waived by DIP Agent in its sole discretion, no later than 6:00 p.m. Tulsa time on each Friday, commencing with the first Friday following the Petition Date, a variance report as required under Section 5.19;

(o)        If, at any time, any Subsidiary of the Borrower is not a wholly-owned Subsidiary, then concurrently with any delivery of financial statements under clauses (a) or (b) above, a certificate of the chief financial officer of the Borrower setting forth consolidating spreadsheets that show all Subsidiaries that are not wholly-owned Subsidiaries and the eliminating entries applicable to the preparation of consolidating financial statements, in such form as would be presentable to the auditors of the Borrower;

(p)        solely to the DIP Agent, within three (3) Business Days of receiving written notice thereof by Borrower or any Subsidiary thereof, copies of all Lien filings of the type described in clause (i), (ii), (iii), (iv), and (v) of the definition of "Permitted Liens" regardless of whether such Lien is a Permitted Lien (which written notice may be by electronic mail to ericw@argonautpe.com with a copy to sory@fdlaw.com, or such other email addresses(es) notified to the Borrower from time to time by the DIP Agent).

Documents required to be delivered pursuant to Section 5.01(a), (b), (c) or (g) (to the extent any such documents are included in materials otherwise filed with the SEC) shall be deemed to be delivered hereunder upon such filing with the SEC on the date of such filing.

SECTION 5.02. Notices of Material Events. The Borrower will furnish to the DIP Agent prompt written notice (and in any event within three (3) Business Days) of the following:

(a)      the occurrence of any Default;

(b)      the commencement of any legal or arbitral proceedings, and of all proceedings before any Governmental Authority filed against Borrower or any Subsidiary, except proceedings that, if adversely determined, could not reasonably be expected to result in liability in excess of the Threshold Amount (whether individually or in the aggregate), unless fully covered by insurance and having a deductible of no greater than $150,000;

(c)      in the event the amount of contested taxes or similar claims not previously disclosed in the financial statements delivered under Section 5.01(a) and Section 5.01(b) above exceeds the Threshold Amount in the aggregate at any one time, prompt written notice from an Authorized Officer describing such circumstances, in detail satisfactory to the DIP Agent;

(d)      the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate in an aggregate amount exceeding the Threshold Amount;

(e)      Promptly upon, and in any event no later than three days after (or such longer period as the DIP Agent may agree in its sole discretion), the receipt thereof, or the acquisition of knowledge thereof, by any Credit Party, a copy of any form of request, claim, complaint, order, notice, summons or citation received from any Governmental Authority or any other Person, concerning (i) violations or alleged violations of Environmental Laws, which seek to impose liability therefore in excess of $150,000 or which would otherwise reasonably be expected to cause a Material Adverse Effect, (ii) any action or omission on the part of any of the Credit Parties or any of their former Subsidiaries in connection with Hazardous Materials which would reasonably result in the imposition of liability in excess of $150,000 or that would otherwise reasonably be expected to cause a Material Adverse Effect or requiring that action be taken to respond to or clean up a release of Hazardous Materials and such action or clean-up would reasonably be expected to cause a Material Adverse Effect, including without limitation any information request related to, or notice of, potential responsibility under CERCLA, or (iii) the filing of a Lien in connection with obligations arising under Environmental Laws upon, against or in connection with the Credit Parties, any of their respective Subsidiaries, or any of their respective former Subsidiaries, or any of their leased or owned Property, wherever located;

(f)      (i) any claims, legal or arbitration proceedings, proceedings before any Governmental Authority, or disputes pending, or to the knowledge of any Credit Party threatened in writing, or affecting any Credit Party or Subsidiary which, if adversely determined, could result in a liability to any Credit Party of Subsidiary in an amount in excess of the Threshold Amount or that could otherwise result in a cost, expense or loss to the Credit Parties or any of their respective Subsidiaries in excess of the Threshold Amount, or any material labor controversy of which any Credit Party or Subsidiary has knowledge resulting in or reasonably considered to be likely to result in a strike against any Credit Party or Subsidiary thereof and (ii) any claim, judgment, Lien or other encumbrance (other than any Permitted Lien) affecting any Property of any Credit Party or Subsidiary thereof if the value of the claim, judgment, Lien, or other encumbrance affecting such Property shall exceed the Threshold Amount;

(g)      a copy of any notice, summons, citation, or proceeding received by any Credit Party or Subsidiary thereof seeking to modify in any material respect, revoke, or suspend any material contract, license, permit or agreement with any Governmental Authority; and

(h)      any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of an Authorized Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.  Existence; Conduct of Business.  Subject to the DIP Orders, Borrower will, and will cause each of the Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of their business, except where the failure to so preserve, renew or keep could not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03.

SECTION 5.04.  Payment of Obligations, Taxes and Material Claims.

(a)      Subject to the DIP Orders, Borrower will, and will cause each of the Subsidiaries to, pay the DIP Obligations according to the terms set forth in this Agreement and the other Loan Documents and do and perform, in all material respects, every act and discharge all of the obligations to be performed and discharged by them under this Agreement and the Loan Documents, at the time or times and in the manner specified.

(b)      Subject to the DIP Orders, Borrower will, and will cause each of the Subsidiaries to, to timely file all U.S. federal income Tax returns and all other material Tax returns and reports required to be filed and pay (i) all material foreign, U.S. federal, state and local Taxes imposed upon it or any of its assets or with respect to any of its franchises, business, income or profits before any penalty or interest accrues thereon and (ii) all material claims (including, without limitation, claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or might become a Lien (other than Liens permitted pursuant to Section 6.02) on any of its assets; provided, however, that no payment of Taxes or claims shall be required if the amount, applicability or validity thereof is currently being contested in good faith by appropriate action promptly initiated and diligently conducted in accordance with good business practices, and the Borrower, as and to the extent required in accordance with GAAP, shall have set aside on its books reserves (segregated to the extent required by GAAP) deemed by it to be adequate with respect thereto.

SECTION 5.05.  Maintenance of Properties; Insurance.

(a)      Borrower will, and will cause each of the Subsidiaries to: (i) except as permitted in Section 6.03, preserve and maintain its existence and all of its material rights, privileges and franchises and maintain, if necessary, its qualification to do business in each other jurisdiction in which the ownership of its Properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; (ii) keep books of record and account in accordance with GAAP; (iii) comply with all Governmental Requirements if failure to comply with such requirements could reasonably be expected to have a Material Adverse Effect; and (iv) keep, or cause to be kept, insured by financially sound and reputable insurers all Property of a character usually insured by Persons engaged in the same or similar business similarly situated against loss or damage of the kinds and in the amounts customarily insured against by such Persons and carry such other insurance against risks

as is usually carried by such Persons. All policies of insurance shall either have attached thereto a "lender's loss payable endorsement" for the benefit of the DIP Agent, as loss payee in form reasonably satisfactory to the DIP Agent or shall name the DIP Agent as an additional insured, as applicable. All policies or certificates of insurance shall set forth the coverage, the limits of liability, the name of the carrier, the policy number, and the period of coverage. All such policies shall contain a provision that notwithstanding any contrary agreements between the Credit Parties, their respective Subsidiaries, and the applicable insurance company, such policies will not be canceled without at least 30 days' prior written notice to the DIP Agent (or at least 10 days' for non-payment of premium). In the event that, notwithstanding the "lender's loss payable endorsement" requirement of this <u>Section 5.05</u>, the proceeds of any insurance policy described above are paid to any Credit Party or a Subsidiary when an Event of Default has occurred and is continuing, the Borrower shall deliver such proceeds to the DIP Agent immediately upon receipt. Waiver of subrogation shall apply in favor of the DIP Agent in connection with any general liability insurance policy of any Credit Party.

(b)     Borrower will, and will cause each of the Subsidiaries to, operate its Properties or cause such Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable Environmental Laws and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the Borrower's business, except, in each case, where the failure to comply would not reasonably be expected to result in a Material Adverse Effect.

(c)     Borrower will, and will cause each of the Subsidiaries to, at its own respective expense, do or cause to be done all things reasonably necessary to preserve and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its Properties, including, without limitation, all equipment, machinery and facilities, and from time to time will make all the reasonably necessary repairs, renewals and replacements so that at all times the state and condition of its Properties will be preserved and maintained, except, in each case, to the extent such failure to so preserve and keep could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.06. <u>Books and Records; Inspection Rights</u>. Borrower will, and will cause each of the Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made in all material respects of all dealings and transactions in relation to its business and activities. Borrower will, and will cause each of the Subsidiaries to, permit any representatives, agents or consultants designated by the DIP Agent, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested. Without limiting the generality of the foregoing, in connection with each annual financial statement required to be delivered under <u>Section 5.01(a)</u>, the Borrower shall make its officers available for a telephonic (or, with the Borrower's consent, an in-person) meeting with the DIP Agent and the Lenders held at reasonable times and upon reasonable prior notice, to discuss such financial statements and such other information regarding the Credit Parties, its Subsidiaries and their respective Properties. Notwithstanding the foregoing, no Credit Party shall be required to disclose to the DIP Agent, or any agents, advisors or other representatives thereof, any written material, (x) the disclosure of which would cause a breach of any confidentiality provision in the written agreement governing such material applicable to such Person, (y) which is the subject of attorney-client privilege or attorney's work product privilege asserted by the applicable Person to prevent the loss of such privilege in connection with such information, or (z) which is a non-financial trade secret or other proprietary information.

SECTION 5.07. <u>Compliance with Laws</u>. Borrower will, and will cause each of the Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority

40

applicable to it or its Property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. Without limiting the generality and coverage of the foregoing, each Credit Party shall comply, and shall cause each of its Subsidiaries to comply with all Environmental Laws and all laws, regulations, or directives with respect to equal employment opportunity and employee safety in all jurisdictions in which any Credit Party or any Subsidiary thereof does business except where failure to so comply has not resulted in and would not reasonably be expected to result in an adverse effect of $150,000 or more on the business, Property, liabilities (actual or contingent), condition (financial or otherwise) or results of operations of the Borrower and the Subsidiaries taken as a whole.  Without limitation of the foregoing, each Credit Party shall, and shall cause each of its Subsidiaries to maintain and possess all authorizations, Permits, licenses, trademarks, trade names, rights and copyrights which are necessary or advisable to the conduct of its business, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08. <u>Use of Proceeds of Loans</u>.

(a)      The proceeds of the New Money Interim Loans and the New Money Final Loans will be used by the Borrower only for the following purposes: (i) to pay certain costs, fees and expenses related to the Loan Documents and the Cases, including Professional Fees and the Carve-Out, (ii) to pay any Adequate Protection Payments and (iii) to fund the working capital needs, capital improvements and expenditures of the Credit Parties during the Cases, in each case in accordance with an Approved Budget (other than with respect to Professional Fees to the extent approved by the Bankruptcy Court) but subject to the Permitted Variance (collectively the "<u>Approved Purposes</u>").

(b)      Proceeds of the Loans shall not be used (i) to permit the Borrower, any Guarantor or any of their representatives to challenge or otherwise contest or institute any proceeding to determine (x) the validity, perfection or priority of security interests in favor of any of the DIP Agent, the other Lenders or the Prepetition Secured Parties, or (y) the enforceability of the obligations of the Borrower or any Guarantor under this Agreement or the Prepetition Credit Agreement, (ii) to investigate, commence, prosecute or defend any claim, motion, proceeding or cause of action against any of the DIP Agent, the other Lenders or the Prepetition Secured Parties, each in such capacity, and their respective agents, attorneys, advisors or representatives, including, without limitation, any lender liability claims or subordination claims, or (iii) to fund acquisitions, capital expenditures, capital leases, or any other expenditure other than as set forth in the Approved Budget (subject to the Permitted Variance) or the Carve-Out.

(c)      No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

(d)      The Borrower will not request any Borrowing, and the Borrower shall not use, and shall ensure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, in either case in violation of any Sanctions applicable to Borrower and its Subsidiaries, or (iii) in any manner that would result in the violation of any Sanctions applicable to any Credit Party or, to the knowledge of Borrower, any other Person.

41

SECTION 5.09. Environmental Matters.

(a)      Borrower will, and will cause each Subsidiary to, establish and implement such procedures as may be reasonably necessary to continuously determine and assure that any failure of the following would not reasonably be expected to have an adverse effect of $150,000 or more on the business, Property, liabilities (actual or contingent), condition (financial or otherwise) or results of operations of the Borrower and the Subsidiaries taken as a whole: (i) all Property of the Borrower and the Subsidiaries and the operations conducted thereon and other activities of the Borrower and the Subsidiaries are in compliance with and do not violate the requirements of any Environmental Laws, (ii) no oil, oil and gas production or exploration wastes, Hazardous Materials or solid wastes are disposed of or otherwise released on or to any Property owned by any such party except in compliance with Environmental Laws, (iii) no Hazardous Material will be released on or to any such Property in a quantity equal to or exceeding that quantity which requires reporting pursuant to Section 103 of CERCLA or under any other Environmental Laws, and (iv) no Hazardous Materials or solid wastes are released on or to any such Property so as to endanger public health or welfare or the environment.

(b)      Borrower will promptly notify the DIP Agent in writing of any written threatened action, investigation or inquiry (including written notices thereof) by any Governmental Authority against Borrower or any of the Subsidiaries or their Properties of which Borrower has knowledge in connection with any Environmental Laws (excluding routine testing and corrective action) if Borrower reasonably anticipates that such action will result in liability, not fully covered by insurance, subject to normal deductibles (whether individually or in the aggregate) in excess of $250,000.

SECTION 5.10. Further Assurances. Each Credit Party shall, and shall cause each Subsidiary to, cure promptly any defects in the creation and issuance of the Notes and the execution and delivery of the Collateral Documents and this Agreement. Each Credit Party hereby authorizes the DIP Agent to file any financing statements without the signature of such Credit Party to the extent permitted by applicable Governmental Requirement in order to perfect or maintain the perfection of any security interest granted under any of the Loan Documents. Each Credit Party at its expense will, and will cause each of its Subsidiaries to, promptly execute and deliver to the DIP Agent upon its reasonable request all such other documents, agreements and instruments to comply with or accomplish the covenants and agreements of the Credit Party, as the case may be, in the Collateral Documents and this Agreement, or to further evidence and more fully describe the collateral intended as security for the DIP Obligations, or to correct any omissions in the Collateral Documents, or to state more fully the security obligations set out herein or in any of Collateral Documents, or to perfect, protect or preserve any Liens created pursuant to any of the Collateral Documents, or to make any recordings, to file any notices or obtain any consents, all as may be necessary or appropriate in connection therewith or to enable the DIP Agent to exercise and enforce its rights and remedies with respect to any Collateral.

SECTION 5.11. [Reserved].

SECTION 5.12. [Reserved].

SECTION 5.13. ERISA Information and Compliance. As soon as available, and in any event, within 10 days after Borrower obtains knowledge of any of the following, Borrower will furnish and will cause each Subsidiary, Guarantor and ERISA Affiliate to promptly furnish to the DIP Agent (a) a written notice signed by an Authorized Officer of Borrower describing the occurrence of any ERISA Event or of any material "prohibited transaction," as described in section 406 of ERISA or in section 4975 of the Code, in connection with any Plan or any trust created thereunder, that could reasonably be expected to result in liability of the Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate in an aggregate amount exceeding the Threshold Amount, including any notices from a Multiemployer Plan

42

sponsor or any Governmental Authority concerning such event, and specifying what action Borrower, Subsidiary, Guarantor or ERISA Affiliate is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto, and (b) copies of any notice of the PBGC's intention to terminate or to have a trustee appointed to administer any Plan to the extent that such action could reasonably be expected to result in liability to the Borrower, any Subsidiary thereof, any Guarantor or any ERISA Affiliate in an aggregate amount exceeding the Threshold Amount. Upon request by the DIP Agent, the Borrower will promptly furnish to the DIP Agent copies of (i) any annual report (Form 5500 Series) filed by Borrower, any Subsidiary thereof, any Guarantor or any of ERISA Affiliate with the Employee Benefits Security Administration with respect to each Employee Benefit Plan; (ii) the most recent actuarial valuation report for each Plan; and (iii) such other information, documents or governmental reports or filings relating to any Employee Benefit Plan as the DIP Agent shall reasonably request. Except as would not reasonably be expected to result in a Material Adverse Effect, with respect to each Plan, Borrower will, and will cause each Subsidiary, Guarantor and ERISA Affiliate to, (i) satisfy in full, without incurring any material late payment or underpayment charge or penalty and without giving rise to any Lien, all of the contribution and funding requirements of section 412 of the Code (determined without regard to subsections (d), (e), (f) and (k) thereof) and of section 302 of ERISA (determined without regard to sections 303, 304 and 306 of ERISA), and (ii) pay, or cause to be paid, to the PBGC, without incurring any material late payment or underpayment charge or penalty, all premiums required pursuant to sections 4006 and 4007 of ERISA.

SECTION 5.14. Business of the Borrower. The primary business of the Borrower and the Subsidiaries is and will continue to be businesses that are energy related, oil field service or pipeline services related businesses or activities, and any activities reasonably related, complementary or incidental thereto.

SECTION 5.15. Permits, Licenses. Borrower shall, and shall cause each Subsidiary to, maintain all material patents, copyrights, trademarks, service marks and trade names necessary to conduct its business, including, without limitation all consents, permits, licensees and agreements material to its Properties, except as could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.16. Cash Management. The Borrower and Guarantors shall use a cash management system that is the same as or substantially similar to its pre-petition cash management system or as otherwise may be approved by the Bankruptcy Court; provided, however, that the Borrower shall only be allowed to withdraw or transfer from their respective accounts amounts necessary to fund expenses of the Credit Parties for the then-current or immediately following week as set forth in the Approved Budget (subject to the Permitted Variance), or as otherwise reasonably approved by the DIP Agent. Any material changes from such prepetition cash management system must be reasonably acceptable to the DIP Agent.

SECTION 5.17. Compliance with Anti-Corruption Laws and Sanctions. Borrower will, and will cause each of its Subsidiaries to, maintain in effect and enforce policies and procedures designed to ensure compliance by Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

SECTION 5.18. Keepwell. Subject to the Final DIP Order, Borrower hereby absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of its obligations under any Guaranty or any Swap Agreement in respect of Swap Obligations (provided that Borrower shall only be liable under this Section 5.18 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 5.18 or otherwise under the Loan Documents voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations

of the Borrower under this <u>Section 5.18</u> shall remain in full force and effect until the DIP Obligations have been repaid in full and the Commitments and this Agreement have terminated. The Borrower intends that this <u>Section 5.18</u> constitute, and this <u>Section 5.18</u> shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 5.19. <u>Budget Compliance and Permitted Variances</u>.

(a)     Subject to the Permitted Variance, no Borrower shall make expenditures or permit any Subsidiary to make expenditures in excess of the amounts set forth in the Approved Budget for any period (other than Professional Fees to the extent approved by the Bankruptcy Court). The Approved Budget shall be tested no later than 6:00 p.m. on each Friday on a cumulative basis for all disbursements made in the prior four weeks (or, if applicable, such shorter number of weeks elapsed since the delivery of the Initial Budget).

(b)     Unless waived by DIP Agent in its sole discretion, the Credit Parties shall deliver to the DIP Agent no later than 6:00 p.m. on each Friday a variance report for the then-ended Approved Budget period comparing (i) actual cumulative disbursements made in the prior week and (ii) actual cumulative disbursements made in the prior four weeks (or, if applicable, such shorter number of weeks elapsed since the delivery of the Initial Budget) (such amount, the "<u>Actual Cumulative Disbursements</u>") to (iii) budgeted cumulative disbursements for such applicable period (such amount, the "<u>Budgeted Cumulative Disbursements</u>"), in each case, other than Professional Fees for such period as forecast in the Approved Budget, all as certified by the Borrower's chief financial officer as being true and correct in all material respects (except with respect to any forward-looking statements or information).

(c)     Actual Cumulative Disbursements (other than disbursements on account of (i) Professional Fees to the extent approved by the Bankruptcy Court), may not vary as tested on the first Friday following the Petition Date, and on each Friday thereafter, from Budgeted Cumulative Disbursements for such applicable period (other than disbursements on account of Professional Fees to the extent approved by the Bankruptcy Court) as reflected in the most recently delivered Approved Budget by more than 15% or by such greater amount as agreed upon by the DIP Agent (the "<u>Permitted Variance</u>").

(d)     The monthly line item for "Professional Fees" shall be on an accrual basis in the full amount of estimated Professional Fees, even though not payable under the Bankruptcy Code until "allowed" (including allowed on a monthly and/or interim basis).

(e)     Notwithstanding the foregoing, the Borrower will not be required to test receipts in the variance report.

SECTION 5.20. <u>Agreement to Pledge; Guaranty</u>.

(a)     Each Credit Party shall, and shall cause each Subsidiary to, grant to the DIP Agent an Acceptable Security Interest in all Property of any Credit Party or Subsidiary.

SECTION 5.21. <u>Bankruptcy Documents</u>. The Borrower will use commercially reasonable efforts to deliver to counsel to the DIP Agent the following documents at least three (3) Business Days prior to date on which Borrower or any of its Affiliates intend to file such documents (a) the proposed DIP Orders (which must be in form and substance reasonably satisfactory to the DIP Agent), (b) all "first day motions and orders", (c) the Plan of Reorganization, including the proposed Disclosure Statement related to such Plan of Reorganization and (d) any other material agreements, motions, pleadings, briefs,

44

applications, orders, and other filings with the Bankruptcy Court (each in form and substance reasonably satisfactory to the DIP Agent, solely to the extent they affect the DIP Agent); provided that if delivery of such documents (other than the DIP Orders, the Plan of Reorganization, the Disclosure Statement or Confirmation Order or any amendments thereto) at least three (3) Business Days in advance is not reasonably practicable, such document shall be delivered as soon as reasonably practicable prior to filing.

ARTICLE VI
NEGATIVE COVENANTS

Until the Discharge of DIP Obligations, Borrower and the Subsidiaries party hereto covenant and agree with the DIP Agent that:

SECTION 6.01. Indebtedness. Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(a)     (i) the DIP Obligations arising under this Agreement, any other Loan Document or any guaranty of or suretyship arrangement for the DIP Obligations arising under any Loan Document, and (ii) the Prepetition Secured Obligations;

(b)     [reserved];

(c)     Indebtedness of Borrower or any Subsidiary existing on the date hereof that is listed on Schedule 6.01(c), and any refinancings, renewals or extensions thereof that do not increase the outstanding principal amount thereof or result in an earlier maturity date or decreased remaining weighted average life to maturity thereof;

(d)     Indebtedness under Capital Leases (as required to be reported on the consolidated financial statements of the Borrower pursuant to GAAP) and purchase money indebtedness entered into prior to the Petition Date and listed on Schedule 6.01(d);

(e)     unsecured intercompany Indebtedness between Credit Parties; provided, further, that any such Indebtedness shall be subordinated to the DIP Obligations on terms set forth in the Guaranty;

(f)     endorsements of negotiable instruments for collection in the ordinary course of business;

(g)     other Indebtedness (not included under subsections (a) through (g) of this Section 6.01) not to exceed the Threshold Amount in the aggregate at any one time outstanding;

(h)     accounts payable incurred in the ordinary course of business prior to the date hereof;

(i)     accounts payable incurred in the ordinary course of business on or after the date hereof that are no more than 60 days past due unless being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided for on the books of such obligor;

(j)     Indebtedness arising under Swap Agreements permitted by Section 6.05;

(k)     usual and customary insurance premiums financing arrangements for insurance policies required hereunder entered into in the ordinary course of business and in a manner consistent with past practice, such financing arrangements not to exceed $50,000 in the aggregate at any one time outstanding; and

(l)     Indebtedness regarding self-insured liabilities, including retentions under insurance policies entered into in the ordinary course of business and in a manner consistent with past practice, not to exceed the Threshold Amount in the aggregate at any one time outstanding.

SECTION 6.02. Liens. Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)     Liens securing the payment of any DIP Obligations;

(b)     Permitted Liens;

(c)     Liens securing leases giving rise to Indebtedness allowed under Section 6.01(d) but only on the Property under lease;

(d)     Liens securing the payment of the obligations under the Prepetition Secured Facilities in existence on the date hereof and Adequate Protection Liens thereon;

(e)     Liens disclosed on Schedule 6.02;

(f)     any Lien arising out of the refinancing, extension, renewal or refunding of any Indebtedness secured by any Lien permitted by any of the foregoing clauses in this Section 6.02; provided that any such Indebtedness is not increased beyond the amount thereof outstanding on the date hereof (other than increases associated with the capitalization of refinancing costs) and is not secured by any additional assets;

(g)     Liens (i) of a collection bank arising under Section 4-210 of the UCC on items in the course of collection and (ii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(h)     Liens arising under the DIP Orders;

(i)     Liens made in the ordinary course of business to secure liability to insurance carriers respecting the financing of insurance premiums permitted under Section 6.01(l);

SECTION 6.03. Fundamental Changes.

(a)     Other than in connection with the commencement of the Cases, Borrower will not, and will not permit any Subsidiary to, change its legal name, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets, or all or substantially all of the stock of any of the Subsidiaries (in each case, whether now owned or hereafter acquired), except as permitted pursuant to Section 6.13, or liquidate or dissolve.

(b)     Borrower will not, and will not permit any Subsidiary to, engage to any material extent in any business other than businesses of the type conducted by the Borrower and the Subsidiaries on the date of execution of this Agreement and businesses reasonably related thereto.

SECTION 6.04. Investments, Loans and Advances. No Debtor shall make or permit to remain outstanding any loans or advances to or Investments in any Person, except that the foregoing

46

restriction shall not apply to: (a) Permitted Investments; (b) accounts receivable arising in the ordinary course of business; (c) Investments made by any Debtor in or to another Debtor; and (d) other Investments disclosed on Schedule 6.04, which in any event, were made prior to the date hereof.

SECTION 6.05. Hedging Transactions.

(a)    Borrower will not, and will not permit any Subsidiary to, enter into any Swap Agreement with any Person without the prior written consent of the DIP Agent.

SECTION 6.06. Restricted Payments. No Borrower will directly or indirectly declare or pay or incur any liability to pay, and no Borrower will permit any Subsidiary thereof to declare or pay or incur any liability to pay, directly or indirectly, any Restricted Payment, provided that any Credit Party or any Subsidiary or a Credit Party may pay dividends or make distributions to any Credit Party. In addition, no Borrower nor any Subsidiary nor any Guarantor shall, directly or indirectly, pay any bonus, incentive, performance pay or similar payment or compensation to or increase the compensation or other similar payments paid (other than regularly scheduled increases in compensation made in the ordinary course of business) directly or indirectly, to (i) any officer (at or above the level of vice president), director, partner, member, manager, shareholder or other equity holder of Borrower, any Subsidiary or any Guarantor, or (ii) any other direct or indirect family member of any of the foregoing Persons, including, without limitation, any direct or lineal descendent thereof; provided that the Borrower shall be permitted to make payments with respect to the items set forth above to the extent set forth in any Approved Budget.

SECTION 6.07. Transactions with Affiliates. Borrower will not, and will not permit any Subsidiary to, sell, lease or otherwise transfer any Property or assets to, or purchase, lease or otherwise acquire any Property or assets from, or otherwise engage in any other transactions with, any of its Affiliates (other than the Borrower and the Guarantors), except (a) on terms and conditions not less favorable to any Credit Party than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among Credit Parties not involving any other Affiliate, (c) any payments permitted by Section 6.06, (d) transactions or agreements in place as of the Petition Date to the extent such transaction or agreement (i) has been disclosed in writing to the DIP Agent or (ii) was in compliance with the Prepetition Credit Agreement, and (e) transactions or agreements approved by the Bankruptcy Court pursuant to an order in form and substance reasonably satisfactory to the DIP Agent.

SECTION 6.08. Restrictive Agreements. Borrower will not, and will not permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of any Credit Party to create, incur or permit to exist any Lien upon any of its Property or assets in favor of the DIP Agent or (b) the ability of any Subsidiary to pay dividends or other distributions to Borrower or any other Subsidiary, as applicable, or the ability of Borrower to pay dividends or other distributions to any other Borrower, in each case, with respect to any shares of its capital stock or to make or repay loans or advances to Borrower or any Subsidiary or to Guarantee Indebtedness of Borrower or any Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law, by this Agreement, or the Prepetition Credit Agreement, (ii) the foregoing shall not apply to restrictions permitted pursuant to an agreement entered into in connection with a sale permitted under Section 6.13, (iii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the Property or assets securing such Indebtedness and (iv) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

47

SECTION 6.09. <u>Additional Subsidiaries</u>. No Credit Party shall, nor shall any Credit Party permit any of its Subsidiaries to, create or acquire any additional Subsidiaries.  No Credit Party shall sell, assign or otherwise dispose of any Equity Interests in any of its Subsidiaries.

SECTION 6.10. <u>Sale-and-Leaseback</u>. No Credit Party shall, nor shall any Credit Party permit any of its Subsidiaries to, sell or transfer to a Person any Property, whether now owned or hereafter acquired, if at the time or thereafter such Credit Party thereof shall lease as lessee such Property or any part thereof or other Property which such Credit Party or Subsidiary thereof intends to use for substantially the same purpose as the Property sold or transferred.

SECTION 6.11. <u>Proceeds of Loans</u>. Borrower will not permit the proceeds of the Loans to be used for any purpose other than Approved Purposes. No Credit Party and no Person acting on behalf of any Credit Party has taken or will take any action which might cause any of the Loan Documents to violate Regulation T, U or X or any other regulation of the Board or to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect. If requested by the DIP Agent, Borrower will furnish to the DIP Agent a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.

SECTION 6.12. <u>ERISA Compliance</u>. Except as would not reasonably be expected to result in a Material Adverse Effect, Borrower will not at any time:  (a) engage in, or permit any Subsidiary, Guarantor or ERISA Affiliate to engage in, any transaction in connection with which Borrower, Subsidiary thereof, Guarantor or any ERISA Affiliate could be subjected to either a material civil penalty assessed pursuant to section 502(c), (i) or (l) of ERISA or a material tax imposed by Chapter 43 of Subtitle D of the Code with respect to a Plan; (b) terminate, or permit any Subsidiary, Guarantor or ERISA Affiliate to terminate, any Plan in a manner, or take any other action with respect to any Plan, that could result in any liability to Borrower, Subsidiary thereof, Guarantor or any ERISA Affiliate to the PBGC; (c) fail to make, or permit any Subsidiary, Guarantor or ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Plan, agreement relating thereto or applicable law, Borrower, Subsidiary thereof, Guarantor or any ERISA Affiliate is required to pay as contributions thereto; (d) permit, or allow any Subsidiary, Guarantor or ERISA Affiliate to permit, the actuarial present value of the benefit liabilities under any Plan to exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities, with the term "actuarial present value of the benefit liabilities" having the meaning specified in section 4041 of ERISA; (e) contribute to or assume an obligation to contribute to, or permit any Subsidiary, Guarantor or ERISA Affiliate to contribute to or assume an obligation to contribute to, any Multiemployer Plan; (f) acquire, or permit any Subsidiary, Guarantor or ERISA Affiliate to acquire, an interest in any Person that causes such Person to become an ERISA Affiliate with respect to Borrower, Subsidiary thereof, Guarantor or any ERISA Affiliate if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained or contributed to, (i) any Multiemployer Plan or (ii) any Plan under which the actuarial present value of the benefit liabilities under such Plan exceeds the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities; or (g) incur, or permit any Subsidiary, Guarantor or ERISA Affiliate to incur, a liability to or on account of a Plan or Multiemployer Plan under sections 515, 4062, 4063, 4064, 4201 or 4204 of ERISA.

SECTION 6.13. <u>Sale of Properties</u>. No Debtor will sell, assign, farm-out, convey or otherwise transfer any Property or any interest in any Property except for (a) the sale or transfer of equipment and other personal property that is no longer necessary for the business of the Debtors; (b) Casualty Events and dispositions resulting from the exercise of eminent domain, condemnation or nationalization which result in the prepayment of the Loans as provided in <u>Section 2.09(a)</u>; (c) any sales,

48

assignments, farm-outs, conveyances or other transfers of Property among Credit Parties; and (d) any other sales or transfers permitted by the DIP Orders or approved by the Bankruptcy Court pursuant to a Final Order.

SECTION 6.14. Environmental Matters. The Debtors shall not cause or permit any of its Property to be in violation of, or do anything or permit anything to be done which will subject any such Property to any remedial obligations under, any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such Property where such violations or remedial obligations could reasonably be expected to result in an Environmental Liability to any Debtor or any subsidiary of a Debtor in excess of the Threshold Amount individually or in the aggregate.

SECTION 6.15. [Reserved].

SECTION 6.16. Fiscal Year; Fiscal Quarter. Borrower shall not, and shall not permit any Subsidiaries to, change its fiscal year or any of its fiscal quarters.

SECTION 6.17. [Reserved].

SECTION 6.18. [Reserved].

SECTION 6.19. Sale or Discount of Receivables. Borrower will not, and will not permit any Subsidiary to, discount or sell (with or without recourse) any of its notes receivable or accounts receivable except for discounts or sales made in the ordinary course of business in connection with the compromise or collection thereof; provided that the aggregate amount of notes receivable or accounts receivable discounted or sold pursuant to this Section 6.19 shall not, in aggregate, exceed the Threshold Amount.

SECTION 6.20. Limitation on Prepayment of Debt; Amendment of Debt Documents. Except as otherwise permitted by the DIP Orders or approved by the Bankruptcy Court pursuant to a Final Order, Borrower will not, and will not permit any of its respective Subsidiaries to:

(a)    (i) make any payment or prepayment of principal of, or premium or interest on, any Indebtedness (A) other than on or after the stated, scheduled date for such payment of principal or interest set forth in the applicable agreement governing such Indebtedness or as contemplated herein, or (B) that would violate the terms of this Agreement, the DIP Orders or the applicable agreement governing such Indebtedness, or (ii) make any deposit (including the payment of amounts into a sinking fund or other similar fund) for any of the foregoing prohibited purposes;

(b)    amend, modify or otherwise change, or consent or agree to any amendment, modification or other change to, or enter into any additional or supplemental agreement that has the effect or consequence of amending, modifying or otherwise changing, any of the terms of any prepetition Indebtedness that could have an adverse effect on the Lenders.

SECTION 6.21. Acquisition of Debt.  Borrower shall not, and shall not permit any of their respective Subsidiaries or Affiliates to, purchase or otherwise acquire, directly or indirectly, any Indebtedness of any Person, provided that the foregoing shall not prohibit (a) Borrower or any other Credit Party from making any payments in respect of such Indebtedness to the holders of such Indebtedness to the extent any such payment is otherwise permitted hereunder and under the DIP Orders or (b) any Investment permitted by Section 6.04.

49

SECTION 6.22. <u>Additional Collateral for Prepetition Secured Obligations</u>. Borrower will not, and will not permit their respective Subsidiaries to, grant a Lien on any property or asset to secure the Prepetition Secured Facilities (other than pursuant to the DIP Orders) or provide any additional guaranty or other credit enhancement in favor of the Prepetition Agent or any Prepetition Secured Parties in connection with the Prepetition Secured Obligations without first (i) giving prior written notice thereof to the DIP Agent (which the Borrower shall endeavor to provide at least 15 days prior to such Lien being granted), (ii) to the extent not already covered thereby, granting to the DIP Agent to secure the DIP Obligations an Acceptable Security Interest on such same property or assets in form and substance reasonably satisfactory to the DIP Agent, and (iii) providing the same guaranty or other credit enhancement in favor of the DIP Agent in connection with the DIP Obligations.

SECTION 6.23. <u>Deposit Accounts</u>. Borrower will not, and will not permit any Credit Party to, maintain any deposit account except in accordance with the terms and conditions of <u>Section 5.22</u>.

SECTION 6.24. <u>Prepetition Secured Obligations</u>. Until the Discharge of DIP Obligations, Borrower will not, and will not permit any Credit Party to, use the proceeds of the Loans or cash collateral to pay Prepetition Secured Obligations, except as permitted by the DIP Orders or this Agreement.

SECTION 6.25. <u>Changes to DIP Orders</u>. Without the consent of the DIP Agent, none of the Debtors shall file a motion (or support any motion) seeking to amend or otherwise modify any DIP Order.

SECTION 6.26. <u>Actions Requiring Prior DIP Agent Consent</u>. Without the consent of the DIP Agent, Borrower will not, and will not permit any Credit Party to, (i) make any motion to the Bankruptcy Court to authorize any actions or transactions (including authorization to sell assets) under Section 363 of the Bankruptcy Code (except for assets sales that are permitted under the Loan Documents), (ii) make any motions to approve any compromise or settlement under Rule 9019, or (iii) file with the Bankruptcy Court any plan of reorganization or liquidation and related disclosure statement.

SECTION 6.27. <u>Non-Obligor Entities</u>. Notwithstanding anything to the contrary contained herein, Borrower will not, and will not permit any Credit Party to, (a) create, assume, incur or suffer to exist any Lien on or in respect of any of its Property for the benefit of any Subsidiary that is not a Credit Party, (b) sell, assign, pledge, or otherwise transfer any of its Properties to any Subsidiary that is not a Credit Party, or (c) make or permit to exist any loans, advances, or capital contributions to, or make any investment in, or purchase or commit to purchase any stock or other securities or evidences of indebtedness of or interests in, any Subsidiary that is not a Credit Party or in any Properties of any Subsidiary that is not a Credit Party other than, without duplication, the loans, advances, capital contributions, investments, and commitments made prior to the date hereof in any Subsidiary that is not a Credit Party; provided that, the respective amounts of such loans, advances, capital contributions, investments, and commitments shall not be increased (other than by appreciation).

SECTION 6.28. <u>No Divisions</u>. Without limitation of anything set forth in <u>Section 6.03</u> above, and in furtherance thereof, no Borrower or other Credit Party will take any action (or permit any action to be taken), whether respecting any such Person or any Subsidiary thereof, under or in connection with any division or plan of division under Delaware law (or under any different jurisdiction's laws), nor take any action (nor permit any action to be taken) respecting any comparable event under any jurisdiction's laws. Without limitation of any of the foregoing, for all intents and purposes of this Agreement and the other Loan Documents: (a) if any Property, right, obligation or liability of any such Person described in this <u>Section 6.28</u> becomes the Property, right, obligation or liability of any different Person under or in connection with any such division, plan of division or comparable event, then it shall be deemed to have been transferred from the original Person to the subsequent Person, automatically subject to the first

priority Liens thereon in favor of the DIP Agent and the Lenders to secure the DIP Obligations, and automatically subject to the prohibitions, restrictions and limitations thereon as set forth in the Loan Documents; and (b) if any new Person comes into existence under or in connection with any such division, plan of division or comparable event, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time, automatically subject to the first priority Liens thereon in favor of the DIP Agent and the Lenders to secure the DIP Obligations on the Property of each such Person, and automatically subject to the prohibitions, restrictions and limitations thereon as set forth in the Loan Documents.

ARTICLE VII
EVENTS OF DEFAULT; REMEDIES; APPLICATION OF PROCEEDS

SECTION 7.01. <u>Events of Default</u>. If any of the following events ("<u>Events of Default</u>") shall occur:

(a)      (i) any Credit Party shall fail to pay any principal when due under this Agreement or (ii) shall fail to pay any other amount when due under the Loan Documents to the DIP Agent (including, without limitation, any payment of interest or fees), and such failure continues for three (3) Business Days;

(b)      any representation or warranty made or deemed made by or on behalf of Borrower or any Subsidiary in or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(c)      Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in <u>Section 2.09(a)</u> (only to the extent the Borrower fails to make mandatory prepayments or post cash collateral as required under such section and not with respect to other requirements thereunder), 5.01(a), (b), (c), (d) and (s), 5.02(a), 5.03 (with respect to Borrower's existence), 5.08, 5.19 (other than with respect to clause (b) therein), 5.20, or in Article VI;

(d)      Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in clause (a), (b) or (c) of this Section), and such failure shall continue unremedied for a period of (i) in the case of delivery of the variance report requirement in <u>Sections 5.01(n)(ii)</u> and <u>5.19(b)</u>, two (2) Business Day, (ii) in the case of any reporting requirement in <u>Section 5.01</u> (other than Section 5.01(n)(ii) and those specified in clause (c) of this Section), five (5) Business Days and (iii) in the case of any other agreement, twenty (20) Business Days, in each case after notice thereof from the DIP Agent to the Borrower;

(e)      Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness (other than the DIP Obligations and any Indebtedness of any Debtor that was incurred prior to the Petition Date) or any Swap Obligation, when and as the same shall become due and payable and such failure continues after any applicable grace period, and any act to collect on any such Material Indebtedness is not stayed by the Automatic Stay and the payment on such Material Indebtedness is otherwise permitted to be paid under this Agreement and by the DIP Orders;

(f)      (i) any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their

behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity which is not stayed by the filing of the voluntary petition to commence the Cases or otherwise addressed in the DIP Orders, or (ii) a default or early termination event shall occur and be continuing under any Swap Agreement of Borrower or any Subsidiary which results in Swap Obligations being due by Borrower or such Subsidiary, and such Swap Obligations are not paid when due or within three Business Days thereafter which is not stayed by the filing of the voluntary petition to commence the Cases or otherwise addressed in the DIP Orders; provided that this clause (f) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(g)      any Debtor files, or supports a motion that has been filed, to reject the RSA;

(h)      other than as a result of the filing of the Cases, a judgment or judgments for the payment of money in excess of the Threshold Amount (net of any amount payable because of insurance) in the aggregate shall be rendered by a court against Borrower or any Subsidiary (excluding any order fixing the amount of any claim in the Cases) and the same shall not be discharged (or provision shall not be made for such discharge), or a stay of execution thereof shall not be in effect (including the Automatic Stay under the Cases), within 30 days from the date of entry thereof and Borrower or such Subsidiary, as applicable, shall not, within such period of 30 days, or such longer period during which execution of the same shall have been stayed, appeal in good faith therefrom and cause the execution thereof to be stayed during such appeal;

(i)      an ERISA Event shall have occurred that, in the opinion of the DIP Agent, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(j)      any material provisions of the Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against a Borrower or a Guarantor party thereto;

(k)      the Collateral Documents (or any portion thereof) cease to create a valid and perfected Lien of the priority described herein and in the DIP Orders on any material portion of the Collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement, or Borrower, any Subsidiary or any of their Affiliates shall so state in writing;

(l)      any Change in Control occurs;

(m)      (i) an order shall be entered dismissing a Case or converting a Case to a case under Chapter 7 of the United States Bankruptcy Code or (ii) a Restructuring Support Party (as defined in the RSA) files a motion seeking dismissal of a Case or conversion of a Case to a case under Chapter 7 of the United States Bankruptcy Code;

(n)      an order shall be entered terminating or reducing the Credit Parties' exclusivity period for proposing a Plan of Reorganization;

(o)      an order with respect to any of the Cases shall be entered appointing, or any Credit Party shall file an application for an order with respect to any of the Cases seeking the appointment of (i) a trustee under Section 1104 of the United States Bankruptcy Code or (ii) an examiner or any other Person with enlarged powers relating to the operation of the business of any Credit Party (i.e., powers beyond those set forth in Sections 1104(d) and 1106(a)(3) and (4) of the United States Bankruptcy Code) under Section 1106(b)(3) and 1106(b)(4) of the United States Bankruptcy Code;

(p)      an order shall be entered that is not stayed pending appeal granting relief from the Automatic Stay to any creditor of a Credit Party with respect to any claim against any property that, when taken together with all other claims with respect to which orders entered on the docket of the Bankruptcy Court that are not stayed pending appeal granting relief from the Automatic Stay with respect to the Credit Parties' Collateral, exceeds the Threshold Amount;

(q)      with respect to the Case or Cases, an order shall be entered or a Credit Party shall apply for the authority, without the prior written consent of the DIP Agent, (i) to revoke, reverse, stay, vacate or otherwise modify the DIP Orders or this Agreement in a manner adverse to the DIP Agent or in a manner inconsistent with the Loan Documents, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the DIP Agent in respect of the DIP Obligations, or the Prepetition Secured Parties in respect of the Prepetition Secured Obligations, in each case other than the Carve-Out and the Non-Primed Excepted Liens (to the extent, and only to the extent, set forth in the DIP Orders), (iii) to terminate or deny use of cash collateral by the Credit Parties, or (iv) to grant or permit the grant of a lien that is equal in priority with or senior to the Liens securing the DIP Obligations or the Prepetition Secured Obligations other than the Carve-Out and the Non-Primed Excepted Liens (to the extent, and only to the extent, set forth in the DIP Orders);

(r)      an order shall be entered by the Bankruptcy Court confirming a plan of reorganization or liquidation in any of the Cases which does not (i) contain a provision for the Discharge of DIP Obligations on or before the effective date of such plan or plans upon entry thereof, or is not otherwise acceptable to the DIP Agent or the Lenders or otherwise adversely affects the rights of the DIP Agent or the Lenders, and (ii) provide for the continuation of the Liens and security interests granted to the DIP Agent and priorities until such plan effective date;

(s)      failure of the Credit Parties to comply with the DIP Orders;

(t)      any payment of or granting of adequate protection with respect to Prepetition Secured Obligations (other than the reimbursement of reasonable and documented out-of-pocket fees and expenses and customary indemnities as set forth in the RSA, and other than as contemplated and permitted by the DIP Orders, the Loan Documents or otherwise approved by the DIP Agent and the Bankruptcy Court, including pursuant to the DIP Orders);

(u)      [Reserved];

(v)      an application for an order described in clause (r) above shall be made by (i) a Credit Party or (ii) a Person other than a Credit Party and such application is not contested on a timely basis, by the Credit Parties in good faith, in each case, other than any such application made in contemplation of the Discharge of DIP Obligations, provided that concurrently therewith the Discharge of DIP Obligations occurs;

(w)      the commencement of any adversary proceeding, contested matter or other action by any Credit Party asserting in writing any claims or defenses against any of the Prepetition Agent or the Prepetition Secured Parties with respect to the obligations of any Credit Party thereunder or the Liens granted to Prepetition Agent or Prepetition Secured Parties to secure the Prepetition Secured Obligations, except as permitted under the Interim Order or the Final DIP Order;

(x)      the termination of the RSA or any agreement attached as an exhibit thereto either in whole or in part, or any modification, amendment or supplement of the RSA, including the exhibits thereto, without the prior written consent of the DIP Agent;

(y)      the payment by any Credit Party of any Prepetition Secured Obligations other than (i) as permitted by the DIP Orders or (ii) as permitted by any order entered by the Bankruptcy Court; provided that such order is reasonably acceptable to the DIP Agent and provided further that such payments are pursuant to the Approved Budget;

(z)      an order shall be entered approving the sale of all or substantially all assets of the Debtors without the prior written consent of the DIP Agent;

(aa)      any party to the RSA fails to comply with any of its obligations thereunder and such noncompliance gives the Supporting Party (as defined in the RSA) a right to terminate the RSA; or

(bb)      failure to timely comply with any of the Milestones; except to the extent such Milestone is extended to a later date with the consent of the DIP Agent.

SECTION 7.02. Rights Upon Default. Upon the occurrence and continuation of any Event of Default, the DIP Agent may, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) upon five (5) Business Days' written notice to the Credit Parties from DIP Agent (such notice, a "Remedies Notice"), the automatic stay of Section 362 of the Bankruptcy Code shall be automatically vacated without further order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading, for the limited purpose of permitting the DIP Agent, to do any of the following: (A) enforce any and all liens and security interests created pursuant to any of the Loan Documents or any other document purporting to create a lien in favor of the DIP Agent or any other Lender (or otherwise foreclose on the Collateral), including, without limitation assuming control over the use of cash in any cash collateral accounts; (B) enforce all rights under the Guaranties; (C) charge the Default Rate of interest on the Loans; (D) declare the Loans and other Obligations to be due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party, and (E) exercise any and all of its or their other rights and remedies (whether as a secured creditor or otherwise) under the Loan Documents and under applicable law (including, but not limited to, the Bankruptcy Code and the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction). In connection with any sale of any of the Credit Parties' assets under section 363 of the Bankruptcy Code, a Chapter 11 plan of reorganization, or any equivalent thereof under any other law, the DIP Agent shall have the absolute right to credit bid any portion, up to the full amount, of all DIP Obligations. For the avoidance of doubt, it is understood and agreed that the Remedies Notice is a one-time requirement and is not required to be delivered with each exercise of remedies.

In the case of the occurrence and continuation of an Event of Default, the DIP Agent and the other Lenders (if any) will have all other rights and remedies available at law and equity and as provided in the DIP Orders.

SECTION 7.03. Application of Payments. Any amount received by the DIP Agent from the exercise of any rights or remedies hereunder or under any of the Collateral Documents shall be applied by the DIP Agent to payment of the DIP Obligations in the following order unless a court of competent jurisdiction shall otherwise direct:

(a)      FIRST, to payment of all reasonable costs and expenses of the DIP Agent incurred in connection with the collection and enforcement of the DIP Obligations or of any security interest granted to the DIP Agent in connection with any collateral securing the DIP Obligations;

(b)        SECOND, to payment of that portion of the DIP Obligations constituting accrued and unpaid interest and fees;

(c)        THIRD, to payment of that portion of the DIP Obligations constituting obligations and liabilities of the Credit Parties with respect to principal on the Loans and the other DIP Obligations;

(d)        FOURTH, to payment of all other DIP Obligations; and

(e)        FIFTH, any surplus thereafter remaining shall be paid to the applicable Borrower or the other Debtors as ordered by the Bankruptcy Court.

ARTICLE VIII
THE DIP AGENT

SECTION 8.01. <u>Agents as Lenders</u>. The bank serving as the DIP Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the DIP Agent, and DIP Agent and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Borrower or any Subsidiary or other Affiliate thereof as if it were not the DIP Agent hereunder.

SECTION 8.02. <u>Duties and Obligations of DIP Agent</u>. The DIP Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the DIP Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the DIP Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the DIP Agent is required to exercise in writing as directed by all Lenders, and (c) except as expressly set forth herein, the DIP Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as DIP Agent or any of its Affiliates in any capacity.

SECTION 8.03. <u>Reliance by DIP Agent</u>. The DIP Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed or sent by the proper Person. The DIP Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The DIP Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the DIP Agent may presume that such condition is satisfactory to such Lender unless the DIP Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.

SECTION 8.04. <u>DIP Agent May File Proofs of Claim</u>. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to Borrower or any of its Subsidiaries, the DIP Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the DIP Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

55

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Indebtedness that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the DIP Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the DIP Agent and their respective agents and counsel and all other amounts due the Lenders and the DIP Agent under Section 11.03) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the DIP Agent and, in the event that the DIP Agent shall consent to the making of such payments directly to the Lenders, to pay to the DIP Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the DIP Agent and its agents and counsel, and any other amounts due the DIP Agent under Section 11.03.

Nothing contained herein shall be deemed to authorize the DIP Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the DIP Agent to vote in respect of the claim of any Lender in any such proceeding.

SECTION 8.05. Authority of DIP Agent to Execute Collateral Documents and Release Collateral and Liens. Each Lender hereby empower and authorize the DIP Agent to execute and deliver to the Debtors on their behalf the Collateral Documents and all related financing statements and any financing statements, agreements, documents or instruments as shall be necessary or appropriate to effect the purposes of the Collateral Documents. Each Lender hereby authorizes the DIP Agent to release any Collateral that is permitted to be sold or released in a transaction permitted by the Loan Documents. Each Lender hereby authorizes the DIP Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense, any and all releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrowers in connection with any sale or other disposition of Property to the extent such sale or other disposition is permitted by the terms of Section 6.13 or is otherwise authorized by the terms of the Loan Documents.

SECTION 8.06. Indemnification.  Each Lender agrees to indemnify the DIP Agent and each of its Affiliates, and each of its Related Parties (to the extent not reimbursed by the Borrower), from and against such Lender's aggregate pro rata share (determined at the time such indemnity is made) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements (including fees, expenses and disbursements of financial and legal advisors) of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against, the DIP Agent or any of its Related Parties in any way relating to or arising out of this Agreement or the other Loan Documents or any action taken or omitted by the DIP Agent under this Agreement or the other Loan Documents; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the DIP Agent's or such Related Party's gross negligence or willful misconduct. Without limiting the foregoing, each Lender agrees to reimburse the DIP Agent promptly upon demand for its pro rata share (determined at the time such reimbursement is made) of any out-of-pocket expenses (including fees, expenses and disbursements of financial and legal advisors) incurred by the DIP Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of its rights or

responsibilities under, this Agreement or the other Loan Documents, to the extent that the DIP Agent is not reimbursed for such expenses by the Borrower or another Credit Party.

ARTICLE IX
GUARANTY

SECTION 9.01. <u>The Guaranty</u>. Subject to <u>Section 9.08</u> hereof, Borrower and each Subsidiary thereof party hereto hereby absolutely, unconditionally and irrevocably guarantees, as primary obligor and not as surety, the full and punctual payment when due (whether at stated maturity, upon acceleration, early termination, demand, declaration or otherwise, and at all times thereafter), and performance of, the DIP Obligations now or hereafter existing or and all renewals, rearrangements, increases, extensions for any period, substitutions, modifications, amendments or supplements in whole or in part of any of the DIP Obligations, including, without limitation, any such DIP Obligations incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, whether or not allowed or allowable in such proceeding (including all such amounts that would become due but for the operation of the automatic stay under Section 362(a) of the United States Bankruptcy Code, 11 U.S.C. §362(a), and the operation of Sections 502(b) and 506(b) of the United States Bankruptcy Code, 11 U.S.C. §502(b) and §506(b)) (collectively, the "Guaranteed Obligations"). Upon failure by any Credit Party to pay when due any such amount, each of the Guarantors agrees that it shall forthwith on demand pay to the DIP Agent for the benefit of the other Lenders (if any) and, if applicable, their Affiliates, the amount not so paid at the place and in the manner specified in this Agreement, or any other Loan Document. This Guaranty is a guaranty of payment and not of collection. Each of the Guarantors waives any right to require the DIP Agent to sue Borrower, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations, or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 9.02. <u>Guaranty Unconditional</u>. Subject to <u>Section 9.08</u> hereof, the obligations of each of the Guarantors hereunder shall be unconditional, absolute and irrevocable and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)     any extension, renewal, settlement, compromise, waiver or release in respect of any of the Guaranteed Obligations, by operation of law or otherwise, or any obligation of any other guarantor of any of the Guaranteed Obligations, or any default, failure or delay, willful or otherwise, in the payment or performance of the Guaranteed Obligations;

(b)     any modification or amendment of or supplement to this Agreement or any other Loan Document;

(c)     any addition, release, non-perfection or invalidity of any direct or indirect security for any obligation of the Borrower under this Agreement, any other Loan Document, or any obligations of any other guarantor of any of the Guaranteed Obligations, or any action or failure to act by the DIP Agent or any Affiliate of DIP Agent with respect to any collateral securing all or any part of the Guaranteed Obligations;

(d)     any change in the corporate existence, structure or ownership of Borrower or any other guarantor of any of the Guaranteed Obligations, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Borrower, or any other guarantor of the Guaranteed Obligations, or its assets or any resulting release or discharge of any obligation of Borrower, or any other guarantor of any of the Guaranteed Obligations;

(e)     the existence of any claim, setoff or other rights which the Guarantors may have at any time against Borrower, any other guarantor of any of the Guaranteed Obligations, the DIP Agent or any other Person, whether in connection herewith or any unrelated transactions;

(f)     any invalidity or unenforceability relating to or against Borrower, or any other guarantor of any of the Guaranteed Obligations, for any reason related to this Agreement, any other Loan Document, or any provision of applicable law or regulation purporting to prohibit the payment by Borrower, or any other guarantor of the Guaranteed Obligations, of the principal of or interest on any Loan or any other amount payable by the Borrower under this Agreement or any other Loan Document; or

(g)     any other act or omission to act or delay of any kind by Borrower, any other guarantor of the Guaranteed Obligations, the DIP Agent or any other Person or any other circumstance whatsoever that might, but for the provisions of this paragraph, constitute a legal or equitable discharge of any Guarantor's obligations hereunder other than the Discharge of DIP Obligations.

SECTION 9.03.  Discharge Only Upon Payment In Full; Reinstatement In Certain Circumstances. Each of the Guarantor's obligations hereunder shall remain in full force and effect until the Discharge of DIP Obligations has occurred. If at any time any payment of the principal of or interest on any Loan or any other amount payable by Borrower or any other party under this Agreement, or any other Loan Document is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, each of the Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

SECTION 9.04.  Waivers. Each Guarantor irrevocably waives acceptance hereof, diligence, promptness, presentment, demand, protest and, to the fullest extent permitted by applicable law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against Borrower, any other guarantor of any of the Guaranteed Obligations, or any other Person.

SECTION 9.05.  Subrogation. Each Guarantor hereby agrees not to assert any right, claim or cause of action, including, without limitation, a claim for subrogation, reimbursement, indemnification or otherwise, against any other Guarantor arising out of or by reason of this Guaranty or the obligations hereunder, including, without limitation, the payment or securing or purchasing of any of the Guaranteed Obligations by any of the Guarantors unless and until the Discharge of DIP Obligations has occurred. If any amount shall be paid to any Guarantor in violation of the preceding sentence and the Discharge of DIP Obligations has not occurred, such amount shall be deemed to have been paid to such Guarantor for the benefit of, and held in trust for, the DIP Agent for the benefit of the other Lenders (if any), and shall forthwith be paid to the DIP Agent to be credited and applied upon the Guaranteed Obligations, whether matured or unmatured; otherwise it shall be returned to remitter. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by this Agreement, any other Loan Documents and that the waiver set forth in this Section 9.05 is knowingly made in contemplation of such benefits.

SECTION 9.06.  Stay of Acceleration. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of Borrower, all such amounts otherwise subject to acceleration under the terms of this Agreement or any other Loan Document, shall nonetheless be payable by each of the Guarantors hereunder forthwith on demand by the DIP Agent.

SECTION 9.07. <u>Subordination of Indebtedness of any Guarantor to any other Guarantor to the Guaranteed Obligations</u>. Each Guarantor agrees that:

(a)    Any indebtedness of Borrower or any Guarantor now or hereafter owed to any Guarantor or any other Guarantor, respectively, is hereby subordinated to the Guaranteed Obligations pursuant to the provisions of this <u>Section 9.07</u>.

(b)    Upon the occurrence and during the continuance of an Event of Default, if the DIP Agent so requests, any such indebtedness of Borrower or any Guarantor now or hereafter owed to any Guarantor or any other Guarantor, respectively, shall be collected, enforced and received by such Guarantor as trustee for the DIP Agent and shall be paid over to the DIP Agent in kind on account of the Guaranteed Obligations, but without reducing or affecting in any manner the obligations of any Guarantor under the other provisions of this Guaranty. Notwithstanding the foregoing, the term "indebtedness" as used in this <u>Section 9.07</u> shall not include amounts owed by Borrower or any Guarantor to any Guarantor or any other Guarantor, respectively, for payments made by a Guarantor for taxes, payroll obligations, third-party royalty obligations and operating expenses incurred in the ordinary course of business.

(c)    Upon the occurrence and during the continuance of an Event of Default, should any Guarantor fail to collect or enforce any such indebtedness of Borrower or any Guarantor now or hereafter owed to such Guarantor or any other Guarantor and pay the proceeds thereof to the DIP Agent, the DIP Agent as each Guarantor's attorney-in-fact may do such acts and sign such documents in such Guarantor's name as the DIP Agent considers necessary or desirable to effect such collection, enforcement and/or payment.

SECTION 9.08. <u>Limitation on Obligations</u>.

(a)    The provisions of this Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guaranty, then, notwithstanding any other provision of this Guaranty to the contrary, the amount of such liability shall, without any further action by the Guarantors, the DIP Agent or any Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "<u>Maximum Liability</u>"). This <u>Section 9.08(a)</u> with respect to the Maximum Liability of the Guarantors is intended solely to preserve the rights of the DIP Agent hereunder to the maximum extent not subject to avoidance under applicable law, and no Guarantor or any other person or entity shall have any right or claim under this <u>Section 9.08(a)</u> with respect to the Maximum Liability, except to the extent necessary so that the obligations of the Guarantor hereunder shall not be rendered voidable under applicable law.

(b)    Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor, and may exceed the aggregate Maximum Liability of all other Guarantors, without impairing this Guaranty or affecting the rights and remedies of the DIP Agent hereunder. Nothing in this <u>Section 9.08(b)</u> shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

(c)    In the event any Guarantor (a "<u>Paying Guarantor</u>") shall make any payment or payments under this Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Guaranty, each other Guarantor (each a "<u>Non-Paying Guarantor</u>") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Pro Rata Share"

59

of such payment or payments made, or losses suffered, by such Paying Guarantor. For the purposes hereof, each Non-Paying Guarantor's "Pro Rata Share" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from Borrower after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantors, the aggregate amount of all monies received by such Guarantors from Borrower after the date hereof (whether by loan, capital infusion or by other means). Nothing in this Section 9.08(c) shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability). Each of the Guarantors covenants and agrees that its right to receive any contribution under this Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to all the Guaranteed Obligations. The provisions of this Section 9.08(c) are for the benefit of both the DIP Agent and the Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

SECTION 9.09. Application of Payments. All payments held by the DIP Agent or received by the DIP Agent shall be applied by the DIP Agent to payment of the Guaranteed Obligations in the order set forth in Section 7.03.

SECTION 9.10. No Waivers. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided in this Guaranty, this Agreement or any other Loan Document shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 9.11. No Duty to Advise. Each of the Guarantors assumes all responsibility for being and keeping itself informed of each other Guarantor's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each of the Guarantors assumes and incurs under this Guaranty, and agrees that the DIP Agent shall have no duty to advise any of the Guarantors of information known to it regarding those circumstances or risks.

ARTICLE X
SECURITY AGREEMENT

SECTION 10.01. Grant of Security Interest.

(a)     To secure the prompt payment and performance in full of all of the DIP Obligations, upon authorization by the Bankruptcy Court under the DIP Orders, including as pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, each Credit Party hereby pledges, hypothecates, assigns, charges, mortgages, delivers, and transfers to the DIP Agent, and hereby grants to the DIP Agent, subject to the Carve-Out, a continuing security interest in all of such Credit Party's right, title and interest in, to and under, all of the following, whether now owned or hereafter acquired by such Credit Party, and wherever located and whether now owned or hereafter existing or arising:

(i)     all accounts;

60

(ii)     all contract rights;

(iii)    all chattel paper;

(iv)     all documents;

(v)      all instruments;

(vi)     all supporting obligations and letter-of-credit rights;

(vii)    all general intangibles (including payment intangibles, intercompany accounts, intellectual property and software);

(viii)   all inventory and other goods;

(ix)     all motor vehicles, equipment and fixtures, including the Plants;

(x)      all investment property, financial assets and all securities accounts;

(xi)     all money, cash, cash equivalents, securities, and other property of any kind;

(xii)    the Cash Collateral Accounts and all other deposit accounts;

(xiii)   all notes, and all documents of title;

(xiv)    all books, records, and other property related to or referring to any of the foregoing, including books, records, account ledgers, data processing records, computer software and other property, and general intangibles at any time evidencing or relating to any of the foregoing;

(xv)     all commercial tort claims;

(xvi)    all real property owned or leased by such Credit Party;

(xvii)   all other personal property of such Credit Party;

(xviii)  all accessions to, substitutions for, and replacements, products, and proceeds of any of the foregoing, including, but not limited to, dividends or distributions on investment property, rents, profits, income and benefits, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing; and

(xix)    any and all proceeds of any of the foregoing.

Notwithstanding anything herein to the contrary, in no event shall the Collateral (or any component term thereof) include or be deemed to include (a) any Building (as defined in the applicable Flood Insurance Law) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Law), (b) any claims and causes of action of the Credit Parties under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law (whether by judgment, settlement or otherwise, and unencumbered or not) (such claims or causes of action, the "Avoidance Actions") (but shall include, for the avoidance of doubt, subject to the entry of the Final DIP Order, any proceeds of, or property received or recovered in connection with, any Avoidance

Action), (c) any claims and causes of action against any directors or officers of the Credit Parties, but including, subject only to entry of the Final DIP Order, any proceeds of, or property recovered in connection with, any successful claims and causes of action against any directors or officers of the Credit Parties, (d) any intent-to-use trademark applications of any Credit Party, or (e) Excluded Accounts.

(b)     Subject to the Carve Out, pursuant to Bankruptcy Code Section 364(c)(1) the DIP Agent has been granted a super-priority administrative claim over any and all administrative claims of the type specified in Bankruptcy Code Section 503(b) and 507(b).

SECTION 10.02. Perfection and Protection of Security Interest.

(a)     Notwithstanding the perfection of any security interest granted hereunder pursuant to the order of the Bankruptcy Court under the applicable DIP Order, each Credit Party shall, as applicable, at such Credit Party's expense, perform all steps reasonably requested by the DIP Agent at any time to perfect, maintain, protect, and enforce the Liens granted to the DIP Agent, including: upon request by the DIP Agent, delivering to the DIP Agent (1) the originals of all certificated investment property, instruments, documents, and chattel paper, and all other Collateral of which the DIP Agent determines the DIP Agent should have physical possession in order to perfect and protect the DIP Agent's security interest therein, duly pledged, endorsed, or assigned to the DIP Agent without restriction, (2) certificates of title (excluding deeds for real estate) covering any portion of the Collateral for which certificates of title have been issued and (3) all letters of credit on which such Credit Party is named beneficiary.

(b)     To the fullest extent permitted by applicable law, the DIP Agent may file one or more financing statements disclosing the Liens on the Collateral granted to the DIP Agent.

(c)     To the extent any Credit Party owns any investment property, such Credit Party agrees as follows with respect to such investment property:

(i)     All cash dividends, cash distributions, and other cash or cash equivalents in respect of such investment property at any time payable or deliverable to such Credit Party shall be deposited into either the Cash Collateral Account or such other deposit account into which the DIP Agent has an Acceptable Security Interest; and

(ii)     Such Credit Party will not acknowledge any transfer or encumbrance in respect of such investment property to or in favor of any Person other than the DIP Agent or a Person designated by the DIP Agent in writing.

(d)     To the extent the Equity Interest of any Subsidiary of a Credit Party is in certificated form, upon the DIP Agent's reasonable request, such Credit Party shall deliver all certificates or instruments at any time representing or evidencing such Equity Interest in such Subsidiary to the DIP Agent, and shall be in suitable form for transfer by delivery, or shall be accompanied by instruments of transfer or assignment, duly executed in blank, all in form and substance satisfactory to the DIP Agent. The DIP Agent shall have the right, at any time, after the occurrence and during the continuance of an Event of Default, to transfer to or to register in the name of the DIP Agent or its nominee any Equity Interest in such Subsidiary. In addition, the DIP Agent shall have the right at any time to exchange certificates or instruments representing or evidencing Equity Interest of such Subsidiaries for certificates or instruments of smaller or larger denominations.

SECTION 10.03. Delivery of Mortgages. Upon reasonable request from the DIP Agent, the applicable Credit Party shall deliver Mortgages with respect to any such Property reasonably requested in

a form reasonably satisfactory to the DIP Agent necessary to create or record a Lien on the applicable Property and other real estate in the appropriate jurisdiction.

SECTION 10.04. <u>Title to, Liens on, and Use of Collateral</u>.  Each Credit Party represents and warrants to the DIP Agent that: (a) all of the Collateral owned by such Credit Party is and will (subject to dispositions permitted hereunder) continue to be owned by such Credit Party free and clear of all Liens whatsoever, except for Liens permitted by <u>Section 6.02</u>, (b) the Liens granted to the DIP Agent in the Collateral will not be junior in priority to any Lien other than the Carve Out and the Non-Primed Excepted Liens (to the extent, and only to the extent, set forth in the DIP Orders), and (c) such Credit Party will use, store, and maintain the Collateral owned by such Credit Party consistent with past practice in all material respects. The inclusion of proceeds in the Collateral shall not be deemed to constitute DIP Agent's consent to any sale or other disposition of the Collateral except as expressly permitted herein.

SECTION 10.05. <u>Right to Cure</u>. Upon the occurrence and during the continuance of an Event of Default and upon delivery of the Remedies Notice in accordance with <u>Section 7.02</u> (including the five (5) Business Days prior delivery time period required thereunder), and subject to the DIP Orders, the DIP Agent shall have the right to pay any amount or do any act required of any Credit Party hereunder or under any other Loan Document (other than in respect of principal, interest or fees on the Loans) in order to preserve, protect, maintain, or enforce the DIP Obligations, the Collateral, or the Liens granted to the DIP Agent therein, and which any Credit Party fails to pay or do, including payment of any judgment against any Credit Party, any insurance premium, any warehouse charge, any finishing or processing charge, any landlord's or bailee's claim, and any other obligation secured by a Lien upon or with respect to the Collateral; provided that the DIP Agent shall not pay any amount (i) being contested in good faith by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP or (ii) in respect of any Lien permitted under <u>Section 6.02</u>. All payments that the DIP Agent makes under this <u>Section 10.05</u> and all out-of-pocket costs and expenses that the DIP Agent pays or incurs in connection with any reasonable action taken by it hereunder shall be considered part of the DIP Obligations and shall bear interest until repaid at the rate set forth in <u>Section 2.7(c)</u>. Any payment made or other action taken by the DIP Agent under this <u>Section 10.05</u> shall be without prejudice to any right to assert an Event of Default hereunder and to proceed thereafter as herein provided.

SECTION 10.06. <u>Power of Attorney</u>. Upon the occurrence of and during the continuance of an Event of Default, subject to the DIP Orders, and upon delivery of the Remedies Notice in accordance with <u>Section 7.02</u> (including the five (5) Business Days prior delivery time period required thereunder), each Credit Party hereby appoints the DIP Agent and the DIP Agent's designee(s) as such Credit Party's attorney to sign such Credit Party's name on any invoice, bill of lading, warehouse receipt, or other document of title relating to any Collateral, on drafts against customers, on assignments of accounts, on notices of assignment, financing statements, and other public records and to file any such financing statements permitted under this Agreement by electronic means with or without a signature as authorized or required by applicable law or filing procedure. Each Credit Party ratifies and approves all acts of such attorney. **This power, being coupled with an interest, is irrevocable until the Discharge of DIP Obligations.**

SECTION 10.07. <u>The DIP Agent's Rights, Duties, and Liabilities</u>. The Credit Parties assume all responsibility and liability arising from or relating to the use, sale, or other disposition of the Collateral. The DIP Obligations shall not be affected by any failure of DIP Agent to take any steps to perfect the Liens granted to the DIP Agent or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral release any Credit Party from any of the DIP Obligations.

SECTION 10.08. <u>Site Visits, Observations, and Testing</u>. The DIP Agent and its representatives will have the right at any commercially reasonable time, and upon at least two (2)

Business Days advance notice (unless an Event of Default has occurred and is continuing) to the applicable Credit Party to enter and visit the Properties of any Credit Party constituting or containing Collateral for the purposes of observing or inspecting such Collateral. The DIP Agent may examine, audit and make copies of any and all of the Credit Parties' books and records and the Collateral and discuss the Credit Parties' affairs with executive officers or managers of any Credit Party. No site visit, observation, or inspection by the DIP Agent will result in a waiver of any Default or Event of Default or impose any liability on the DIP Agent other than for damages incurred as a result of the gross negligence or willful misconduct by the DIP Agent as determined by a final, non-appealable order of a court of competent jurisdiction. The DIP Agent will make reasonable efforts to avoid interfering with any use of such Properties or any other property in exercising any rights provided hereunder. Notwithstanding the foregoing, no Credit Party shall be required to disclose to the DIP Agent, or any agents, advisors or other representatives thereof, any written material, (x) the disclosure of which would cause a breach of any confidentiality provision in the written agreement governing such material applicable to such Person, (y) which is the subject of attorney-client privilege or attorney's work product privilege asserted by the applicable Person, or (z) which is a non-financial trade secret or other proprietary information.

SECTION 10.09. <u>Rights in Respect of Investment Property</u>. During the existence of an Event of Default and upon delivery of the Remedies Notice in accordance with <u>Section 7.02</u> (including the five (5) Business Days prior delivery time period required thereunder), subject to any order of the Bankruptcy Court (including the DIP Orders) and the Bankruptcy Code, (i) the DIP Agent may, upon prior written notice to the relevant Credit Party, transfer or register in the name of the DIP Agent or any of its nominees, any or all of the Collateral consisting of investment property, the proceeds thereof (in cash or otherwise), and all liens, security, rights, remedies, and claims of any Credit Party with respect thereto (collectively, the "<u>Pledged Collateral</u>") held by the DIP Agent hereunder, and the DIP Agent or its nominee may thereafter, after prior written notice to the applicable Credit Party, exercise all voting and corporate rights at any meeting of any corporation, partnership, or other business entity issuing any of the Pledged Collateral and any and all rights of conversion, exchange, subscription, or any other rights, privileges, or options pertaining to any of the Pledged Collateral as if it were the absolute owner thereof, including the right to exchange at its discretion any and all of the Pledged Collateral upon the merger, consolidation, reorganization, recapitalization, or other readjustment of any corporation, partnership, or other business entity issuing any of such Pledged Collateral or upon the exercise by any such issuer or the DIP Agent of any right, privilege, or option pertaining to any of the Pledged Collateral, and in connection therewith, to deposit and deliver any and all of the Pledged Collateral with any committee, depositary, transfer agent, registrar, or other designated agency upon such terms and conditions as it may determine, all without liability except to account for property actually received by it, but the DIP Agent shall have no duty to exercise any of the aforesaid rights, privileges, or options, and the DIP Agent shall not be responsible for any failure to do so or delay in so doing, (ii) to the extent permitted under any requirements of law, after the DIP Agent's giving of the notice specified in clause (i) of this <u>Section 10.09</u>, all rights of any Credit Party to exercise the voting and other consensual rights which it would otherwise be entitled to exercise and to receive the dividends, interest, and other distributions which it would otherwise be authorized to receive and retain thereunder shall be suspended until such Event of Default shall no longer exist, and all such rights shall, until such Event of Default shall no longer exist, thereupon become vested in the DIP Agent which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Collateral such dividends, interest, and other distributions, (iii) all dividends, interest, and other distributions which are received by any Credit Party contrary to the provisions of this <u>Section 10.09</u> shall be received in trust for the benefit of the DIP Agent, shall be forthwith deposited into the Cash Collateral Accounts as Collateral in the same form as so received (with any necessary endorsement), and (iv) each Credit Party shall execute and deliver (or cause to be executed and delivered) to the DIP Agent all such proxies and other instruments as the DIP Agent may request for the purpose of enabling the DIP Agent to exercise the voting and other rights

which it is entitled to exercise pursuant to this <u>Section 10.09</u> and to receive the dividends, interest, and other distributions which it is entitled to receive and retain pursuant to this <u>Section 10.09</u>.

SECTION 10.10. <u>No Filings Required</u>. Notwithstanding anything to the contrary contained herein, (a) the Liens and security interests referred to herein shall be deemed valid and perfected by entry of the DIP Order and (b) the DIP Agent shall not be required to file or enter into any financing statements, mortgages, control agreements, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, any other Loan Document or the DIP Order; <u>provided</u> that, notwithstanding the foregoing, the DIP Agent shall from time to time, in its sole discretion, be permitted to file or enter into (and the Borrower and other Credit Parties hereby authorize the DIP Agent to file and enter into, and will, upon request from the DIP Agent, enter into) such financing statements, mortgages, control agreements, notices of Liens or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, any other Loan Document or the DIP Order.

ARTICLE XI

MISCELLANEOUS

SECTION 11.01. <u>Notices</u>.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

> (i)     if to any Credit Party, to:
>
> Cypress Environmental Partners, L.P.
> 5727 S. Lewis Avenue, Suite 500
> Tulsa, Oklahoma 74105
> Attention: Peter C. Boylan III and Jeff Herbers
> Telephone: (918) 748-3903 and (918) 947-5730
> Electronic Mail: pete@cypressenvironmental.biz and
>                             jeff.herbers@cypressenvironmental.biz
>
>
> with a copy to:
>
> Paul Hastings LLP
> 200 Park Avenue
> New York, NY 10166
> Attention: [Scott C. Shelley]
> Telephone: [(212)318-6063]
> Electronic Mail: [scottshelley@paulhastings.com]
>
>
> (ii)     if to the DIP Agent (for payments, Borrowing Requests and all other notices to the DIP Agent) to:

65

APE V Cypress, LLC
7030 South Yale Avenue
Suite 810
Tulsa, Oklahoma 74136
Email: philvt@argonautpe.com; ericw@argonautpe.com
Attention: Phil VanTrease; Eric Weeldreyer

with a copy (other than for payments or Borrowing Requests, but in any event, which copy shall not constitute notice hereunder), to:

Frederic Dorwart, Lawyers PLLC
124 East Fourth Street
Tulsa, Oklahoma 74103
Attention: Samuel Ory
Telephone: (918) 583-9913
Electronic Mail: sory@fdlaw.com

(iii)    if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)    Notices and other communications to any other Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the DIP Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the DIP Agent and the applicable Lender. The DIP Agent or the Borrower (on its behalf and on behalf of any and all other Credit Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 11.02. Waivers; Amendments.

(a)    No failure or delay by the DIP Agent in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the DIP Agent and any other Lender hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any Credit Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the DIP Agent may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the DIP Agent.

66

SECTION 11.03. <u>Expenses; Indemnity; Damage Waiver</u>.

(a)      Each Credit Party shall pay all reasonable and documented out-of-pocket expenses incurred by the DIP Agent in connection with the discussion, negotiation, preparation, execution and delivery of any documents in connection with any proposed financing of the Borrower, including the Loan Documents and the funding of all Loans under this Agreement, such costs and expenses including due diligence, syndication of this Agreement (including printing, distribution and bank meeting) transportation, duplication, messenger, audit, insurance, appraisal and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Agent in connection with this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby, the administration of this Agreement and any amendments, modifications or waivers of any provision of the Loan Documents or the transactions contemplated thereby or hereby (whether or not the transactions contemplated thereby or hereby shall be consummated), or in connection with the interpretation, enforcement or protection of any of their rights and remedies under the Loan Documents including its rights under this Section, or in connection with the Loans made hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans (in the case of legal or consultancy fees, disbursements, charges and expenses, limited to: (i) all reasonable fees, disbursements, charges and expenses of Frederic Dorwart, Lawyers PLLC, and one local counsel in each necessary jurisdiction for the DIP Agent, and in the case of an actual or perceived conflict of interest, one additional counsel in each relevant jurisdiction to the affected parties similarly situated taken as a whole, and other reasonable legal or consultancy fees, expenses and disbursements of the DIP Agent (including, without limitation, the fees, disbursements, charges, and expenses of the DIP Agent's auditors, accountants, printers, insurance and environmental advisors, and consultants and agents, including any third party consultant engaged by the DIP Agent to evaluate the Borrower and its Subsidiaries) in its sole discretion, (ii) all reasonable fees, disbursements, charges and expenses of DIP Agent).

(b)      EACH CREDIT PARTY SHALL INDEMNIFY THE DIP AGENT, AND EACH RELATED PARTY OF THE DIP AGENT (EACH SUCH PERSON BEING CALLED AN "<u>INDEMNITEE</u>"), AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY FINANCIAL ADVISOR OR COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY, (II) ANY LOAN OR THE USE OF THE PROCEEDS THEREFROM , (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY OF THE DEBTORS, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE DEBTORS, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; <u>PROVIDED</u> THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE (**IT BEING ACKNOWLEDGED AND AGREED THAT IT IS THE INTENTION OF THE PARTIES HERETO THAT THE INDEMNITEES BE INDEMNIFIED IN THE CASE**

**OF THEIR OWN NEGLIGENCE (OTHER THAN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT), REGARDLESS OF WHETHER SUCH NEGLIGENCE IS SOLE OR CONTRIBUTORY, ACTIVE OR PASSIVE, IMPUTED, JOINT OR TECHNICAL)**. IN THE CASE OF AN INVESTIGATION, LITIGATION OR OTHER PROCEEDING TO WHICH THE INDEMNITY IN THIS PARAGRAPH APPLIES, SUCH INDEMNITY SHALL BE EFFECTIVE WHETHER OR NOT SUCH INVESTIGATION, LITIGATION OR PROCEEDING IS BROUGHT BY BORROWER, ANY OF ITS RESPECTIVE DIRECTORS, SECURITY-HOLDERS OR CREDITORS, AN INDEMNITEE OR ANY OTHER PERSON, OR AN INDEMNITEE IS OTHERWISE A PARTY THERETO AND WHETHER OR NOT THE TRANSACTIONS CONTEMPLATED HEREBY ARE CONSUMMATED. FOR THE AVOIDANCE OF DOUBT, UNDER NO CIRCUMSTANCES SHALL BORROWER BE LIABLE FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES SUFFERED OR INCURRED BY ANY INDEMNITEE.

(c)     To the extent permitted by applicable law, no Credit Party shall assert, and each hereby waives, any claim against any Indemnitee or any party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with or as a result of this Agreement or any agreement or instrument contemplated hereby, any Loan or the use of the proceeds thereof. For the avoidance of doubt, the parties hereto acknowledge and agree that a claim for indemnity under Section 11.03(b), to the extent covered thereby, is a claim of direct or actual damages and nothing contained in the foregoing sentence shall limit the Credit Parties' indemnification obligations to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such Indemnitee is otherwise entitled to indemnification hereunder.

(d)     All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 11.04. Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) no Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of DIP Agent (and any attempted assignment or transfer by a Credit Party without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of the DIP Agent) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i)     Subject to the conditions set forth in paragraph (b)(ii) below, the DIP Agent may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)     the Borrower, provided that no consent of the Borrower shall be required for an assignment to an Affiliate of DIP Agent, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee;

(ii)     [Reserved]:

68

(iii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (with respect to amounts accruing during the period such Lender was a party hereto and for which such Lender was entitled to reimbursement or indemnity) and Section 11.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 11.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section. If the consent of the Borrower to an assignment is required hereunder (including a consent to an assignment that does not meet the minimum assignment thresholds specified in this Section), the Borrower shall be deemed to have given its consent ten days after the date notice thereof has been delivered by the assigning Lender (through the DIP Agent) unless such consent is expressly refused by the Borrower prior to such tenth day.

(iv)     The DIP Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the other Lenders (if any), and the Commitment of, and principal amount (and stated interest) of the Loans owing to, DIP Agent pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrower, the DIP Agent and any other Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the DIP Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.04(d), 2.05(b), 2.16(d) or 11.03, the DIP Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)     DIP Agent may sell participations to one or more banks or other entities (a "Participant"), other than Borrower or any Affiliate thereof or any natural person (or any company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person or relative(s) thereof), in all or a portion of DIP Agent's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it).

(d)      DIP Agent may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of DIP Agent, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 11.05. Survival. All covenants, agreements, representations and warranties made by the Credit Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the DIP Agent may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.13, 2.14, 2.15 and 11.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 11.06. Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the DIP Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the DIP Agent and when the DIP Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 11.07. Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 11.08. Right of Setoff. If an Event of Default shall have occurred and be continuing, subject to the DIP Orders and any other order of the Bankruptcy Court related to the account that provides cash collateral with respect to utilities, and upon delivery of the Remedies Notice in accordance with Section 7.02 (including the five (5) Business Days prior delivery time period required thereunder), each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of any Credit Party against any of and all the obligations of any Credit Party now or hereafter existing under this Agreement or any other Loan Document held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured. The rights of each Lender

70

under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender may have.

SECTION 11.09. <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)     THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF OKLAHOMA EXCEPT TO THE EXTENT THE LAW OF THE STATE OF OKLAHOMA IS SUPERSEDED BY THE BANKRUPTCY CODE.

(b)     EACH CREDIT PARTY HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT (INCLUDING WITH RESPECT TO THE EXERCISE OF EVENTS OF DEFAULT AND REMEDIES BY THE DIP AGENT, ANY LENDER AND PRESERVATION OF THE DIP COLLATERAL'S VALUE) OR, TO THE EXTENT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION, TO THE UNITED STATES SOUTHERN DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS AND ANY APPELLATE COURT THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, AND EACH CREDIT PARTY HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM. THE DIP AGENT MAY NOT BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION.

(c)     Each Credit Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 11.01</u>. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 11.10. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 11.11. <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 11.12. <u>Confidentiality</u>.

(a)      Each of the DIP Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that (A) the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and (B) in any event, any subsequent disclosure by its or its Affiliates' directors, officers or employees shall be deemed to be, and treated as if it were, a disclosure by, as applicable, the DIP Agent or such Lender), (ii) to the extent requested by any regulatory or self-regulatory authority, (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iv) to any other party to this Agreement, (v) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section, to (x) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (y) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Credit Party and its obligations, (vii) with the consent of the Borrower or (viii) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the DIP Agent on a nonconfidential basis from a source other than Credit Parties. For the purposes of this Section, "<u>Information</u>" means all information received from Borrower relating to any Credit Party or their respective businesses, other than any such information that is available to the DIP Agent on a nonconfidential basis prior to disclosure by any Credit Party. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)      **EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 11.12(a) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

(c)      **ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY ANY CREDIT PARTY OR THE DIP AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE CREDIT PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE DIP AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.**

SECTION 11.13. <u>Interest Rate Limitation</u>.

Each Credit Party, the DIP Agent and any other Lender (if any) intend to strictly comply with all applicable laws, including applicable usury laws. Accordingly, the provisions of this <u>Section 11.13</u> shall govern and control over every other provision of this Agreement or any other Loan Document that

conflicts or is inconsistent with this <u>Section 11.13</u>, even if such provision declares that it controls. As used in this <u>Section 11.13</u>, the term "interest" includes the aggregate of all charges, fees, benefits or other compensation which constitute interest under applicable law, provided that, to the maximum extent permitted by applicable law, (a) any non-principal payment shall be characterized as an expense or as compensation for something other than the use, forbearance or detention of money and not as interest, and (b) all interest at any time contracted for, reserved, charged or received shall be amortized, prorated, allocated and spread, in equal parts during the full term of the DIP Obligations. In no event shall any Credit Party or any other Person be obligated to pay, or Lender have any right or privilege to reserve, receive or retain, (i) any interest in excess of the maximum amount of nonusurious interest permitted under the applicable laws (if any) of the United States or of any other applicable state or (ii) total interest in excess of the amount which such Lender could lawfully have contracted for, reserved, received, retained or charged had the interest been calculated for the full term of the DIP Obligations at the Highest Lawful Rate. On each day, if any, that the interest rate (the "<u>Stated Rate</u>") called for under this Agreement or any other Loan Document exceeds the Highest Lawful Rate, the rate at which interest shall accrue shall automatically be fixed by operation of this sentence at the Highest Lawful Rate for that day, and shall remain fixed at the Highest Lawful Rate for each day thereafter until the total amount of interest accrued equals the total amount of interest which would have accrued if there were no such ceiling rate as is imposed by this sentence. Thereafter, interest shall accrue at the Stated Rate unless and until the Stated Rate again exceeds the Highest Lawful Rate when the provisions of the immediately preceding sentence shall again automatically operate to limit the interest accrual rate. The daily interest rates to be used in calculating interest at the Highest Lawful Rate shall be determined by dividing the applicable Highest Lawful Rate per annum by the number of days in the calendar year for which such calculation is being made. None of the terms and provisions contained in this Agreement or in any other Loan Document that directly or indirectly relate to interest shall ever be construed without reference to this <u>Section 11.13</u>, or be construed to create a contract to pay for the use, forbearance or detention of money at an interest rate in excess of the Highest Lawful Rate. If the term of any Obligation is shortened by reason of acceleration of maturity as a result of any Event of Default or by any other cause, or by reason of any required or permitted prepayment, and if for that (or any other) reason Lender at any time, including but not limited to, the stated maturity, is owed or receives (and/or has received) interest in excess of interest calculated at the Highest Lawful Rate, then and in any such event all of any such excess interest shall be canceled automatically as of the date of such acceleration, prepayment or other event which produces the excess, and, if such excess interest has been paid to such Lender, it shall be credited pro tanto against the then-outstanding principal balance of the Borrower's obligations to such Lender, effective as of the date or dates when the event occurs which causes it to be excess interest, until such excess is exhausted or all of such principal has been fully paid and satisfied, whichever occurs first, and any remaining balance of such excess shall be promptly refunded to its payor.

SECTION 11.14. <u>No Third Party Beneficiaries</u>. This Agreement, the other Loan Documents, and the agreement of the Lender to make Loans hereunder are solely for the benefit of the Borrower, and no other Person (including, without limitation, any Subsidiary of Borrower, any obligor, contractor, subcontractor, supplier or materialman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the DIP Agent for any reason whatsoever. There are no third party beneficiaries.

SECTION 11.15. <u>NO ORAL AGREEMENTS</u>. THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

SECTION 11.16. <u>DIP Orders</u>. In the case of any conflict or inconsistency between the terms of this Agreement and the DIP Orders, the terms of the DIP Orders shall govern and control.

[*Signature Pages Follow*]

LEGAL_US_W # 112048364.6

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BORROWER**:

**CYPRESS   ENVIRONMENTAL   PARTNERS,   L.P.**, a Delaware limited partnership

By:_____

Name:_____

Title:_____

**GUARANTORS**:

[_____]

By:_____

Name:_____

Title:_____

[*Signature Page to Credit Agreement*]

**APE V CYPRESS, LLC**, 
a Delaware limited liability company, as DIP Agent and a Lender

By: APE V Management, LLC, its Manager

By_____
Name: Phil VanTrease
Title:  Chief Financial Officer

[*Signature Page to Credit Agreement*]

## Exhibit 2 to Interim DIP Order

**DIP Budget**

**Cypress Environmental Partners DIP Cash Forecast**
$ in 000's

|  | 1<br>May 13, 22<br>Fcst | 2<br>May 20, 22<br>Fcst | 3<br>May 27, 22<br>Fcst | 4<br>Jun 3, 22<br>Fcst | 5<br>Jun 10, 22<br>Fcst | 6<br>Jun 17, 22<br>Fcst | 7<br>Jun 24, 22<br>Fcst | 8<br>Jul 1, 22<br>Fcst | Emergence<br>9<br>Jul 8, 22<br>Fcst | 9-Week<br>Forecast<br>Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | |
| Inspection Receipts | $ 758 | $ 357 | $ 843 | $ 2,102 | $ 1,995 | $ 2,620 | $ 1,823 | $ 669 | $ 1,762 | $ 12,929 |
| Water & Environmental Receipts | 132 | 33 | 191 | 30 | 127 | 36 | 248 | 32 | 157 | 986 |
| Other Receipts | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Receipts** | $ 891 | $ 390 | $ 1,033 | $ 2,133 | $ 2,122 | $ 2,655 | $ 2,071 | $ 701 | $ 1,919 | $ 13,914 |
| **Operating Disbursements** | | | | | | | | | | |
| Inspection Payroll | $ (1,494) | $ (1,388) | $ (1,368) | $ (1,408) | $ (1,421) | $ (1,449) | $ (1,424) | $ (1,425) | $ (1,425) | $ (12,803) |
| Water & Environmental Payroll | - | (26) | - | (26) | - | (26) | - | (26) | - | (105) |
| Corporate Payroll | (306) | (26) | (306) | (26) | (26) | (306) | (26) | (306) | (26) | (1,354) |
| **Total Payroll** | $ (1,800) | $ (1,441) | $ (1,674) | $ (1,460) | $ (1,447) | $ (1,781) | $ (1,450) | $ (1,757) | $ (1,451) | $ (14,262) |
| Vendor Payments | (52) | (115) | (226) | (597) | (87) | (148) | (384) | (830) | (132) | (2,572) |
| Income and property taxes | - | - | - | (2) | - | - | - | - | - | (2) |
| Other disbursements | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | $ (1,853) | $ (1,556) | $ (1,900) | $ (2,059) | $ (1,535) | $ (1,930) | $ (1,834) | $ (2,587) | $ (1,583) | $ (16,836) |
| **Operating Cash Flow** | $ (962) | $ (1,166) | $ (867) | $ 73 | $ 588 | $ 726 | $ 237 | $ (1,886) | $ 336 | $ (2,922) |
| **Total Interest & Fees** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Company Advisors | $ - | $ - | $ - | $ - | $ (177) | $ - | $ - | $ - | $ (2,695) | $ (2,872) |
| Secured Lender Advisors | - | - | - | - | (113) | - | - | - | (108) | (221) |
| UCC Advisors | - | - | - | - | - | - | - | - | (250) | (250) |
| Other One-Time Expenditures | (50) | - | - | - | - | - | - | - | (500) | (550) |
| **One Time Expenditures** | $ (50) | $ - | $ - | $ - | $ (290) | $ - | $ - | $ - | $ (3,553) | $ (3,893) |
| **Net Cash Flow** | $ (1,012) | $ (1,166) | $ (867) | $ 73 | $ 298 | $ 726 | $ 237 | $ (1,886) | $ (3,217) | $ (6,815) |
| Beginning Cash Balance | $ 3,568 | $ 2,556 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,568 |
| Net Cash Flow | (1,012) | (1,166) | (867) | 73 | 298 | 726 | 237 | (1,886) | (3,217) | (6,815) |
| DIP Borrowings/(Repayments) | - | 1,610 | 867 | (73) | (298) | (726) | (237) | 1,886 | 1,900 | 4,930 |
| **Ending Cash Balance** | $ 2,556 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 1,684 | $ 1,684 |
| **DIP Facility Balance** | $ - | $ 1,660 | $ 2,530 | $ 2,461 | $ 2,167 | $ 1,446 | $ 1,211 | $ 3,100 | $ 5,000 | $ 5,000 |